# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF LOUISIANA
### LAKE CHARLES DIVISION

NICOLE EDWARDS                           CIVIL ACTION NO. 2:19-cv-01150

       *Versus*                           JUDGE JAMES D. CAIN, JR.

CITY OF LAKE CHARLES, ET AL      MAGISTRATE JUDGE: KATHLENE KAY
**************************************************************************

## MEMORANDUM IN SUPPORT PLAINTIFF'S *DAUBERT* MOTION IN LIMINE TO EXCLUDE THE TESTIMONY OF TERRY ANDERSON

Plaintiff, Nicole Edwards, moves this Honorable Court to exclude the "expert" testimony and report of Defendants' witness, Terry Anderson, whose report offers legal conclusions as opinions, unduly credits the Defendants' factual assertions, offers opinion testimony that appears to be both irrelevant and unsupported by data or proper methodology, and is litigation driven.

### I.        Relevant Factual History

When K-9 Bobby was brought from Europe to the United States, he had no certifications. For two years of K-9 Bobby's life in Europe, there are no records of his training. K-9 Bobby was transferred from a kennel in Europe to someone in Texas before being purchased by Lake Charles Police Department. The first owner of K-9 Bobby found him defective and returned him to the breeder according to Lake Charles Police Department records only in the United States in Broussard Louisiana. Exhibit P-4. K-9 Bobby was not originally certified for police pursuit, and was originally certified for four types of drugs, and later certified for police pursuit. Exhibit P-4. K-9 Bobby was not KNVP Certified in Europe. The Lake Charles Police Department inquired whether K-9 Bobby was KNVP Certified prior to purchase. An email from World Wide Canine informed the Lake Charles Police Department that their offered K-9 dog was not KNVP Certified, and that dog was rejected by the department for this reason. Exhibit P-4. Lake Charles Police

Department training records for K-9 Bobby demonstrate that he performed well in detecting narcotics, but had difficulties maintaining his bite and disengaging in decoys. Exhibit P-40.[1] K-9 Bobby was not trained to bite during his formative two years in Europe, was never KNVP certified, and did not perform any bite work until October 5, 2015. Exhibit P-40 pg. 43.[2]

On May 3, 2019, Nicole Edwards, her brother, Tyrone Edwards, and her fiancé, Glenn lemon, were on a road trip from New Orleans with a destination of Houston, Texas. Exhibit P-59 Edwards Deposition 17:3-17:23. The purpose of the road trip was to go and meet with Ms. Edwards' attorneys in Houston regarding an automobile accident case unrelated to the present matter. Exhibit P-59 Edwards Deposition 17:3 - 20:4. On this road trip, the trio made a stop at a gas station in Lake Charles, Louisiana to get gasoline. Exhibit P-59 Edwards Deposition 20:5-21:10. This stop at the service station forms the basis of this lawsuit.

Defendant Corporal Falcon and Defendant Officers Baccigalopi, Pearson, and Ewing (herein after "Defendant Officers") entered the premises of the gas station allegedly due to citizen calls which stated that a man was at a gas pump with his shirt off. Exhibit P-57 Ewing Deposition 17:13-24. Officer Ewing made contact with Glenn Lemon, who was shirtless, and placed him in handcuffs, and put him in the back of a police vehicle. Exhibit P-57 Ewing Deposition 20:10-13; 17:13-18:16; Exhibit P-56 Falcon Deposition 18:1-18:9. Officer Falcon placed Ms. Edwards brother, Tyrone Edwards, in the back of his police vehicle as well. Exhibit P-57 Ewing Deposition 17:13-18:16; Exhibit P-56 Falcon Deposition 18:1-18:9. Officer Ewing also made contact with Ms. Edwards, and testified that she was "real compliant." Exhibit P-57 Ewing Deposition 22:2-17. Ms. Edwards had no outstanding warrants (Exhibit P-57 Ewing Deposition 30:1-6) and was not arrested or detained as Mr. Edwards and Mr. Lemon were.

---

[1] This exhibit has been filed previously in the record under seal.
[2] *Id.*

Nicole Edwards was not arrested nor was she instructed not to leave the scene. Exhibit P-57 Ewing Deposition 17:13-19:9. Defendant Officer Ewing spoke to Ms. Edwards at the hood of the rented vehicle, then left Ms. Edwards to talk to Defendant Corporal Falcon. *Id.* After Defendant Ewing and Defendant Corporal Falcon talk for some time, they notice Ms. Edwards left the scene. *Id*.

Ms. Edwards walked away to call her mother when she heard the officers say there was a warrant for her brother's arrest. Exhibit P-59 Edwards Deposition 31:10-34:1, 34:18-35:15, 39:4-39:16. Ms. Edwards was still on the premises of this gas station and had full view of the officers while they detained and questioned her travelling companions. While Ms. Edwards waited for her mother to call her back, she sat down in the grass and fell asleep, as it was in the very early morning hours and she had been travelling for some time. Exhibit P-59 Edwards Deposition 44:3-45:4. Defendant Officers begin looking for Ms. Edwards after Defendant Corporal Falcon suggests that she might have contraband in her purse. Defendant Corporal Falcon offers no reason for this theory. After Defendant Officers search on foot for Ms. Edwards for some time, Defendant Officer Pearson retrieves K-9 Officer Bobby (herein after "K-9 Bobby) from his police vehicle and begins using K-9 Bobby to search for Ms. Edwards. Exhibit P-57 Edwards Deposition 19:22-20:13.

