

# CITY OF LAKE CHARLES

NICHOLAS E. HUNTER
MAYOR

326 Pujo Street • P.O. Box 900
Lake Charles, LA 70602-0900
(337) 491-1523 • FAX (337) 491-1488

LEGAL DEPARTMENT
DAVID L. MORGAN
CITY ATTORNEY

July 28, 2021

**<u>Via e-mail and US Mail</u>**
Glenn C. McGovern
Law Office of Glenn C. McGovern Corp.
P.O. Box 516
Metairie, LA 70004

RE: *Nicole Edwards*
*v. The City of Lake Charles, Chief of Police Shawn Caldwell, Corporal*
*Bendy Falcon, Officer Dakota Baccigalopi, Officer Jacob Pearson, Officer*
*Joshua Ewing, and K9 Bobby*
*Docket No. 2:19-cv-01150; USDC Western District*

Dear Mr. McGovern,

The City has retained Terry Anderson as its canine law enforcement expert. We have enclosed a copy of Mr. Anderson's written report, which also contains his fee schedule. We have also enclosed Mr. Anderson's curriculum vitae including his trial and deposition testimonies.

If you have any questions, please do not hesitate to contact me.

With kindest regards, I remain

Yours very truly,

CHRISTOPHER E. JOHN
Assistant City Attorney

CEJ/alc
Enclosures

*United for Progress and Prosperity*

Federal Rule of Civil Procedure, Rule 26

Disclosure of expert Testimony

**Case:**     Nicole Edwards (Plaintiff) v. The City of Lake Charles, Chief of Police Shawn Caldwell, Corporal Bendy Falcon, Officer Dakota Baccigalopi, Officer Jacob Pearson, Officer Joshua Ewing, and K9 Bobby (Defendants)

Civil Action: 2:19-cv-01150-JDC-KK: USDC Western District

**Name:**     Terry Anderson

**Company:**     Keli's K9's LLC

1566 County Road 4510 Hillister, Texas 77624

I, Terry Anderson, have been retained as an expert witness for The City of Lake Charles, Louisiana, and the above-named defendants in this action. I have been asked to consider the facts in this case and form opinions regarding the allegation:

*The defendants' deprived the Plaintiff of her civil rights under the Fourth, Fifth, Eighth and Fourteenth Amendment with maliciously exerting excessive and unreasonable use of force, conspiring to violate the rights privileges and guarantees otherwise depriving the Plaintiff of her Constitutional and statutory rights. After reviewing the below materials, I have formed several opinions regarding the use of force, in particularly Officer Pearson and Canine Bobby, based upon the facts in this case.*

I.     **Experts Background and Experience**

- I am the Trainer/Handler for Keli's K9's LLC. We train single purpose and dual-purpose canines for Law Enforcement (LE) Agencies. I also train dogs for private citizens in Basic, Intermediate and Advance Obedience.
- We work our own service dogs in the private sector searching for narcotics and explosives.
- We provide Training for LE agencies regarding all areas of police service dogs and tactics.
- I began my career in 1988 at Pasadena Police Department (PPD) where I worked until I retired as a Sgt. in 2013. I became a certified instructor through the State of Texas Commission on Law Enforcement Standards in 1989.

- I became a canine handler in 1991 and attended numerous canine training schools. I became a certified canine trainer in 1994 and head trainer for PPD that same year. I remained the head trainer for PPD canine Program until just prior to my retirement in 2013. I was responsible for canine procurement, testing and evaluations, budgets, weekly unit training, selection of handlers, handler training programs, monthly departmental reports, medical consultations, policy and procedures, mission specific training and operational deployments, and personnel evaluations as well as proficiency assessments.
- I was elected President of National Police Canine Association (NPCA) in 2004, a position that I continue to retain as I have been reelected. I spent three years on the Standards Committee (SC) for NPCA. The SC was responsible for developing certification standards for NPCA. I oversee a 1400-member organization with an annual budget exceeding $200,000.00, where we provide training and certifications to LE entities. I annually attend a Legal update class that we provide to our members, as well as teach all disciplines related to canine training to our members.
- I also was a member of PPD SWAT team from 1994-2013. I remain on SWAT following my promotion and was moved to PPD Special Operations Division Sergeant and was responsible for forty operators in Canine, SWAT and Explosive Ordinance Division (EOD). This responsibility entailed overseeing unit training of all three units, budgets, procurement of equipment, personnel selections, and operational deployments.
- I am employed as an instructor for Swat K9 Interacting During Deployments (SKIDDS) and travel all over the United States teaching SWAT operators and canines how to interact during tactical deployments.
- During my career I have testified in City, State and Federal Courts and have been retained previously as an expert witness and consultant where I have provided opinions, depositions, and testimony on canine related issues such as proper utilization of detection canines and patrol deployments.
- I am on six Federal Boards which are responsible for developing industry best practices. I was on the Executive Board for Scientific Working Group on Dogs and Orthogonal (SWGDOG) and National Explosive Detector Canine Advisory Board (NEDCAB). Previously I was one of 25 members for Organization of Scientific Area Committees (OSAC); however, due to demanding schedules in our business I chose to move to an affiliate position on OSAC.
- I have been employed for the Department of Homeland Security since 2019 as a subject matter expert/evaluator in the field of Explosive Detection canines and The Limited integration of explosive canine teams in an Active Shooter Situation.

II    **Below are the documents I considered in forming my opinions:**

1. 1905030121 - J. Ewing - bite footage
2. Bendy Falcon deposition
3. Dakota Baccigalopi deposition
4. Joshua Ewing deposition
5. Pearson deposition
6. Photo's of Bobby

7.  Plaintiff's Discovery Responses
8.  UOF with Bite for Pearson - K9 Bobby, 2016, 2017, 2019
9.  20190503_071158 photo, Nicole bite photos
10. 1905030121 - J. Ewing - inside patrol unit
11. 1905030121 - J. Pearson - ambulance arrival
12. 1905030121 - J. Pearson - dog bite footage
13. 1905030121 - J. Pearson - hospital
14. 1905030121 - J. Pearson - hospital part 2
15. 1905030121 - LC130 - rear seat view (Ewing Patrol unit)
16. 1905030121 - LC183 – rear seat view (Pearson unit/ Bobby)
17. 1905030121-LC130 - Front Dash Cam at Chevron (Ewing unit)
18. A 19 USE OF FORCE POLICY 12-09-2016 Full Version
19. O 26 CANINE UNIT OPERATION POLICY 09-17-2012 Full Version
20. Acadian Ambulance
21. Arrest Report (Ewing)
22. Bobby Training Records 12.16 - 3.20
23. Bobby Training Records two
24. Certificates (Bobby/NPCA)
25. Criminal Charges Dismissed (record document)
26. Darrell Henderson Report
27. Dr. Susan Andrews Neuropsych Eval Report
28. Dr. Thomas Axelrad CV
29. Dr. Thomas Axelrad Expert Report 21.07.16
30. DSCN0155 photo, (Nicole bite)
31. DSCN0156 photo, (Nicole bite)
32. DSCN0157photo, (Nicole bite)
33. Ernest Burwell Report
34. Event Report
35. Incident Report
36.  Use of Force Report
37. K-9 Records
38. K-9 Records
39. nedwards6221 (Nicole deposition)
40.  Original Lawsuit
41. Pearson - redacted personnel file
42. Plaintiff's Answers to Rogs
43. PLEADINGS
44. Resisting Arrest in Louisiana new addition
45. Westcare Medical Center

**III    Incident Summary: Here are the facts represented to me upon which my opinions are based**

**Primary Participants:**

**Officer Jacob Pearson:** Officer Pearson is an Officer for the Lake Charles Police Department. (LCPD) and has been since 2003. Officer Pearson was also a certified Police Officer in DeRidder PD (La) from 2007 through 2012. He returned to the LCPD and at the time of this deployment Officer Pearson is assigned to the canine unit with his canine partner, Bobby.