Body camera footage shows K-9 Bobby catch Ms. Edwards' trail, rush to where Ms. Edwards is located sitting on the ground, unarmed. Exhibit P-1, P-1a. The body camera footage shows K-9 Bobby attack Ms. Edwards without receiving any order to do so, latching onto Ms. Edwards' leg and rip into her flesh repeatedly. *Id*. While Defendant Officer Pearson gives K-9 Bobby multiple commands to release Ms. Edwards, K-9 Bobby does not release Ms. Edwards, who is unarmed and poses no threat. *Id*. When K-9 Bobby remained undeterred by Defendant Officer Pearson's commands, he begins striking the dog numerous times on the head and side of its body to physically coerce K-9 Bobby off of Ms. Edwards. *Id*. Ms. Edwards begged and cried

for Defendant Officers to remove K-9 Bobby from her leg. *Id*. However, K-9 Bobby remained clamped down on her leg even while Ms. Edwards was handcuffed. *Id*. P-57 Ewing Deposition 22:21-23:6, 27:4-27:8. Ms. Edwards had no weapons, did not resist arrest, and did not fight Defendant Officers or K-9 Bobby as he ripped into her flesh and latched on her leg. Exhibit P-1, P-1a.

Defendant Officers ran a background check on Ms. Edwards prior to the K-9 pursuit, to which she came back as "clear", and had no reason to believe she was a threat or in any way dangerous prior to pursuing her.

Officer Ewing, who was the only officer who made contact with Ms. Edwards directly, testified that he did not place Ms. Edwards under arrest until *after* the canine bite complained of herein had occurred. Exhibit P-57 Ewing Deposition 22:21-23:11. In fact, Officer Ewing stated that he had no probable cause to arrest Ms. Edwards. Exhibit P-57 Ewing Deposition 23:2-11. During Officer Ewing's deposition, he lamented that he should have detained Ms. Edwards along with Tryone Edwards and Glenn Lemon, and that, had he have detained her, "we [wouldn't] be sitting here today if [he] would have done that." Exhibit P-57 Ewing Deposition 22:2-17; 46:3-13.

Officer Ewing testified that the canines are only to be used when a suspect is being charged with a felony offense, and that in previous situations he had asked for a canine to be deployed only to be told "no" because the suspect was only being charged with misdemeanor offenses. Exhibit P-57 Ewing Deposition 36:4-17. Interestingly though, Ms. Edwards was only charged with misdemeanor offenses, yet a canine was deployed on her as a weapon. 38:1-39:14. When Officer Ewing was asked why the canine was deployed on Ms. Edwards despite her charges being only misdemeanors, he recounted the felony charges *of her travelling companions* as being the reasoning. Exhibit P-57 Ewing Deposition 38:1-39:10. As stated *supra*, Officer Ewing placed Ms.

Edwards in handcuffs while the canine was latched onto her leg. When asked if it was permissible to continue to exert force over a suspect that has been subdued and placed in handcuffs, he said that it was not but that he cannot remove a canine off of a suspect as he is not a K-9 officer. Exhibit P-57 Ewing Deposition 40:20-41:3.

Ms. Edwards testified that Defendant Officers delayed her medical care and refused to allow ambulance paramedics to tend to Ms. Edwards in order for Defendant Officers to question her about her purse. Exhibit P-59 Edwards Deposition 57:1-59:1.

## II. Law and Argument
### A. <u>Standard of Review</u>

Federal Rule of Evidence 702 controls the admission of expert testimony. Under Rule 702, the Court's gatekeeping function first involves determining whether the expert is qualified; then it "involves a two-part inquiry into reliability and relevance:"

> "First, the Court must determine whether the proffered expert testimony is reliable. The party offering the testimony bears the burden of establishing its reliability by a preponderance of the evidence. The reliability inquiry requires the Court to assess whether the reasoning or methodology underlying the expert's testimony is valid. The aim is to exclude expert testimony based merely on subjective belief or unsupported speculation. Second, the Court must determine whether the expert's reasoning or methodology is relevant. The question here is whether the reasoning or methodology "fits" the facts of the case and will thereby assist the trier of fact to understand the evidence."

*Burst v. Shell Oil Co.*, 120 F. Supp. 3d 547, 550 (E.D. La. 2015) (citations omitted).

*Daubert,* and its attendant Fifth Circuit jurisprudence, mandates that the court must serve a gatekeeper function in assessing whether the proffered expert evidence is reliable and relevant. *Curtis v. M&S Petroleum, Inc.*, 174 F.3d 661, 668 (5th Cir. 1999); *Watkins v. Telesmith, Inc.,* 121 F.3d 984, 988-89 (5th Cir. 1997) ("the inquiry envisioned by Rule 702 is, we emphasize, a flexible

one. This gatekeeper function is not limited to scientific experts but instead extends to all expert testimony. *Kumho Tire Co., Ltd. v. Carmichael,* 526 U.S. 137, 147 (1999). Its overarching subject is the scientific validity and thus the evidentiary relevance and reliability – of the principles that underlie a proposed submission." (quoting *Daubert*, 509 U.S. at 594-95). A district court has broad discretion to exclude an expert report. Fed. R. Evid 702.

The *Daubert* court set out five flexible, non-exclusive, and non-dispositive factors or guideposts for courts to assess admissibility:

> These factors include: (1) whether the expert's theory can be or has been tested; (2) whether the theory has been subject to peer review and publication; (3) the known or potential rate of error of a technique or theory when applied; (4) the existence and maintenance of standards and controls; and (5) the degree to which the technique or theory has been generally accepted in the scientific community.