**Corporal Bendy Falcon:** Corporal (Cpl.) Falcon is an Officer with the LCPD and has been since 2005. At the time of this incident Corporal Falcon is assigned to patrol.

**Officer Dakota Baccigalopi:** Officer Baccigalopi is an Officer with the LCPD and has been since approx. 2015. At the time of this incident Officer Baccigalopi is assigned to patrol.

**Officer Joshua Ewing:** Officer Ewing is an Officer with the LCPD and has been since approx. 2017. At the time of this incident Officer Ewing is assigned to patrol.

**Glenn Halbert Lemon Jr.:** Glenn was the rear passenger in the suspect vehicle and was subsequently arrested for felony charges regarding his possession of a firearm and controlled substances.

**Tyrone Edwards Jr.:** Tyrone was in the driver seat of the suspect vehicle. Tyrone was contacted and later secured in a police unit. He was later issued a citation for misdemeanor charges for drugs.

**Nicole Tyra Edwards:** Nicole was seated in the rear, driver side of the vehicle. As the officers began conducting their investigation into this incident Nicole was removed from the vehicle and told to stand near in front Officer Ewing's patrol unit. As the investigation continued, officers located drugs and a firearm in the vehicle. When Officer Ewing looked up from searching the vehicle the he realized that Nicole was gone and had fled the scene.

1. On 05-03-2019, at approx. 0519 Officer Ewing and Cpl. Falcon were sent to 1825 Interstate 10 Service Rd. in reference to a narcotics complaint.
2. The caller stated there was a b/m, whom he believed to be intoxicated, was walking around shirtless yelling at his phone.
3. Officer Ewing and Cpl. Falcon arrived and observed the vehicle parked at the gas pumps. Officer Ewing parked in front of the vehicle to prevent it from moving.
4. He immediately observed a b/m (later identified as Glenn Lemon) exit the vehicle from the rear, passenger side back door.
5. He began attempting to interview Glenn but quickly observed Glenn to be profusely sweating and evasive when asked questions.

6. Due to his erratic behavior Officer Ewing secured Glenn's hands and placed him in the back seat of his patrol unit.

7. Cpl. Falcon contacted the driver of the vehicle and identified him. Tyrone Edwards) Tyrone was found to have an open warrant and was secured in Cpl. Falcon's, unit.

8. Officer Ewing then contacted the rear, driver side passenger, Nicole Edwards, and asked her to step out of the vehicle, which she did.

9. Officer Ewing began interviewing Nicole when Cpl. Falcon advised him that he observed marijuana in the vehicle. Officer Ewing asked Nicole to stand at the front of his unit as he turned and began searching the interior of the vehicle also.

10. As the officers searched the vehicle, Cpl. Falcon advised he found a gun, in a plastic bag, under the passenger side front seat.

11. When Officer Ewing looked up, he found that Nicole had fled the scene. He contacted several persons asking if they had seen the b/f and was advised she was seen headed towards the field behind the building near the trailer.

12. Officer Ewing then walked the area to the north of the business trying to locate Nicole. He was unsuccessful in locating Nicole, so a canine unit was sent to that location.

13. When canine Officer Pearson arrived, he contacted Officer Ewing who advised him they had recovered illegal drugs and a firearm from the vehicle. He also gave a clothing description of Nicole as well as showed him her photo identification.

14. After checking several locations near the rear of the business Pearson took his partner, Bobby, out of the unit and began walking the area together.

15. Pearson and Bobby checked several abandon trailers and small structures north of the business. One of the trailers Bobby entered on his own as Pearson gave several clear verbal announcements to make themselves known.

16. These warnings clearly stated they were the police department searching with a dog and they could be bit if they did not surrender.

17. After a period checking the area with Bobby, Pearson observed a person running on the north side of an overgrown rubble pile towards the south.

18. Pearson and Bobby began running towards the area where he saw the person running as he broadcast what he saw over their police radio.

19. Officer Ewing and Officer Baccigalopi moved to that area the person was last seen running where they contacted Pearson. Pearson advised both officers of more details of what he had seen and what direction that person was last seen running.

20. Officer Ewing and Officer Baccigalopi assumed a southern perimeter position while Pearson and Bobby continued searching for Nicole.

21. A few minutes later Pearson yelled at Officer Ewing that he found her, and Bobby was biting her.

22. Ewing ran towards their location on top of the overgrown debris pile. As Ewing approached Bobby and Nicole, Pearson advised him to grab her arm so they could handcuff her.

23. Nicole was actively being bitten by Bobby as they handcuffed her and started to remove Bobby from his bite on Nicole. During the bite Ewing requested an ambulance via his police radio.

24. Once Bobby released his bite, Pearson moved him away from Nicole and Ewing immediately applied first aid to Nicole.

25. Once the ambulance arrived Nicole was treated and then transported to the hospital.

**IV    Professional Opinion:**

**The following are my professional and expert opinions, which I will offer in this case, and the basis and reason for those opinions. My professional and expert opinions are based on the information I reviewed as well as my training, experience, expertise, education, and familiarization with professional publications. It is my opinion that:**

*Opinion #1*

*In my professional opinion the utilization of Canine Bobby to locate Nicole and arrest her was reasonable, lawful, and consistent with modern police practices, industry standards and in accordance with State and Federal Law, the City of Lake Charles Police Department (LCPD) General orders, Use of Force Policy and Canine Policy.* ***Officer Pearson's utilization of canine Bobby as a less lethal force option is justified. Therefore, Officer Pearson is NOT responsible for violating the plaintiff's civil rights with excessive use of force.*** *(refer to: Byrd v. City of Bossier, No. 14-30809, 2015 WL 5259961. At *1*

Police Service Dogs have an important role in Law Enforcement.  Their role is multi-faceted and encompasses responsibilities from public relations, education, detection of hidden odors, a static presence of deterrence and use of force options.

State and Federal Laws, individual departmental policies and procedures and various departmental guidelines govern how police service dogs are utilized on the streets and in the industry. Industry standards are observed by agencies that utilize canine teams in Law Enforcement.

Canines are commonly deployed to detect hidden human odor as well as other illegal substances or dangerous items such as explosives.