*Moore v. Ashland Chem. Inc.,* 151 F.3d 269, 275 (5th Cir. 1998)(citing *Daubert,* 509 U.S. at 593-95).

While Federal Rule of Evidence 704 allows experts to present opinions that "embrace an ultimate issue," the rule **does not** allow an expert to present legal conclusions. *United States v. Izydore,* 167 F.3d 213, 218 (5th Cir. 1999)(citing *Owen v. Kerr-Mcgee Corp.,* 698 F.2d 236, 240 (5th Cir. 1983)).

**Courts also consider whether the expert's findings are litigation-driven or results-driven.** *See Daubert v. Merrell Dow Pharm., Inc.*, 43 F.3d 1311, 1317 (9th Cir. 1995) (Daubert II). In making this assessment, courts have considered "whether experts are 'proposing to testify about matters growing naturally and directly out of research they have conducted independent of the litigation, or whether they have developed their opinions expressly for purposes of testifying.'" *Burst*, 120 F. Supp. 3d at 551 (quoting Daubert II, 43 F.3d at 1317)).

As to relevance, the Court must determine whether the proffered expert testimony is sufficiently tied to the facts in issue that it will aid the jury. *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 591 (1993) (holding that the district court's "gatekeeping role" requires ensuring that the expert testimony "is relevant to the task at hand"). "The question here is whether the reasoning or methodology 'fits' the facts of the case and will thereby assist the trier of fact to understand the evidence." *Burst*, 120 F. Supp. 3d at 551 (emphasis added).

**B.** **Mr. Anderson's Report Fails the Reliability Standard of *Daubert.***

 Terry Anderson has never been admitted by any court as an expert in police canine apprehension techniques. Anderson is the current president of the National Police Canine Association ("NCPA") Defendant Officer Pearson is certified with and is a member of the NCPA. Together with K9 Bobby, Officer Pearson is registered as a "team" with the NCPA. In a prior matter also within the Western District of Louisiana, Mr. Terry Anderson testified that as president of the NCPA, he would never find against a member of the NCPA as that would create an incurable conflict of interest for himself. Specifically, in deposition, Mr. Anderson relevantly testified as follows:

> **A. What you're asking is a plaintiff who was injured by a police K-9 have I ever assisted them or wrote a report for them.**
> Q. Well not that. We can get to that in just a second. I'm asking have you ever been asked by such a person to review their case?
> **A. No, sir.**
> Q. Would you ever do that?
> **A. I would review it, yes, sir.**
> Q. And would you if you saw that there was a violation would you write a report for them?
> **A. If that officer was in the right and he was in the wrong, yes, sir, I would.**

Exhibit B, Anderson Deposition 45:14-46:1 (emphasis added). Mr. Anderson states that he would write a report for an injured plaintiff if the plaintiff was in the *wrong* and the *officer was in the right*. Mr. Anderson goes on to testify:

Q. Now, you're the president of the NPCA [sic], right?

**A. Correct.**

Q. If there was a -- let's say you had one of these injured plaintiffs that came to you who has been injured by police K-9 and the defendant is a member of the NPCA [sic], would you as the president write an expert report if you found a violation for -- in such a case?

**A. Absolutely not. I don't get involved with those cases through NPCA [sic]. The only advice or representation of an expert witness that I would provide on behalf of NPCA [sic] is in the event the certification, integrity of the certification is being questioned. If there is any question regarding a department case whatever the case maybe, if it does not involve the integrity of my certification NPCA [sic] does not get involved. If it does involve the integrity of my certification then I will find somebody to represent NPCA [sic] with that in that situation.**

Q. All right. Let me make sure we're on the same page. So if a plaintiff whose been injured by a K-9, police K-9 comes to you requesting you to review the case and provide an expert report and the offending K-9 belongs to an agency that is a member of the NPCA [sic], are you telling me that you would under take that case or that you would not?

**A. Would not.**

Q. And is that because you may have a conflict of interest?

**A. Absolutely.**

Exhibit B, Anderson Deposition 46:2-47:2 (emphasis added).

Q. Is it accurate to say that you as the president of NPCA [sic] would not provide an expert opinion that a member of your organization violated any individual's Constitutional Rights?

**A. I'm not going to get involved with that at all, no, sir. I will not.**

Q. So you would not provide an opinion for any NPCA [sic] member other than upholding the actions of that NPCA [sic] member?

A. What I have to do is make sure that if I discuss anything with anybody that's an NPCA [sic] member is to determine whether or not NPCA [sic] certification is being questioned.

Exhibit B, Anderson Deposition 48:1-10 (emphasis added).

In this matter, canine handler Defendant Officer Pearson testified that he is NCPA certified through the Lake Charles Police Department. Mr. Anderson's report is thus unreliable as he has plainly stated his bias in official proceedings. It is clear based on this testimony that Mr. Anderson cannot serve as an independent and detached expert. Thus, his testimony is inherently inappropriate in these proceedings. This is particularly illustrated in his upholding of Officer Pearson's actions, including lifting and choking K-9 Bobby while K-9 Bobby was still attached to and tearing Ms. Edwards' leg. In the case cited above, also in the Western District of Louisiana,

Mr. Anderson testified that this maneuver, called a "choke off," can exacerbate the bite and create a more serious injury - just as the Plaintiff has alleged in this matter. Exhibit B, Anderson Deposition 18:5-19. Additionally, Mr. Anderson testified that the industry standard calls for 16 hours a month of training. Exhibit B, Anderson Deposition 23:16-18. Mr. Anderson also testified that when a K-9 is commanded to release the bite, the K-9 is expected to release the bite. Exhibit B, Anderson Deposition 35:5-7. In this case, Officer Pearson commanded K-9 Bobby nine (9) times to release the bite and hit K-9 Bobby on the nose and head to no avail (Exhibit P-1, P-1A).