Their intelligence, willingness to learn and proven ability to accept and obey commands provides officers another tool to successfully complete their tasks. Their physical capabilities such as agility, speed, temperament, and inherent character traits improve officers' ability to locate hidden criminals, and increase the safety of officers, the person they are searching for and citizens. Canine teams are commonly utilized in departments "Force Continuum" as less than lethal options.

Officer Pearson was employed by the City of Lake Charles Police Department at the time of this incident. Officer Pearson was on duty responding to calls for service via departmental policies that require them to enforce City, State and Federal laws and protect the citizens who reside in Lake Charles. While on active-duty status this incident involving illegal drugs, resisting arrest by fleeing the scene, known felons and firearms occurred so Officer Pearson responded to the area to assist in this case.

At 0526, on 05-03-2019, Officer Ewing arrived on the scene and contacted the suspect vehicle (Blue Ford Edge VIN#2fmpk3j92kbb90176) parked at gas pump #5. As he parked, he observed a b/m subject, later identified as Glenn Lemon, exit the rented vehicle from the passenger side back door. As he attempted to interview Glenn, he found him to be unable or unwilling to answer his questions and follow simple instructions. Due to Glenn's erratic behavior Officer Ewing handcuffed him and detained him for his safety and Glenn's safety.

During this time Officer Falcon contacted a b/m sitting in the driver seat of the rented vehicle. He was identified as Tyrone Edwards Jr. He was found to have an outstanding warrant for his arrest, so Officer Falcon detained him by handcuffing him and placing him in his patrol unit.

Officer Ewing then contacted a b/f sitting in the driver side rear seat position. He asked her to step out of the vehicle so he could interview her. She was identified as Nicole Edwards. As Ewing was talking to Nicole, Officer Falcon advised Officer Ewing that there was marijuana in plain view from the driver side front door window. Officer Ewing lawfully told Nicole to stand in front of his unit while he went to the rented vehicle to continue this criminal investigation.

Both officers then began a cursory search of the vehicle when Officer Falcon located a loaded firearm, inside a plastic bag under the front seat on the passenger side of the vehicle. The gun (*Ruger 357 Magnum SR#176-31269, Original Criminal Report*) was in the area immediately accessible to Glenn who exited the rear passenger side of the vehicle. *(1905030121-LC130 - Front Dash Cam at Chevron)*

Officer Ewing looked up from searching the driver compartment and realized that Nicole was gone. The dash camera video from Officer Ewing's patrol unit shows Nicole watching the officers search the car and then covertly walking away from the patrol unit. *(Reference: 1905030121-LC130 - Front Dash Cam at Chevron)* Having been told to stand at the front of his unit so they could continue their lawful criminal investigation implies one is not free to leave. At no time did Officer Ewing tell Nicole she was free to leave the scene or that the investigation was completed, and she was free to go. According to the plaintiff's original complaint against the defendants, it clearly states "the Defendant officers **detained** Nicole Edwards, Tyron Edwards and Glenn Lemon at the Chevron gas station where they are instructed to get out of the car and are questioned". *(Original Complaint Written by Glen McGovern, Page 3, #11)* The idea that Nicole was not legally detained is purely untruthful.

Nicole, knowing the vehicle contained illegal drugs and a firearm slowly walked away from the officers to avoid being arrested. The actions of the two officers, although tactically un-safe, did not give Nicole permission to flee the scene to avoid potentially being arrested. Any person given a lawful order from a police officer while conducting a criminal investigation has a lawful obligation to follow that command. A person who has not violated any laws would not just walk away from an active criminal investigation unless they had something to hide. Nicole's action of fleeing from the police officers, either fast or slow, was unlawful and resulted in additional criminal charges in this investigation. Nicole had every opportunity to surrender peacefully to the officers, but she chose to evade them. Officer Ewing searched for Nicole for 27 minutes before Officer Pearson arrived on the scene. Officers searched for a total of 43 minutes before Officer Pearson and canine Bobby located her. (*Refer Officer Ewing BC*)

At 0548, Officer Pearson and his canine partner Bobby was dispatched, via police radio, to the above gas station and he arrived on the scene at 0550. He received a preliminary description of Nicole and was advised that officers had recovered a loaded firearm inside the vehicle. This information elevated Nicole to a higher threat level due to the potential that she could be in possession of a firearm also. Pearson then began checking areas around the eastern side of the business. He searched in the more readily accessible public areas before moving around to the north side of the complex. Officer Ewing contacted Pearson on the north parking lot and provided more information along with a photo identification of Nicole. Officer Pearson continued searching the immediate area with no results.

Due to an injury to canine Bobby, Officer Pearson did not originally retrieve Bobby from his unit, however, as the search area expanded to the dark, overgrown, junk filled area Officer Pearson removed Bobby from his unit and continue searching for Nicole. Officer Pearson has a duty to utilize canine Bobby as a locating tool due to the serious nature of this crime. Nicole's active resistance of fleeing/resisting arrest and for the safety of the officers involved in this investigation and the local community. The team began searching the area north of the gas station in all directions as the sun began to rise. Their search was not productive, however, according to Officer Pearson's body camera counter beginning at 2215, Officer Pearson and Bobby begin running west bound near the northern portion of the property because he saw a person take off running. Officer Pearson and Bobby continue running west in between the northern fence line and an overgrown rubble pile. This area was overgrown and filled with abandoned equipment and trailers that littered the area. (BC: *1905030121 - J. Pearson - dog bite footage*)

Officer Pearson could not identify the person who ran but he broadcasted over his police radio that he believed someone had just took off running from him. After he lost sight of the runner Officer Pearson and Bobby searched some abandon structures and trailers for the person who ran away. As Pearson approached an abandoned trailer with an open door, he began giving loud verbal canine warnings. These warnings clearly identified that he was LC police officer and that if they did not show themselves, they could be bit.

Officer Ewing and Officer Baccigalopi moved to the western end of the property where they contacted Officer Pearson and canine Bobby. Officer Pearson could not positively identify Nicole as the person he saw running just a few minutes earlier, he was able to identify that she was wearing black pants, a dark under shirt and orange top. Officer Pearson provided both officers more information regarding the person who ran and asked both officers to watch towards the southern portion of the area while he and Bobby began searching the area again. (BC: *1905030121 - J. Pearson - dog bite footage*)

At 2810, while working in an eastly direction, on the south side of the overgrown rubble pile, canine Bobby begins displaying visual responses to human odor. This body posture display is visible by a change in his head carry position and change of speed. As the team approaches the eastern edge of the elevated obstacle pile, Bobby takes Officer Pearson back over the eastern edge of the rubble pile and turns back to the west. They begin working back to the west, on the north side of the rubble pile. (BC: *1905030121 - J. Pearson - dog bite footage*)

At 2827 as the team is working back to the west Bobby abruptly changes his direction and speed as he climbs on top of the rubble pile and begins working back to the east. The foliage is extremely thick and deep with poor ground visibility. The area is very cluttered with what appears to be concrete debris that is covered in deep vegetation. This environment presented an extremely high-risk threat to Officer Pearson and Bobby. A person hiding in this area had a significant advantage if their intent were to ambush the officer trying to locate them. It is clearly visible that when Bobby located and bit Nicole, she was completely hidden from Officer Pearson's. He absolutely could not see her hidden in the deep covered vegetation. (BC: *1905030121 - J. Pearson - dog bite footage*)