Plaintiff's police canine expert Mr. Ernest Burwell discusses the proper procedure for when a police canine bites a suspect:

> There is hardly ever a reason to allow a dog to bite a human for an extended period of time. When the dog bites someone, the officer must quickly, with back up officers, do what Taser teaches. They teach back up officers to get control holds of the suspect immediately. Similarly, the dog needs to be called off the bite, secured on leash, so that the struggle between the dog and suspect stops and backup officers can more safely and quickly conduct handcuffing procedures. Exhibit P-52 pg. 8, P-52A

Here, as evidenced by body cam video, Officer Pearson did not follow this procedure. Officer Pearson did not get control of K-9 Bobby immediately, as he is seen repeatedly trying to get K-9 Bobby to release unsuccessfully. Exhibit P-1, P-1a. Officer Pearson commanded, choked, slapped, lifted the dog's front legs off the ground while choking it, but was unable to get the dog to release its bite on Ms. Edwards. *Id*.; Exhibit P-52 pg. 19, P-52A. None of these methods are appropriate for controlling a police canine bite. Further, Officer Pearson did not have a backup officer trained in police canine handling. K-9 Bobby and Officer Pearson would not pass the NPCA standards for release. Exhibit P-27 pg. 13). These NPCA standards are from Mr. Anderson's organization, which K-9 Bobby and Officer Pearson violated.

None of the officers, including Officer Pearson, was adequately trained on the Use of Force Continuum of Lake Charles Police Department's Use of Force Policy. Exhibits P-55 Baccigalopi Deposition 18:24-19:9; P-57 Ewing Deposition 31:6-31:23; P-58 Pearson 99:10-99:15. In deposition, none of the officers were well versed on the use of force continuum. *Id*. While some officers knew that a police canine may be used for tracking in cases of a felony, Officer Pearson and K-9 Bobby were sent out to track down Ms. Edwards for alleged misdemeanor offenses. Further, Officer Pearson did not have his supervisor's permission to deploy his K-9. Exhibit P-58 Pearson Deposition 142:22-142:25. In deposition, Officer Pearson stated that he did not have to ask his supervisor. However, page one of the Canine Unit Operation policy states that Patrol Lieutenants are responsible for deployment of K-9 teams. Exhibit P-17.

Clearly, and most likely based on his stated bias, Mr. Anderson is unwilling to hold Officer Pearson and the Lake Charles Police Department to the standards which the NPCA, the organization which he is president of, requires. *See* Exhibit P-27 pg. 13. Thus, his opinion is inherently unreliable and the inquiry into the propriety of Mr. Anderson's testimony could end here.

C. **Mr. Anderson's Report is Inadmissible Because Mr. Anderson Invades the Province of the Jury by Attempting to Determine Facts at Issue Couched as "Expert" Opinion.**

Mr. Anderson seeks to testify primarily as to the factual matters in this case. Anderson concludes the actions of all parties, their thoughts, and motivations, despite conflicting testimony and direct video evidence, and then uses those factual conclusions to support his bald assertions that the police were justified in their use of force. Anderson does not address the conflicting testimony from Plaintiff, and instead offers opinions as to what Plaintiff knew at the time of the officer's contact, as though looking through a crystal ball. What's more, Anderson does not address

Defendant Officer Ewings' own testimony in which he stated that he did not detain Ms. Edwards and that he lacked probable cause to place her under arrest. Exhibit P-57 Deposition Ewing 18:20-23, 21:22-22:17, 23:5-23:11, 32:17-33:17, 46:3-46:13. The Fifth Circuit as well as Louisiana state courts have made clear that it is wholly improper for an expert to invade the province of the jury by determining issues of material fact. *See United States v. Deville,* 278 F.3d 500, 506 (5th Cir. 2002); *United States v. Rasco,* 123 F.3d 222, 229 (5th Cir. 1997); *Henson v. Odyssea Vessels, Inc.*, 2008 U.S. Dist. LEXIS 12026, at *6 (E.D. La. Feb. 15, 2008)

In an excellent illustration of Mr. Anderson's inappropriate invasion of the province of the jury (as well as inappropriate testimony regarding legal conclusions, to be discussed below), Mr. Anderson states on page 20 of his report:

> In my professional opinion the utilization of Canine Bobby by Officer Pearson as a less than lethal force option to arrest Nicole was reasonable, lawful, and consistent with modern police practices, industry standards and in accordance with State and Federal Law, LCPD's General orders regarding the Use of Force and Canine Policies. **Therefore, the defendant is NOT responsible for violating plaintiff's civil rights.** The deployment of Canine Bobby was totally in response to Nicole's evasion/fleeing, her active resistance and refusal to comply with lawful orders and allow officers to affect her arrest created their use of force and the severity of her injury. **Any allegation that Officer Pearson intentionally or willfully used excessive force against Nicole is "NOT" true.** Officer Pearson's actions was a justified use of force in Nicole's arrest.