It was clearly established and communicated to all the officers on the scene illegal drugs and a firearm had already been recovered from the vehicle which made the severity of the crime a dangerous felony. The information provided combined with the high-risk environment that Bobby took them into are reasonable factors involved in Officer Pearson's decision to utilize Bobby as a less than lethal force option: the severity of this crime, the immediate threat posed to officers and others, the fact that Nicole had fled from the investigating officers and could have potentially been armed with a firearm. **This satisfies all the components of *Graham v. Conner, (490 U.S. 386, 394 1989) and Smith v. City of Hemet, (394 F.3d 689, 702 {9th Cir. 2005})* The facts and circumstances, which were legally relevant to the "objective reasonableness" determination, are only those that were known to the officer at the time force was used.**

The immediate threat to officers and others existed because of the serious nature of the crime and knowing that Nicole could be armed with a firearm. The facts and circumstances that were known to Officer Pearson established the deployment of canine Bobby without a verbal canine warning was prudent, justified, and acceptable under U.S. case law and industry standards. No officer is required to place himself in a lethal situation by announcing his presence or immediate location to a suspect that is known to be armed. Officer Pearson had every right to assume Nicole was armed. *(Gutierrez v. Hackett, 131 F. App'x 621, 624-25 (10th Cir. 2005) (Jay v. Hendershott, 579 F. App'x 948, 951-52 (11th Cir. 2014): Crenshaw v. Lister, 556 F.3d 1282 (5th Cir. 2009).*

As canine Bobby moved deeper into the overgrown area, unbeknownst to Officer Pearson, Nicole was lying on the ground completely hidden from his view. (BC: *1905030121 - J. Pearson - dog bite footage*) Nicole was passive, hidden in an elevated, completely concealed ambush position. She knew that the police were actively looking for her because she had just fled from officers. Her actions were not that of a innocent child's game of hide and seek, her actions were that of a person fleeing from the police because she was involved in criminal offenses. In my personal experience having been in these situations countless times it is impossible to know her intentions.

Any reasonable officer would assume that a person seen running in that confined, overgrown abandoned junk yard area at that time of the morning, in the last known area a person involved in a criminal offense was last seen, matching Nicole's clothing description, *"IS"* the suspect the police were looking for originally. *In my opinion, based on my training and experience: Nicole saw Bobby and Officer Pearson moving in the direction she was hidden so she got up and ran to another location hoping they would not find her.*

Nicole stated in her deposition:
*16. I kept walking.· I just kept taking steps,*
*17· ·walking.· At a certain point I was waiting for her to*
*18· ·call back and the rubble went to grass, and I went up*
*19· ·and I turned back, and I said oh, I can see.· I'll*
*20· ·give her time to call back.· If they're going to take*
*21· ·them, they're going to take them, but I'll give her*
*22· ·some time to call me back.· And I kneeled, I sat, I*
*23· ·kneeled, sat to get some patience with my feet and*
*24· ·then I must have sat all the way down and that's how*
*25· ·I wound up dozing off". (Nicole Depo: nedwards6221_cond: P41, line 16 thru 25)*

It is more plausible that Nicole saw Officer Pearson and Bobby approaching her original hiding spot from the east and ran away again. Her continued action of evading the police is active resistance because she refused to surrender to a lawful arrest. **The deployment of canine Bobby was justified, lawful and in accordance with State and Federal Laws, LCPD Canine Policy as well as the LCPD Use of Force Policy, and Industry Standard.** *(Crenshaw v. Lister 556, F.3d, 1282 5ᵗʰ Cir. 2009 and Escobar v. Montee 895, F.3d, 387, 394 5ᵗʰ Cir. 2018. Other References below)*

*Reference: Louisiana State Legislature: Code of Criminal Procedure*
*Art. 218.  Method of arrest without warrant*

*A peace officer, when making an arrest without a warrant, shall inform the person to be arrested of his intention to arrest him, of his authority, and of the cause of the arrest.  A private person, when making an arrest, shall inform the person to be arrested of his intention to arrest him and of the cause of the arrest.*

*The officer or private person making the arrest need not so inform the person to be arrested if the person is then engaged in the commission of an offense or is pursued immediately after its*

*commission or after an escape or flees or forcibly resists before the officer or person making the arrest has an opportunity to so inform him, or when the giving of the information would imperil the arrest.*

*Art. 220.  Submission to arrest; use of force.*

*A person shall submit peaceably to a lawful arrest.  The person making a lawful arrest may use reasonable force to effect the arrest and detention, and to overcome any resistance or threatened resistance of the person being arrested or detained.*

The Policy listed below comes from the LCPD General Order:

Use of Force.

*POLICY*

*One of the most difficult and confusing job tasks for police officers is determining when and how force may be used against a citizen. Members of the Lake Charles Police Department are entrusted by the citizens we serve with the responsibility to protect life and property; and to bring those who fail to abide by the law before a competent court for judgment. In fulfilling those duties, officers are confronted daily with situations where some level of control must be exercised over a person to protect the public safety or affect an arrest.*

*In most circumstances, control will be achieved without force by the mere presence of the officer, his persuasion, and/or verbal direction. Members will encounter; however, some situations where the use of reasonable physical force may be necessary. Physical force should be the last resort only when; other reasonable alternatives have been exhausted, those alternatives would be clearly ineffective under the prevailing circumstances, or the officer reasonably perceives the alternatives would be ineffective.*

*Officers of the Lake Charles Police Department shall never employ excessive force or violence and shall use only such force that is reasonable during the course of his duties.*

*The Lake Charles Police Department will provide its members with clear guidelines for use of authorized force. Members will be trained annually in the Lake Charles Police Department's Use of Force Continuum that guides the appropriate level of force and control for each level of resistance that may be encountered from an offender.*

*DEFINITIONS*

*Use of Force – Physical effort to compel compliance by an unwilling subject above un-resisted handcuffing, to include pointing a firearm at a person or animal.*

*Less-Lethal Force - Force which is not likely to result in or produce serious bodily injury or death.*

*Deadly Force - That level of force that would lead a reasonable person to objectively
conclude that its use poses a high risk of death or serious injury to its human target or
animal regardless of whether or not death, serious injury, or any harm actually occurs.*

*Resistance - The opposition to an officer's control by a subject who is being placed under
arrest or is already under arrest against an officer acting in his official capacity.
Resistance may be verbal or physical.*

*Control- The force an officer utilizes to influence or neutralize the unlawful, physical
actions of a subject.*

*Reasonable Belief - The facts or circumstances the officer knows, or should know, which
would cause an ordinary and prudent person to act or think in a similar way under
similar circumstances.*

*Serious Physical Injury - A bodily injury that creates a substantial risk of death, causes
serious, permanent disfigurement, or results in long-term loss or impairment of the
functioning of any bodily member or organ.*

*Imminent threat- This term means immediate danger, which must be instantly met, such
as cannot be guarded against by calling for the assistance of others.*