Exhibit A, Anderson Report (emphasis is his own). Just in this one quote, Mr. Anderson not only takes it upon himself to determine the truth of the matter at issue, he also arrives at ultimate legal conclusions. Notably, Mr. Anderson willfully disregards the Defendants' own testimony and Officer Ewing's testimony – specifically that it was testified to that Ms. Edwards was not resisting in any way, was compliant, and that the officers lacked probable cause to place her under arrest. Exhibit P-57 Deposition Ewing 18:20-23, 21:22-22:17, 23:5-23:11, 32:17-33:17, 46:3-46:13; Exhibit P-1a, P-2a. Likewise, it seems that Mr. Anderson did not even fully read the Lake Charles

Police Department's own policy manual, as there is no mention of canines in the policy being used as use of force, much less does it state if the use of canine falls under a "lethal" or "less than lethal" use of force. In fact, the Defendant's own officers did not even know where a canine fell as a use of force in their own policy. Exhibit P-55 Baccigalopi Deposition 21:12-21:23. Further, Mr. Anderson neglects to address whether canine units are to be used only for felony offences. Exhibit P-57 Ewing Deposition 35:19-36:17.

Mr. Anderson, who was not present for the attack and has not ever interviewed the Plaintiff, states in his report that Ms. Edwards "knew that the police were actively looking for her because she had just fled from officers. Her actions were not that of an innocent child's game of hide and seek, her actions were that of a person fleeing from the police because she was involved in criminal offenses." Exhibit A, Anderson Report pg. 11. Mr. Anderson also states, "Nicole [Plaintiff] saw Bobby and Officer Pearson moving in the direction she was hidden so she got up and ran to another location hoping they would not find her." *Id.* Mr. Anderson then, on the same page cited above, refers to Ms. Edwards' deposition testimony in which she stated that she walked away to call her mother upon seeing that her two male companions, and thus her means of transportation, were likely being taken by the police, and then Mr. Anderson "expertly" determines Ms. Edwards' credibility by stating, "It is more plausible that Nicole saw Officer Pearson and Bobby approaching her original hiding spot from the east and ran away again. Her continued action of evading the police is active resistance because she refused to surrender to a lawful arrest." *Id.* Mr. Anderson further questions Plaintiff's credibility stating "Nicole intentionally hid from Officer Peason and before Bobby found her. Clearly, Nicole knew they were getting close to her hiding spot. She could hear and see their approach but chose to stay hidden from their view." Exhibit A Anderson Report pg. 17.

Again, not only does Mr. Anderson unilaterally determine Ms. Edwards' credibility, he attempts to determine the truth of the matter at hand – even though his speculations are not supported by any deposition testimony or by any of the extensive body-cam footage, all materials which he should have reviewed. Another example of this can be found on page 9 of his report, in which he states:

> Nicole, knowing the vehicle contained illegal drugs and a firearm slowly walked away from the officers to avoid being arrested. The actions of the two officers, although tactically un-safe, did not give Nicole permission to flee the scene to avoid potentially being arrested. Any person given a lawful order from a police officer while conducting a criminal investigation has a lawful obligation to follow that command. A person who has not violated any laws would not just walk away from an active criminal investigation unless they had something to hide. Nicole's action of fleeing from the police officers, either fast or slow, was unlawful and resulted in additional criminal charges in this investigation. Nicole had every opportunity to surrender peacefully to the officers, but she chose to evade them.

Exhibit A, Anderson Report pg 9. Again, Mr. Anderson disregards Ms. Edwards' testimony in which she did not know about any firearm or drugs in the vehicle. Exhibit P-59 Edwards Deposition 25:25-26:3, 38:5-38:18. This vehicle was not Ms. Edwards', she had no control over it, and was unaware of the contents other than her own belongings. Exhibit P-59 23:17-23:18. Additionally, all charges brought against Ms. Edwards were dropped very quickly by the District Attorney. Exhibit P-67, P-59 98:14-98:25. It is well established that being charged with an offense does not de facto imply guilt for the commission of said offense. Mr. Anderson attempts to use this information to determine Ms. Edwards' credibility for the jury and couples it with his own anecdotal personal opinions that a person who has nothing to hide would do whatever the police wanted. Mr. Anderson's personal and anecdotal opinions are not factual nor based in any reality which Mr. Anderson can cite, other than his own mind. Clearly, such testimony would unjustly invade the province of the jury and would greatly prejudice Plaintiff as Mr. Anderson

inappropriately determines her credibility. The jury is likely to be confused in its role should such testimony be heard.

Another case within the Fifth Circuit has very helpfully analyzed such a circumstance where an expert invades his purview in the context of a use-of-force case:

> While [defendants' expert] is a qualified expert in law enforcement, his opinions on probable cause and the reasonableness of the force used by the BRPD officers when arresting Plaintiff are inherently unreliable … **Although he has no personal knowledge relative to Plaintiff's July 9 arrest, [defendants' expert] essentially engages in a credibility determination and appears to accept, *in toto*, Defendants' version of events.** After making those credibility determinations, [defendants' expert] concludes that on July 9, Plaintiff in fact stepped into the roadway and "impeded the flow of traffic" in violation of La. R.S. § 14:97; "failed to comply [with BRPD's] law orders"; and "acted in a resistant manner" after being "pushed" by BRPD officers and then again when they attempted to arrest him. Having arrived at these conclusions of fact, [defendants' expert] then renders opinions regarding the ultimate issues in the case. Specifically, [defendants' expert] concludes (1) that Defendants had probable cause to and did arrest Plaintiff for violating La. R.S. § 14:97, and (2) that, based on the "totality of the circumstances," the use of force by "[BRPD] Officer Neyland and the other officer[s]...were justified, authorized, necessary and in accordance with policy, procedures and protocols."
>
> **[Defendants' expert] proposed testimony regarding the foregoing does not meet the test for the allowance of expert opinion evidence. As noted above, Fed. R. Evid. 702 allows for the introduction of such evidence when "the expert's scientific, technical, or other specialized knowledge *will help the trier of fact to understand the evidence or to determine a fact in issue*."** (Emphasis added). Notwithstanding his qualifications in the area of law enforcement, training, and use-of-force, his opinions as to the existence of probable cause and the reasonableness of the BRPD's use of force on Plaintiff are nonetheless unreliable because they do not apply any particular analysis or methodology to the July 9 incident but merely accept one of two contested factual versions in this case. The Court fails to see how this will assist the jury in understanding the evidence or in reaching its own resolution of the factual questions, especially in a case, like this one, where multiple videos and photographs depict some of the events of July 9, and each side believes the evidence supports its version of those events. [Defendants' expert] is not in a better position, despite his law enforcement expertise, to opine as to whether the evidence establishes probable cause and/or excessive force. **In simply accepting Defendants' version of the facts, [defendants' expert]'s report artificially bolsters and potentially elevates Defendants' version without any apparent basis for such enhanced credibility. This presents the type of danger that the gatekeeping function of *Daubert* is intended to alleviate, *i.e.*, the danger that the purported expert testimony will receive unwarranted weight and will encourage the factfinder to give more weight to one side's contention than is warranted.**