### CANINE UNIT OPERATION

*4. Canine Handlers The following are the duties and responsibilities of the canine
handlers:*
*• perform normal patrol duties to include, calls for service;*
*• monitor the police communications at all times when on duty and be available to
respond to canine calls for service;*
*• participate in rotational call-out when canine support is not available;*
*• protect officers from immediate death or serious injury;*
*• conduct building searches for hidden offenders;*
*• track and apprehending suspects/offenders;*
*• participate in crowd control operations;*
*• tracking and locating missing persons;*
*• locate hidden instruments or evidence of a crime;*
*• detect the presence of concealed narcotics;*
*• respond to felony in progress calls in which a canine may be needed;*
*• be responsible for the total care of the canine to include feeding and maintenance of
the canine on a daily basis;*
*• be responsible for the care and upkeep of the canine police unit and ensure all
equipment is in proper working condition prior to field deployment;*
*• never leave the canine unattended when the climate in the police unit is unsafe;*
*• be responsible for the actions of the canine and prevent the canine from being a
nuisance or danger by locking the canine in the police unit at all times;*
*• other circumstances that in the handlers judgment is in the best interest of officer or
community safety; and*

*• conduct training on duty for upkeep of proficiency when time allows. Off-duty
responsibilities:*
*• when the canine is out of the kennel or unit, the handler will maintain*

Nicole was lawfully told to stand in a particular location as officers continued their investigation.
She was not free to leave regardless of the terminology used by Officer Ewing. By fleeing the
scene, she exclusively instigated the criminal act of resisting arrest/fleeing. Officers had
established that this investigation was no longer a misdemeanor but rather a felony. Glenn, who
was a known felon, was found to be in possession of a firearm and Tyrone had an open warrant.
Illegal drugs and a firearm were in the vehicle. When Nicole exited the vehicle, she secured her
purse over her head and shoulder. When she fled the scene, she was wearing that purse. It is
reasonable to assume that during her flight from officers Nicole intentionally discarded her
purse. Any reasonable officer would assume her purse contained other illegal contents and she
intentionally discarded her purse. Her purse was never recovered. *(Nicole Depo:
nedwards6221_cond: P43, line 4 thru 24)*

Officer Pearson and canine Bobby were utilized to search for Nicole. Their pursuit is clearly
described in the *Louisiana State Legislature: Code of Criminal Procedure Art. 218. Method of
arrest without warrant. (Refer to above reference)* Due to the elevated threat level Nicole must
be considered an imminent threat until proven otherwise. In reviewing Officer Pearson's BC I
have documented the following in Chronological order based the left hand timer:

28:44 Bobby bit Nicole in the left anterior upper leg, clearly Officer Pearson could not see Nicole
before Bobby bit Nicole. Regardless of her intent, Officer Pearson actions were totally reactive
to Bobby's bite and Nicole's response.
28:44 Officer Pearson immediately yelled to the other officers that they found Nicole. Nicole's
reaction to Bobby's bit was to grab him.
28:47 Officer Pearson commanded Nicole to let go of Bobby and roll over on her belly,
28:57 Officer Pearson yells at the approaching officers to "come on let's handcuff her". During
the 10 second interval Nicole continues to struggle with Bobby as she vaguely attempts to
follow Officer Pearson's instructions. Nicole is trying to displace Bobby's bite with her left hand.
29:01 Nicole now has her hand on Bobby's mouth area as she is struggling and rolling around.
Nicole is clearly rolling back and forth with Bobby still biting and at times rolling completely over
on top of Bobby. *(1905030121 - J. Ewing - bite footage)*
29:03 Officer Pearson grabs Nicole's left arm to remove it from Bobby and handcuff her.
29:06 Officer Pearson is clearly trying to apply handcuffs to her left wrist.
29:11 Her left hand is secured in a handcuff however, her right arm is not visible and completely
under her body. *This hand/arm position that is hidden from Officer Pearson's view is extremely
dangerous as she could have a firearm under her body.* Also, because Officer Pearson was not
able to see or gain control of Nicole's right arm and his other hand was controlling her
handcuffed left arm, he had no choice but to restrain her left arm and upper body to reduce her
ability to engage him with a weapon.
29:39 Officer Ewing and Officer Pearson were finally able to secure both hands in handcuffs.
29:43 Officer Pearson calls Bobby by name and immediately goes hands on Bobby's collars and
begins the removal process. During the delayed release Officer Ewing called for an ambulance to
be sent to the scene
30:33 Bobby releases his bit on Nicole and Officer Pearson moves Bobby completely away from
Nicole.

30:53. Officer Ewing applies a torniquet and begins to deliver first aid.

**The deployment of canine Bobby was objectively reasonable. It was justified, lawful and in accordance with State and Federal Laws, LCPD Canine Policy as well as the LCPD Use of Force Policy, and Industry Standard.** Bobby's bite lasted between 48-50 seconds after Officer Pearson started giving Bobby commands to release his bite. For a violation under the Fourth Amendment to occur the officer (ie, the government) must terminate a person "freedom of movement through means intentionally applied". While Officer Pearson was working to remove Bobby from the bite the continued bite was not a "means intentionally applied". The question then becomes was the delay in removing Bobby from the bit an intentional act by Officer Pearson, or simply the action of the dog and the process of removal. Officer Pearson's body camera video clearly shows that as soon as Nicole was handcuffed, he immediately moved to remove Bobby. Clearly, Bobby's action of remaining on the bite cannot be consider an intentional act by Officer Pearson. Bobby's action contrary to Officer Pearson's instructions does **NOT** create a constitutional violation. (BC: *1905030121 - J. Pearson - dog bite footage) Dunigan v. Noble, 390 F.3d 486, 492 (6th Cir. 2004) ( (Brower v. Cty. of Inyo, 489 U.S. 593, 596 (1989). (Montanez v. City of Orlando, 678 F. App'x 905, 911, 11th Cir. 2017)*

*Opinion #2:*

> *The Lake Charles Police Department's training and polices provide their employees with clear guidance regarding Use of Force and less lethal force options. In my opinion the LCPD has **NOT** failed to adequately train Officer Pearson and Canine Bobby.*

In reviewing Officer Pearson's personal training records, he was hired by the LCPD in 2003 and I find his history of training to be extensive. He is well trained in most every aspect of Law Enforcement. He has a plethora of different training records found. This training includes internal and external training.  Officer Pearson has had no known disciplinary actions; however, he has several motor vehicle accidents. This is an outstanding validation of his character and demeanor which attests to his decision-making capabilities. By all accounts and documents produce for my evaluation Officer Pearson is a conscientious and exceptional officer.

Officer Pearson was assigned to LCPD canine unit in 2015 and has received volumes of training specific to police canines. Canine Bobby was put into service with Officer Pearson in 2015 after they successfully completed a 120 Basic Canine Handlers Course from Canine Concepts, taught by Jack Robicheaux. After reviewing all the training records from Officer Pearson, it is abundantly clear Canine Bobby and Officer Pearson have been exposed and trained under a leading trainer in the Law Enforcement Canine Industry. The voluminous records indicate that Canine Bobby is very capable of being a police service dog and highly trained.