While the issues with the facts upon which [defendants' expert] relies to reach his conclusions might be properly addressed through cross-examination, **[defendants' expert]'s opinions regarding probable cause and excessive force also go beyond "embracing" ultimate issues of law and fact and instead offer "ultimate legal conclusions," for which "[t]he judge is the source of law and the only expert needed by a jury."** Although the Fifth Circuit has explained that Rule 704 "abolished the *per se* rule against testimony regarding ultimate issues of fact, 'courts must remain vigilant against the admission of legal conclusions, and an expert witness may not substitute for the court in charging the jury regarding the applicable law.'" Whether probable cause existed at the time of Plaintiff's arrest is an ultimate question for the jury to decide. So too is the reasonableness of the officers' actions in arresting and using force on Plaintiff.

Accordingly, the **testimony of [defendants' expert] relative to the legal conclusions of (1) whether BRPD officers had probable cause to arrest Plaintiff, including whether Plaintiff in fact violated La. R.S. § 14:97 (or other statute), and (2) the reasonableness of the BRPD officers' actions in arresting Plaintiff, including whether the force use was excessive or necessary, will <u>not</u> reliably assist the jury in resolving these contested issues of law and fact in this case and will be excluded.**

*Day v. Baton Rouge City Police*, No. 17-328-EWD CONSENT, 2020 U.S. Dist. LEXIS 223670, at *11-15 (M.D. La. Nov. 30, 2020) (emphasis added).

The Middle District Court for the State of Louisiana has also helpfully weighed in on such a situation, also within the context of use-of-force:

The Court concludes that the proposed testimony of [defendant's expert] relative to the foregoing does not meet the test for the allowance of expert opinion evidence. As noted above, Fed. R. Evid. 702 allows for the introduction of such evidence when "the expert's scientific, technical, or other specialized knowledge *will help the trier of fact to understand the evidence or to determine a fact in issue*." (Emphasis added). **Whereas [Defendant's expert] is unquestionably a qualified expert in the area of law enforcement, training and use-of-force, his opinion as to the reasonableness of Officer Taylor's actions prior to the events complained would nonetheless be of little assistance to the jury in understanding the evidence or in reaching its own resolution of the factual question whether Defendants utilized force thereafter.**

*Gage v. Jenkins*, No. 13-0638-SDD-EWD, 2017 U.S. Dist. LEXIS 75785, at *11-12 (M.D. La. May 18, 2017)(emphasis added). And again, the Middle District Court for the State of Louisiana found such testimony to be inappropriate in the case of *Haynes v. Parker*, stating in relevant part:

Thus, in simply accepting Defendant's version of the facts in this case, [defendant's expert]'s report artificially bolsters and potentially elevates Defendant's version of the facts without any apparent basis for such enhanced credibility. **This presents the type of danger that the gatekeeping function of *Daubert* is intended to alleviate, *i.e.*, the danger that the purported expert testimony will receive unwarranted weight and will encourage the fact-finder to give more weight to one side's contention than is warranted.** Accordingly, the Court finds that the testimony of [defendant's expert] relative to the reasonableness of Defendant Parker's action in utilizing chemical spray would not reliably assist the jury in resolving this contested issue in this case and should therefore be excluded as to this issue. *Cf., Harris v. City of Baton Rouge*, 2005 WL 60009992 (M.D. La. April 8, 2005) (disallowing testimony by [defendant's expert] "concerning the *reasonableness of the actions of the police officer* in making [an] arrest" (emphasis added)); *Chauvin v. Lee*, 2000 U.S. Dist. LEXIS 15604, 2000 WL 1537988 (E.D. La. Oct. 16, 2000) (granting plaintiff's motion in *limine* "to exclude the testimony and report of purported expert [defendant's expert]" after defendants advised the court that they would not oppose the motion).

*Haynes v. Parker*, No. 13-0818-SDD-EWD, 2017 U.S. Dist. LEXIS 37842, at *11-12 (M.D. La. Mar. 16, 2017).

Just like in the cases cited above, Mr. Anderson has provided the Defendants with a report that repeatedly makes both factual and credibility determinations as well as legal conclusions.