In reviewing the utilization records of Canine Bobby, he has been utilized to arrest 35 criminal suspects. Of those 35 criminal apprehensions Bobby was forced to bite 5 of those suspects. Four of those bites were handler commanded and one was an officer protection situation. In correlation to the number of arrest that Canine Bobby accumulated since he went into service

with the LCPD Canine unit that number is pointedly low. Specifically, this team represents a 14.29% bite ration. A bite ratio this low clearly establishes that Bobby was never utilized as a use of force tool except in situations where Officer Pearson was forced to use him as a less than lethal force option. Nor can it be insinuated that Officer Pearson and Canine Bobby acted under any form of "MISBEHAVIOR". The plaintiff's expert witness excerpts that a bite ratio should be less than 30%. In comparison, Officer Pearson and Canine Bobby's bite ratio is less than half of the plaintiff's expert witness acceptable percentage. The photographs provided for my review of Bobby's previous bites prove that his bite force was minimal. There was extraordinarily little tissue destruction observed in those photographs. In comparison, it leads the reader to understand that this failure to immediately release the bite on Nicole was positively created by her active resistance.

Canine Bobby was purchased from a well-known, established vendor who accepts dogs based on its natural instincts and drives, their character and temperament and other pertinent traits. The vendor or his designee's then trains the canine to an accepted level of industry standards based on the buyer's predetermined requirements. Not every canine has this ability. It is obvious that to achieve these standards Canine Bobby must be very levelheaded and demonstrate an enormous amount of acceptance to be controlled by the handler.

Jack Robicheaux, owner of Canine Concepts, has a long-established career as a canine handler, trainer, and is a published author regarding canine detection training. It is abundantly clear that the City of Lake Charles Police Department has ensured their canines and handlers are trained to an extremely high industry standard by competent and qualified trainers. Considerable effort and expense have been put into LCPD canine unit with regards to training and certifications.

According to LCPD Canine Policy each canine team must successfully pass a certification with a recognized National Organization that has certifications that meet or exceed industry standards. Officer Pearson and Bobby received Patrol 2 certification from the National Police Canine Association (NPCA) in 2016, 2017,2018, 2019 and 2020.

A level 2 Patrol certification from NPCA meets an INDUSTRY BEST PRACTICE which is the highest level of certification offered for patrol canines through the NPCA. The level of control needed to achieve this certification displays the enormous amount of control Officer Pearson possess regarding Canine Bobby and Canine Bobby's ability to clearly understand and act on commands by Officer Pearson. Five consecutive years receiving an INDUSTRY BEST PRACTICE standard patrol certification demonstrates this teams continuous training efforts as well as their ability to consistently sustain this level of excellence.

The LCPD maintains departmental Policies and Procedure Manuals for their canine unit which established guidelines for training, certifications, deployments, and all facets of record keeping for their canine teams. My review of the Use of Force Police that was dated 12/2016 and the Canine Police which was dated 09/2012 appear to be their active policy at the time of this incident on 05-03-2019. These policies adequately reflect their departmental guidelines for this period. However, if there has not been a recent review it is recommended to complete a comprehensive review of these policies.

Police officers are taught that the potential for violence exists until the suspect has been secured with handcuffs or otherwise rendered safe. Many police officers have lost their life at the hands of handcuffed offenders. Officers are trained on a continuing basis to evaluate each situation as it presents itself as any event could escalate into a deadly force utilization. Understandable, Nicole's natural defense is to displace Bobby from biting her, however her actions are interpreted by any reasonable officer in the same situation as active resistance. It is an industry wide court accept practice for a canine to remain on the bite until both hands are visualized or handcuffed. Due to the circumstances in this incident the potential for Nicole to be armed existed therefore creating the immediate threat to Officer Pearson and others. It is very plausible that Nicole could have placed a firearm in the area around her that would have been impossible for the arresting officers to see. *(Escobar v. Montee, 895 F.3d 387, 394 (5th Cir. 2018) (Zuress v. City of Newark No. 19-3945, Filed: 05/28/2020)*

Police canines are taught in different modalities of training regarding their aggression or bite work. This training is based on departmental policies and guidelines. These policies and guidelines must be approved through an agency's command staff and legal department to assure State and Federal Law compliance. Although every use of force is subject to review regarding excessive use of force claims a department is **NOT** governed by outside agencies. The plaintiff's expert wants the reader to believe that "Recommended Guidelines" or policies from other states, organizations or federal agencies have to be applied in this incident. Truthfully, that decision belongs to the City of Lake Charles and the LCPD not the plaintiff's expert witness. The LCPD has a review process for every use of force application through the departments chain of command. This use of force report was reviewed by the LCPD process and found that no laws or policy violation had occurred.

The LCPD Canine unit trains their canines in the bite and hold modality that is handler initiated except for officer protection. Specifically, industry wide, canines that are trained to bite generally train their canine once they bite, retained that bite. The process of bite and hold is to reduce how many times a canine bites, therefore a reduction in the injuries incurred. To re-enforce this behavior, in training the decoy excerpts simulated pressure on the dog by positional placements, pushing, shoving, twisting, fighting, striking, kicking etc. to ensure that the dog stays on the original bite location. The photographs provided for my review of Bobby's previous bites prove that his bite force was minimal. There was extraordinarily little tissue destruction observed in those photographs. *In my opinion, due to the active resistance from Nicole and the pressure she excerpted on Bobby during the bite he fought through her aggression by not letting go and remaining on the bite.* **Bobby's action of remaining on the bite cannot be consider an intentional act by Officer Pearson**.

This resulted in more tissue injury because Bobby's failure to release his bite on command. Bobby's failure to release his bite is completely against his nature and proven behaviors in training and actual deployments. This anomaly was not an intentional action caused by Officer Pearson but merely an unfortunate result canine Bobby perceived as the "fight" with Nicole.

Nicole was transported to Lake Charles Memorial Hospital via an ambulance. She was subsequently admitted into the hospital for follow up patient care. Dr. Axelrad examined Nicole in the ER and was the attending physician submitted a medical report regarding her care.