**D. <u>Mr. Anderson's Legal Conclusions Couched as Expert Opinion Should Likewise be Excluded</u>.**

Throughout his report, Mr. Anderson offers numerous opinions that are legal conclusions and should thus be excluded. These legal conclusions are beyond his purview as an expert. For example, Mr. Anderson states items such as, but not limited to:

The deployment of canine Bobby was justified, lawful and in accordance with State and Federal Laws, LCPD Canine Policy as well as the LCPD Use of Force Policy, and Industry Standard. (*Crenshaw v. Lister 556 F.3d, 1282 5th Cir. 2009 and Escobar v. Montee 895, F.3d, 387, 394 5th Cir. 2018. Other References below)*
*Reference: Louisiana State Legislature: Code of Criminal Procedure*

*Art. 218 Method of arrest without warrant*
*A peace officer, when making an arrest without a warrant, shall inform the person to be arrested of his intention to arrest him, of his authority, and of the cause of the arrest. A*

> *private person, when making an arrest, shall inform the person to be arrested of his intention to arrest him and of the cause of the arrest.*
>
> *The officer or private person making the arrest need not so inform the person to be arrested if the person is then engaged in the commission of an offense or is presumed immediately after its commission or after an escape or flees or forcibly resists before the officer or person making the arrest has an opportunity to so inform him, or when the giving of the information would imperil the arrest.*
>
> > *Art. 220 Submission to arrest; use of force.*
> > *A person shall submit peaceably to a lawful arrest. The person making a lawful arrest may use reasonable force to effect the arrest and detention, and to overcome any resistance or threatened resistance of the person being arrested or detained.*

Exhibit A, Anderson Report pg. 10. Mr. Anderson testifies as to what the law is and arrives at ultimate legal conclusions. This is indisputably impermissible and goes beyond the legal bounds set forth by the Fifth Circuit for expert witnesses. The only permissible source of law in this matter is the Court, and certainly not Mr. Terry Anderson.

Mr. Anderson must be barred from testifying as an expert as the central opinions he seeks to make are indisputably barred under law. It is well established that expert witnesses should not be permitted to testify to legal conclusions. The Fifth Circuit has explicitly addressed such testimony in the excessive-use-of-force context:

> [Rule 704] does not permit experts to offer legal conclusions, *United States v. Izydore*, 167 F.3d 213, 218 (5th Cir. 1999), and whether an officer's use of his firearm was unreasonable for purposes of the Fourth Amendment is a legal conclusion. *United States v. Williams*, 343 f. 3d 423, 435 (5th Cir. 2003).

*McBroom v. Payne*, 478 F. App'x 196, 200 (5th Circuit 2012).

Mr. Anderson's opinion on the reasonableness of the officers' use of force within his report is a legal conclusion that should not be admitted into evidence. Mr. Anderson's opinions are generally based upon case law. His report clearly exceeds the bounds of Federal Rule of Evidence 704 because it offers legal conclusions, and his conclusions are premised upon case law. The Fifth Circuit has made it clear that an expert may not testify to what the law is because that would

impinge upon or usurp the trial court's function to instruct the jury; expert testimony that offers a legal opinion is inadmissible. *Estate of Sowell v. United States of America*, 198 F.3d 169, 171 (5th Cir. 1999); *Askanase v. Fatjo*, 130 F.3d 657, 669 (5th Cir. 1997). In fact, Mr. Anderson's "expert" report reads more like a legal opinion than an expert report. Thus, again, the inquiry into the propriety of Mr. Anderson's testimony could end here.

### E.  Mr. Anderson's Testimony is Litigation Driven

Courts also consider whether the expert's findings are litigation-driven or results-driven. *See Daubert v. Merrell Dow Pharm., Inc.*, 43 F.3d 1311, 1317 (9th Cir. 1995) (Daubert II). In making this assessment, courts have considered "whether experts are 'proposing to testify about matters growing naturally and directly out of research they have conducted independent of the litigation, **or whether they have developed their opinions expressly for purposes of testifying**.'" *Burst v. Shell Oil Co.*, 120 F. Supp. 3d 547, 551 (quoting Daubert II, 43 F.3d at 1317)(emphasis added).

Mr. Anderson is the president of the NPCA and makes a living training police dogs and handlers. Defendant Officer Pearson is a member of the NPCA and is certified with K-9 Bobby through the NPCA. On page 12 of NCPA Training and Standards, it states that the minimum standard for the lowest level of Patrol certification for police service dog teams "[d]emonstrates a team's ability to immediately release a bite and find human odor." Exhibit C. It also states under the subheading "Warnings" under the same main heading of "Patrol Certifications" that, "[t]he handler is to issue K-9 warnings that the canine will be released prior to deploying his/her canine to search the building or area and before sending the K-9 to apprehend the decoy on the recall and apprehension." Exhibit C. In this case, K9 Bobby indisputably did not immediately release, nor did handler Officer Pearson give any verbal warnings near Plaintiff that a canine was being

released. Mr. Anderson wishes to rely on his own training as the president of the NCPA but does not wish to hold the Defendants in this case to his organization's minimal standards. Under the standards of the NCPA, neither K9 Bobby nor Officer Pearson would receive their Patrol Certifications based on the actions taken during their encounter with Ms. Edwards. It is clear based on the significant departure from Anderson's own practices that a report which does not even mention these failures is in fact litigation driven.

Further, Plaintiff's police canine expert Mr. Ernest Burwell provides eight cases that "mandate giving suspects a warning, prior to using a dog as a potential use of force" in his report.[3] Exhibit P-52 pg. 13, P-52A. Officer Pearson testified in deposition that he gave verbal announcements, stating that he and K-9 Bobby were in the area. Exhibit P-58 Pearson Deposition 68:20-69:7. However, Officer Pearson's body cam video demonstrates that he did not make these verbal commands while searching in the over grown area beyond the building section where Ms. Edwards was originally located. *Id.* Exhibit P-1, P-1a. Again, Mr. Anderson's own NPCA standards require multiple prior warnings be given to the suspect before releasing a police canine.