Dr. Axelrad provides a medical description of her injury and the two surgeries he performed. Dr. Axelrad report gives details regarding what he saw, what he did, and future care of Nicole if needed. His report referenced a report he reviewed submitted by Dr. Hendersen, a plastic surgeon. Dr. Hendersen's expertise deals with reconstructive surgery. In his report Dr. Hendersen gives a detail synopsis of what he reviewed in the records provided to him and what he assumes may be needed for Nicole. Dr. Hendersen even provides opinions regarding canine Bobby:

> *2. It is my opinion, to a reasonable degree of medical certainty, that it is unlikely the K- 9 dog was an adequately trained and certified police dog and was up to date on his training or he would have obeyed the officer who told him to release his victim.*
>
> *3. It is my opinion, to a reasonable degree of medical certainty as a reconstructive surgeon, that a police dog should be expected to bite and hold, but also to release the bite and hold when commanded. Otherwise, it would be an unsafe animal for the community.*

Having been a state certified paramedic for 8 years, trained in Advanced Cardiac Life Support (ACLS), Basic/Advanced Trauma Life Support, supervised two ACLS ambulances for the City of Baytown, Texas for approximately two years, completion of a Tactical MED course taught by H&K, collateral duty as a tactical medical officer on our primary assault team for the City of Pasadena, Texas SWAT team for 19.5 years, does not provide me with a *"reasonable degree of medical certainty"* that the medical information Dr. Hendersen provided in his report is true and accurate regarding Nicole's ongoing medical needs. Nor does Dr. Hendersen's *"reasonable degree of medical certainty"* provide him with accurate knowledge regarding canine Bobby's "adequate" training or certifications. His statement that canine Bobby as "an unsafe animal for the community" is based on one incident out of five years of proven service as a dual-purpose police canine. Five certifications from the NPCA achieving an "Industry Best Practice Standard" are completely negated by Dr. Hendersen's review of one incident. Without an extensive background experience as a canine handler, trainer, and evaluator, extensive knowledge regarding all aspects of police service animals, comprehensive review of all documented training and deployment records it is impossible to provide and educated opinion on police service dogs. I strongly believe due to the active resistance from Nicole and the positional pressure she excerpted on Bobby during the bite he fought through her aggression by remaining on the bite.

The act of biting a passive person has connotations of being excessive. However, in my training and experience even a passive suspect can kill an officer. A passive person is no less dangerous than an outwardly resistant subject. Each situation involving a passive person is different and dictates an officer's response accordingly. Nicole intentionally hid from Officer Pearson and canine Bobby in an overgrown rubble pile that prevented Officer Pearson from seeing her before Bobby found her. Clearly, Nicole knew they were getting close to her hiding spot. She could hear and see their approach but chose to stay hidden from their view.

In general, knowing a police service dog has the potential of biting, most persons normal reaction would be to make themselves known to avoid being bit. To remain hidden from the canine team any reasonable officer would assume that person has other intentions, potentially the use of deadly force against the officer. Biting a passive subject is a common practice and situationally based. *Due to the immediate threat that Nicole presented the utilization of canine Bobby as a less than lethal force option is appropriate and consistent with industry standards.*

One of the LCPD canine training and deployment modalities/practices, is to hand cuff a resistant or violent person before a canine is removed from a bite on that person. Although this is an accepted industry safety practice it is situationally based. Accordingly, if the subject is or becomes compliant the canine must be immediately removed from the bite. Another aspect of this practice is removal of the dog when an officer can see both suspect's hands. For the safety of both officers and Nicole during the process of arresting her it was clear that her active resistance and neither officer being able to see both of her hands dictated that her hands be secured before the removal process began. *(Escobar v. Montee, 895 F.3d 387, 394 (5th Cir. 2018)*

The Plaintiff's expert witness report provides details from a case that has no relevance to this case. The details and actions of officers involved in this case distinctly differ. *(Cooper v Brown, 844 F.3d 517, 523 (5th Cir. 2016).* Officer Pearson faced a different circumstance, and any reasonable officer would deem this situation as an immediate threat. Nicole was involved in a felony investigation; illegal drugs and firearms were recovered from the vehicle she was inside. She fled the scene with a purse that certainly could have contained a firearm. She hid and refused to surrender to officers therefore placing them in imminent danger as they approached her ambush position. When Bobby located and bit her, she actively struggled to get Bobby to release his bite. At the same time, she refused to comply with the officers' commands to show them her hands. This refusal to present her hands for cuffing is reason to believe she potentially had a weapon on her person or hidden within her reach. Officer Ewing had to physically pull her arm out from under her to complete the handcuffing process. (*Refer Officer Ewing BC)*

The plaintiff's expert provides several descriptions or definition of terms to describe a suspect's behaviors:

> Whether the suspect poses an immediate threat to the safety of the law enforcement officers or others: If the suspect is armed with a typical or non-typical (baseball bat, hammer, etc.) weapon, he poses a threat.

> In addition, the suspect' s prior actions indicate whether he poses a threat. Generally, un- cuffed and un- searched suspects who are in close proximity of officers pose a threat to you and others.

> And whether the suspect is actively resisting arrest or attempting to evade arrest by flight: This is active resistance, such as fighting, assaulting, etc.

> Passive resistance, such as passive non- compliance, not following verbal orders, " locking up" their body, etc., passive protestors, is not active resistance.

Illegal drugs and firearms were in the vehicle she was inside, she was not hand cuffed nor physically searched *(note: a visual observation of a person cannot preclude if that person is armed or not)* she evaded officers twice by flight, during her arrest she was in extremely close proximity to officers and actively resisting arrest by refusing to comply with officers' commands to give them her hands so the arrest could be completed. All of which their expert wants the reader to accept that Nicole was passive and NOT an imminent threat.

*In my professional opinion the utilization of Canine Bobby by Officer Pearson as a less than lethal force option to arrest Nicole was reasonable, lawful, and consistent with modern police practices, industry standards and in accordance with State and Federal Law, LCPD's General orders regarding Use of Force and Canine Policies. Therefore,* **the defendant is NOT responsible for violating the plaintiff's civil rights.** *The deployment of Canine Bobby was totally in response to Nicole's evasion/fleeing, her active resistance and refusal to comply with lawful orders and allow officers to affect her arrest created their use of force and the severity of her injury.* **Any allegation that Officer Pearson intentionally or willfully used excessive force against Nicole is "NOT" true. Officer Pearson's actions was a justified use of force in Nicole's arrest.**

**V.**   The compensation I will receive for my study and testimony in this manner is:

SCHEDULE OF FEES-Terry Anderson-2021

a. All Case Preparation: $200.00/hour

b. Any Deposition: $300.00/hour

c. Court Room Charges: 4 hours standby waiting to testify is $500.00, 8 hours standby waiting to testify is $800.00 (hours past 8 for standby testimony will be billed at case preparation rate)

d. No charges accrue once called to testify. Charges do accrue for pre-testimony and post testimony if not released from court.

e. Consultation Fee: $250.00/hour

f. Travel Time: $75.00/hour Plus $0.56/mile

g. Retainer fee is $3,000 and is deducted from total hours billed. The retainer fee is NON-refundable.

h. Non-disclosed Case Analyst Work: $200.00/hour

**VI.**   I have testified as an expert witness at trial or deposition in the preceding 5 years.

(Refer to attached CV for further details)

I have provided these opinions based on the information that I have reviewed and I reserve the right to change, mend or supplement my opinion based on additional information.

Terry Anderson

Terry Anderson – Keli's K9's

**Terry Anderson, Sgt., Pasadena Police Department (Ret.)**

Canine Consultant/Trainer Keli's K9's LLC

1566 County Road 4510  Hillister, Texas 77624

contact@kelisk9s.com 713-562-7371

**Summary**

Twenty-five-years law enforcement career includes seven years as a supervisor over patrol, canine unit, swat and eod units. Canine handler and swat operator for twenty years and trainer for the canine unit for twenty –two years. Five years assigned to narcotic unit with canine partner on swat.  Variety of operational responsibilities related to patrol, canine, swat and eod. Have testified multiple times in county, district and federal court cases related to canine patrol utilizations and narcotic investigations. I am the President of the National Police Canine Association (NPCA). A position I have held since 2004.   I am on six different federal boards. Board Member of two Canine related Federal Boards involving Best Practices for Canine Training/Operations (SWGDOG) and Minimum Standard Explosive Canine Training and Certifications (NEDCAB).  Original Member of Organization of Scientific Area Committee (OSAC) for forensic canine best practices, now an affiliate member of OSAC. Along with three other federal boards dealing with domestic breeding programs and industry training events. Affiliate of NTOA responsible for review of tactical deployments involving canine awards. Certified twice through the State of Texas as an Advanced Life Support Paramedic.