Mr. Burwell further points out Officer Pearson's lack of training regarding using a police canine on a passive and unarmed suspect:

> In this incident Officer Pearson allowed his dog to walk very slowly up to Nicole and bite her, even though she was passive and unarmed. Officer Pearson could have easily held back on the leash to prevent the dog from biting Nicole, called her by name, and told her to come out of the bushes. After all, she was lying right in front of the canine team and could be seen.

Exhibit P-52 pg. 21, P-52A.

---

[3] *Burrows v City of Tulsa, Trammell v Thomason, Sorchini v City of Covina, Vathekan v Prince George's County, MD, Kuha v City of Minnetonka, Szabla v City of Brooklyn Park, Minnesota Deorle v Rutherford, Rogers v City of Kennewick.*

It is evident from the police body cam videos that Officer Pearson did not have control of K-9 Bobby, and was not adequately trained to command K-9 Bobby to stop biting.

## F. **Mr. Anderson's Testimony is Entirely Irrelevant.**

Mr. Anderson's entire testimony also fails *Daubert's* relevancy prong because his mere acceptance and recitation of the Defendants' version of events coupled with his "expert" conclusion that such claims amount to reasonable force will not help the trier of fact understand or determine a fact at issue. *Guillory v. Domtar Indus. Inc.,* 95 F.3d 1320, 1331 (5th Cir. 1996)("[An] opinion based totally on incorrect facts will not speak to the case at hand and hence will be irrelevant"); *Haynes v. Parker*, No. 13-0818-SDD-EWD, 2017 U.S. Dist. LEXIS 37842, at *4 (M.D. La. Mar. 16, 2017) (finding that the expert's mere acceptance of one of two contested factual versions in the case "[would] not assist the jury in understanding the evidence or in reaching its own resolution of the factual questions.")

Instead, his testimony will mislead jurors and usurp their authority to make credibility determinations. *See e.g. Tingle v. Hebert,* No. CV 15-626-JWD-EWD, 2018 WL 2287028, at *5 (M.D. La. Apr. 23, 2018)(citing *United States v. Hill*, 749 F.3d 1250, 1258 (10th Cir. 2014)); *Charalambopulous v. Grammer*, No. 14-2424, 2017 WL 930819, at *17 (N.D. Tex. Mar. 8, 2017); *In this Matter of M&M Wireline & Offshore Servs., L.L.C,* No. 15-4999, 2016 WL 4681196, at *8 (E.D. La. Sept. 7, 2016) ("The Fifth Circuit and several lower courts have made clear that expert testimony may not usurp the factfinder's inherent authority to make credibility determinations.")

Anderson's testimony will artificially enhance the credibility of the Defendants' fact witnesses, version of events, and theories because he relies solely on the Defendants' version of events in forming his opinions about the Defendant officers' actions. *Aubin v. Columbia Cas. Co.,* No. CV 16-00290-BAJ-EWD, 2018 WL 1956108, at *5 (M.D. La. Apr. 23, 2018)(citing *Westcott*

*v. Crinklaw,* 68 F.3d 1073, 1076 (8th Cir. 1995)("[A]n expert may not go so far as to usurp the exclusive function of the jury to weigh the evidence and determine credibility.")

Such confusing and misleading testimony is particularly risky in this case, where the facts are so sharply disputed and are material to the reasonableness of the Defendant officers' use of force and to their subjective awareness of Defendant officers that the outcome of the trial may reasonably be determined by which party's version of facts the jury finds most credible. Mr. Anderson's testimony is directly intended to bolster the Defendants' position by using his expertise in law enforcement to convince the jury to accept Defendants' version of events. Mr. Anderson's testimony not only fails to help jurors understand or determine a fact in issue, but it also impedes their ability to do so and must be excluded as irrelevant.

III.     **CONCLUSION**

Mr. Anderson's testimony is untrustworthy, unreliable, and irrelevant. Furthermore, Mr. Anderson's testimony as to factual determinations and legal conclusions would invade both the province of the jury and the Court. Rather than assisting the jury in making its findings of fact, Anderson would confuse the jury as to their role. Allowing him to present these factual determinations to the trier-of-fact would be unduly prejudicial and misleading under Rule 03. His status and history as a law enforcement officer may cause jurors to improperly credit his factual determinations over their own, or adopt Anderson's assessment of an officer's credibility. There is no part of his report that is free from these infirmities. Thus, Plaintiff requests that this Court enter an Order barring Anderson's testimony at the trial of this case.

Respectfully Submitted,


*/s/Glenn C. McGovern*
Glenn C. McGovern (LBA #9321)
Callan J. Johns (LBA #38788)

Peyton M. Bowman (#38679)
Mailing Address:
P.O. Box 516
Metairie, LA 70004-0516
Physical Address:
2901 Division Street, Suite 201
Metairie, LA 70002
Telephone: 504.456.3610
Facsimile: 504.456.3611
E-mail: glenn@glennmcgovern.com
*Attorneys for Plaintiff*

## **CERTIFICATE OF SERVICE**

I do hereby certify that a copy of the foregoing pleading has been electronically filed with the Clerk of Court using the ECF system which sent notification to all counsel of record who are ECF users on this 16th day of September 2021.

*/s/Glenn C. McGovern*
Glenn C. McGovern