**Experience**

| | |
|---|---|
| 2013-Present | Canine Trainer/handler and owner of Keli's K9's, a business that procures, trains and provides canine services (narcotic/explosive canine searches) for LE agencies and investigations as well as train dogs for private citizens. |
| 2020- Present | Consultant for Las Vegas Metro Police Department (LVMPD) Canine Unit, includes review of canine related policies and recommendations. Review of LVMPD Internal Review Final Report, updated policies. |
| 2018- Present | Subject Matter Expert for Department of Homeland Security Explosive Canine Program Evaluator |
| 2017-Present | Expert witness in canine detection and excessive use of force and civil rights violations.  (Refer to Case List Below) |
| 2015 thru 2017 | Consultant/Trainer City of Brenham canine unit, Reviewed Canine related Departmental Policies |
| 2011-Present | One of sixteen original members of OSAC responsible for developing standards for canine industry.  Now an Affiliate Member |

| 2008-2013 | Executive Board Member of SWGDOG |
| 2009 thru 2014 | Executive Board Member of NEDCAB |
| 2008- Present | Instructor for Swat and K9 Interacting During Deployments (SKIDDS), K9 and Tactical Tracking (KATTS) |
| 2004 – Present | President of NPCA |
| 1988-2013 | Sgt. Pasadena Police Department (Ret.) |

Began career in March of 1988, obtained Basic, Intermediate, Advanced and Master certifications through the State of Texas as a Police Officer.  Certified through the State of Texas as a TCLEOSE Instructor. Taught Basic Life Support techniques for PPD academy as well as courses in all canine discipline, tactics, tactical operations and small team tactics.

Spent a total of fifteen years on night shift patrol as a canine handler, swat operator, and later as a Sgt with my canine partner on swat. Promoted to Sgt and moved to Special Operations over canine, swat and eod. As the Sgt over these combined units, I was responsible for sixty tactical operators' assignments, training, procurements and all field operations. Training responsibilities included developing course curriculums and PowerPoint presentations for units under special operations.

Five years' experience as a narcotic investigator with my dual-purpose canine. Extensive surveillance and search warrant experience. Prepared and managed budgets for the canine unit, swat and for eod. Also participated in multiple grant writing/submissions that resulted in several million dollars being awarded to our agency as well as our regional, multi-agency, eod team.

Teach swat operators and canine teams across the country on integrating canine teams into tactical operations successfully (SKIDDS) and K9 and Tactical Tracking (KATTS) Classes.

Also, I am a Vice Chairman for National Tactical Officers Association (NTOA) Awards Committee.

| 1986-1988 | Paramedic for City of Baytown:  Hired as paramedic and original member of a new city service for the Health Department of the City of Baytown. Became a shift supervisor responsible for two ambulances, vehicle maintenance, ER relations, four personnel and equipment inspection. |
| 1988 -2004 | Adjunct Instructor/Preceptor for San Jacinto Jr College EMT Program |

### Education

| 1982 | Graduated High School: Post high school graduation, I entered the work force in construction and painting, then decided to return to school. |

| 1983-1984 | Two Year Athletic Scholarship to Alvin Community College:  Received athletic scholarship and utilized one of two years and decided to pursue a first responders' career with the intent to become a firefighter- paramedic. |
| --- | --- |
| 1984-1986 | Enrolled San Jacinto Jr College (SJJC) EMT Program |
| 1986-1988 | SJJC Diver Medic Program and Commercial Underwater Welding Program while obtaining Basic Certifications for EMT, I became a local volunteer firefighter. As I advanced in EMT certifications my career goals changed as I developed a deeper interest in the commercial diving field and was able to combine both fields by becoming a Certified Commercial Diver and paramedic-diver medic. |

**Certifications**

Texas Commission on Law Enforcement

Basic, Intermediate, Advanced and Master LE Certifications

Successfully completed Basic Supervisory Course at Sam Houston State University

Basic through Advanced Swat operator

Numerous tactical certifications with weapons, less lethal, breaching, armored vehicle operations and explosive entry

Previously Certified as a Paramedic by the State of Texas

Certified Basic Open Water Sport Dived

Certified Commercial Diver in deep dives, chamber operations and mixed gases

Co-owner of Keli's K9's licensed through the State of Texas #C03041801

President and lifetime Member of NPCA

**Interest/Skills**

Currently handle our own detection canine teams that conduct private searches for narcotics and explosives.

Train dogs for LE in Detection and Patrol that includes all aspects of control and aggression bite work. As well as basic through advance obedience for private citizen owned canines.

Hunting, fishing, horseback riding, hiking, riding motorcycles and RVing.

Previously attended a Non-Denominational (Christian) Church, Elim, that I grew up attending.

Fifteen years' experience as President of NPCA managing a 501 © 3, non-profit organization, with a two hundred thousand dollar a year budget, an executive board of nine board members and overseeing all

daily operations as well as problem solving organization issues across this country. NPCA is responsible for training/certifications of our members.

**Expert Witness Case**:

1. State of Louisiana Vs. David Horace Leonard NO. #01602-11, Narcotic Detection, report and called to testify in court.
2. Angelica Maria De La Rosa vs. City of Tucson No. #c20164674, Canine Use of Force, report written.
3. George Willie Rios vs. City of Tucson No. CV-17-00003-JAS-POST, Canine Use of Force, report, and deposition given.
4. Raymond Collins vs. City of Tucson No. 4:17-cv-00157-RCC, Canine Use of Force, report, and called to testify.
5. Daniel Tegart vs. City of Tucson No. CV-17-00472-TUC-RM, Canine Use of Force, report, testified during trial.
6. Robert C. Moore vs National Railroad Passenger Corporation (AMTRAK) Civic Action No. 2018 CA 006324B, consultant and wrote report for Plaintiff (Police Officer)
7. Solomon Coley and Arshakne Hall vs. City of Bossier City No. 5:17-cv-01553-EEF-MLH, Canine Use of Force, report, and deposition.
8. Nicole Edwards vs City of Lake Charles No. 2:19-cv-01150-JDC-KK, Active Case, wrote report,
9. Daniel Charles Montez vs. Maricopa County SO No. 2:19-cv-00349-SMB-JZB Active Case, wrote report
10. Olivia Sligh v.. City of Conroe, Texas, and Montgomery County, Texas Tyson Sutton, Individually and Alexis Alias Montes. Civil Action 4:20-cv-1417 Active Case, wrote report.

References available on request

Terry Anderson, CV