1        IN THE UNITED STATES DISTRICT COURT

2       FOR THE WESTERN DISTRICT OF LOUISIANA

3              SHREVEPORT DIVISION


5   SOLOMON COLEY and ARSHAKNE HALL    )
    individually and on behalf of      )
6   their minor children JEWEL COLEY   )
    and A'BRIANNA COLEY,               )
7                                      )
             Plaintiffs,               )
8                                      ) CIVIL ACTION
    vs.                                ) FILE NO. 17-1553
9                                      )
    CITY OF BOSSIER CITY, CHAD         )
10  BOYETT AND SGT. FAULKNER,          )
                                       )
11           Defendants.               )
                                       )
12  _____)


17              **DEPOSITION OF TERRY ANDERSON**
                 Taken October 17th, 2019


24              REPORTED BY:
            YORANDA SAID, CCR, RPR
                COURT REPORTER

ORIGINAL

1

1    **APPEARANCES OF COUNSEL:**

2         APPEARING ON BEHALF OF THE PLAINTIFFS,
          SOLOMON COLEY, ET AL:
3
4                   MR. NELSON W. CAMERON
                    Attorney at Law
                    675 Jordan Street
5                   Shreveport, LA 71101
                    Phone: (318)226-0111
6
7         APPEARING ON BEHALF OF THE DEFENDANTS,
          CITY OF BOSSIER CITY, ET AL:
8
9                   MR. LAYNE A. CLARK, JR.
                    LAW OFFICE OF WIENER, WEISS, & MADISON, APC.
                    330 Marshall Street, Suite 1000
10                  Shreveport, LA. 71101
                    Phone: (318)226-9100
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

2

```
 1                              I N D E X

 2

 3    STIPULATIONS                                           4

 4

 5    WITNESS:  TERRY ANDERSON

 6         Examination by Mr. Cameron..........................5

 7

 8

 9

10                            E X H I B I T S

11

12    Exhibit No. 122.........................................8

13    Exhibit No. 122B........................................9

14

15

16

17

18

19

20

21

22

23

24

25
```

1        The deposition of Terry Anderson, being taken by Counsel

2    for the Plaintiff, Nelson W. Cameron, pursuant to notice by and

3    between Counsel, for all purposes allowed under the Federal

4    Rules of Civil Procedure, before Yoranda N. Said, Certified

5    Court Reporter, at the office of Nelson W. Cameron, 675 Jordan

6    Street, Shreveport, Louisiana, on the 17th day of October, 2019.

7        It being agreed and stipulated by and between Counsel that

8    all formalities with the exception of the swearing of the

9    witness are waived; it being further stipulated that the reading

10   and signing of the deposition is reserved by counsel and the

11   Deponent; it being further stipulated that all objections except

12   as to the form of the question and the responsiveness of the

13   answer are reserved until time of trial.

14

15

16

17

18

19

20

21

22

23

24

25

4

1                       P R O C E E D I N G S

2                          TERRY ANDERSON,

3      having first been duly sworn, was examined and testified as

4      follows:

5                             EXAMINATION

6                         BY MR. CAMERON:

7          Q.    Mr. Anderson, my name is Nelson Cameron.  I'm an

8      attorney in Shreveport, Louisiana.  And I represent the

9      plaintiffs in this case Mr. Coley and Ms. Hall and the children.

10     And I'll be asking you a series of questions about your expert

11     opinion in this case and if I don't -- I ask you questions you

12     don't understand what I'm trying to ask you, just ask me to

13     repeat, rephrase, or explain the question before you answer it,

14     okay?

15         A.    Yes, sir.

16         Q.    And I know we won't have this problem in a telephone

17     deposition, but we do ask that you use words rather than, you

18     know, grunts or sounds, okay?

19         A.    Yes, sir.

20         Q.    Please allow me to finish my question before you try to

21     answer it.  That way we won't be talking on top of each other

22     and you have the opportunity to hear the entire question before

23     you answer it, okay?

24         A.    Yes, sir.

25         Q.    You understand that you are under oath just like you

1    would be in a court of law?

2        A.    Yes, sir.

3        Q.    And you also understand as a part of your obligation to

4    tell the truth you're not to leave out any truthful information

5    from your answer.  You understand that?

6        A.    Yes, sir.

7        Q.    All right.  If you answer a question I have to assume

8    that you've understood the question, is that fair enough?

9        A.    Yes, sir.

10       Q.    All right.  Well, first thing I need for you do is

11   state your name and your professional address?

12       A.    My name is Terry Anderson.  My professional address is

13   1566 County Road 4510 Hillister, H-i-l-l-i-s-t-e-r, Texas

14   77624.

15       Q.    Are you associated with a company called Keli's K-9's,

16   LLC?

17       A.    Yes, sir.

18       Q.    Tell me briefly what that is?

19       A.    It's my wife's company.  We train dogs, police dogs,

20   service dog, patrol, narcotics, and explosives.  We train

21   private owners dogs for obedience, events, obedience.  We have

22   our own dogs.  We work on contract for different private

23   industries and I teach classes all over this country.

24       Q.    Now, these K-9s that you train are they for law

25   enforcement and security purposes only or are there other

6

1    aspects you train on?

2        A.    No.   There's other aspects.

3        Q.    What other purposes -- what other kind of training do

4    you provide for K-9s besides law enforcement and security?

5        A.    Obedience.

6        Q.    And if you gave a percentage of the business that you

7    do that's related to law enforcement out of this company what

8    would it be?

9        A.    I don't know what you're referring to, sir.   I don't

10   know how to answer that.

11       Q.    What percentage of your business with Keli's K-9 is

12   related to law enforcement?   Did you hear me?

13       A.    I did.   I'm trying to figure out how to answer that.

14   We do -- we do not do as many private dogs and we don't do very

15   many law enforcement dogs for training.   We've done probably

16   four or five, 14.   Our job is working our dogs in our service

17   contracts and then my teaching.   My teaching is everything to do

18   with SWAT dogs and tactics and tracking and doing searches and

19   things of that nature all over the country.

20       Q.    Well, if you would can -- are you able to break down

21   for me what percentage of your business with Keli's is devoted

22   to the teaching versus actually training dogs?

23       A.    Significant is teaching.   We've only trained four or

24   five dogs since we started doing this.

25       Q.    When did you start doing that work?

1    A.    We created the business in 2012 while my wife was still

2    working.  2013 I retired.  2014 we found cancer.  And the end of

3    '14 beginning of '15 is when we started focusing on the business

4    when I was declared cancer free.

5    Q.    All right.  We share something in common then.  I've

6    been through that myself.  Okay.  Let's talk a little bit about

7    -- there's a couple of housekeeping matters I want to take care

8    of.  One is, Mr. Anderson, you provided a report in this case

9    and it's -- let's see what the date of it is.  I don't have a

10   date on it, but any way you provided a report I believe it's 15

11   or 16 pages long and I wanted to attach that to the deposition.

12   It's going to be Exhibit 122, which is I believe is the number

13   we designated in our pretrial order.  Can you verify for me that

14   you did provide an expert opinion in this case?

15   A.    Yes, sir, I did.

16              (Whereupon, Exhibit No. 122 was marked for

17              identification.)

18   BY MR. CAMERON:

19   Q.    And is it approximately -- might be 18 pages long.  The

20   pages aren't numbered.  So would you agree it's approximately

21   18 pages long?

22   A.    Yes, sir.

23   Q.    I just counted them, 16 pages.  So I'll make that

24   Exhibit 122.  And then you have a CV that was referenced on the

25   last page and it is three pages long and would you -- can you

1    verify that you did provide a CV?

2        A.    Yes, I did provide a CV.

3        Q.    I'll mark this -- and was it three pages long?

4        A.    Approximately, yes, sir.  I don't have it pulled up in

5    front of me.

6        Q.    All right.  It provides a history of your law

7    enforcement experience and your education and it's some

8    certifications with the Texas Commission of Law Enforcement and

9    then a section on interest and skills.  Does that sound

10   correct?

11       A.    Yes, sir.

12       Q.    All right.  I'll mark this as 122B.  It wasn't really a

13   part of the report.  Attach those to the deposition.

14             (Whereupon, Exhibit No. 122B was marked for

15             identification.)

16   BY MR. CAMERON:

17       Q.    Do you have your report there in front of you?

18       A.    Yes, sir, I do.

19       Q.    Very quickly get your year of birth?

20       A.    1964.

21       Q.    And currently you are not employed with any law

22   enforcement agency, is that right?

23       A.    That's correct.

24       Q.    You say you retired and that's -- when you mean you

25   retired, you retired from law enforcement in 2013?

1    A.    That is correct.

2    Q.    And was that from the -- that was from the City of

3    Brenham, is that correct?

4    A.    No.  No.

5    Q.    Not correct.  What is that?  What is correct?

6    A.    City of Pasadena, Texas.

7    Q.    Oh, okay.  I see it.  And you are currently the

8    president of the National Police K-9 Association?

9    A.    That is correct.

10    Q.    And then says your -- on your resume a member of OSAC.

11    What is that?  Oh, I see.  Organization of Scientific Area

12    Committee?

13    A.    Yes, sir.

14    Q.    Is that an adjunct of the MPCA?

15    A.    No, sir.  An adjunct of Mid National Institute of

16    Science Technology.

17    Q.    Where is that located?

18    A.    I don't know, sir.  It's out of Washington.  I believe

19    we meet different parts of the country.  I have not -- I'm an

20    affiliate member now so I don't travel.

21    Q.    Okay.  When was the last time this OSAC met?

22    A.    I don't -- they met just recently.

23    Q.    And you did not participate in that meeting?

24    A.    I participated online, but I did not participate in

25    that meeting.

1    Q.    Does that meet like once a year or how often does it

2    meet?  You say twice a year or once a year?

3    A.    Twice a year.

4    Q.    The last time that you participated in one of those

5    meetings was when?

6    A.    Several years ago.  I'm not sure if it was '17 or '16.

7    I'm not sure.

8    Q.    And -- I'm sorry?

9    A.    I'm sorry.  Mr. Nelson, in a face-to-face meeting I

10   participated in telephonic meetings and online meetings since

11   then, yes.

12   Q.    And what kind of -- oh, I see.  Has this committee ever

13   -- has it issued any standards for K-9 best practices?

14   A.    That's what it --

15   Q.    You said yes?

16   A.    That is what it is, OSAC is all about, yes, sir.

17   Creating standards for the law enforcement K-9 industry in a

18   detection.

19   Q.    And is there a name for these standards?

20   A.    Those standards were developed from Swgdog.

21           THE COURT REPORTER:  Where?

22           THE WITNESS:  Swgdog, S-w-g-d-o-g.

23   BY MR. CAMERON:

24   Q.    And where can those standards be located?

25   A.    This is a very, very long story, but to simplify it you

1    can find those standards on FIU, Florida International
2    University website.  Swgdog brought federal funding multiple
3    years ago, three or four years ago and that is how OSAC was
4    created.  It was Swgdog's documents were brought underneath OSAC
5    organization -- sorry, Dogs and Sensors underneath the crime
6    scene investigation.  And that is to continue the development of
7    those living documents in creating guidelines and standards.
8        Q.    Would these guidelines and standards be applicable to
9    any of the actions of Chad Boyett in this case?
10       A.    Not in this case.
11       Q.    And is that because these were mainly for evidentiary
12   gathering purposes or -- these standards we're talking about?
13       A.    Not at all.  It's all about detection in every aspect
14   of detection.
15       Q.    Detection, okay.  I see.  Are you still performing
16   duties for the City of Brenham as a consultant or trainer?
17       A.    No, sir.
18       Q.    When did that stop?
19       A.    I believe our last -- first off we were never under
20   contract.  We billed them for our service.  That stopped in I
21   want to say January of '18.
22       Q.    Of this year?
23       A.    No, sir.
24       Q.    What year was it?
25       A.    It could have been '17.  I don't recall.

1    Q.   All right.  Just going to move along here.  When a K-9

2  handler has his K-9 and he is kind of like what Boyett was doing

3  in this case pursuing a suspect, and he gives a command to -- is

4  it to apprehend the suspect?  Is that the command he gives to

5  the dog?

6    A.   Mr. Nelson, there's multiple commands.  You're going to

7  have to be a little more specific to what you want me to answer

8  on this one.

9    Q.   Well let's say in this particular case Boyett gave a

10  command to Canine Torres to what, with Williams?

11    A.   To apprehend Williams, that is correct.

12    Q.   Okay.  And when they -- K-9 is given a command to

13  apprehend a suspect is that a command that's the officer knows

14  that the K-9 will bite?

15    A.   No, sir.

16    Q.   Okay.  What would the officer expect the K-9 to do

17  after giving a command to apprehend?

18    A.   Very, very vague question again, sir, because there's

19  multiple things that the dogs could do.

20    Q.   What does the officer expect the K-9 to do once the

21  officer gives a command to apprehend?

22    A.   Okay.  So do you want me to answer that as a bark and

23  hold dog or the bite and hold dog?

24    Q.   I understand what you're saying.  So let me ask you

25  this.  So what's the difference between those two, bite and hold

13

1    and bark and hold?

2        A.    The bark and hold the dog will go and not engage the

3    suspect -- I'm sorry, did I say bark and hold or bite and hold?

4        Q.    Just start over.

5        A.    Okay.   On a bark and hold dog once the handler deploys

6    the dog he goes and he apprehends the suspect or the decoy, the

7    dog will go down and contact without physically contacting the

8    suspect and will bark at the suspect.   The difference in that

9    and a bite and hold is the dog will go down and if he actually

10   has physical contact or capable of contacting the suspect he

11   will actually bite the suspect.

12       Q.    Do you teach any bite and hold on -- to any law

13   enforcement agencies?

14       A.    Not anymore.

15       Q.    And when did you last teach that method?

16       A.    I taught it my whole career in Pasadena.   So I haven't

17   taught that to any specific dog other than the police service

18   dogs that I've trained since then, which was just one patrol dog

19   in '16 and he was a bite and hold dog.

20       Q.    Is there any advantages or disadvantages to the bark

21   and hold method versus the bite and hold?

22       A.    Absolutely.

23       Q.    What are they?

24       A.    Multiple.

25       Q.    I'm all ears.   Just go ahead and tell me.

1    A.    Okay.  Bark and hold dogs put the handler it sounds on

2  the surface like this a real good thing in IETC -- in a nutshell

3  associated with chief of police, they support this.  However,

4  it's typically proven that a bark and hold dog gets more bites

5  than a bite and hold dog.  A bite and hold dog will go down and

6  if they can make contact with a suspect generally speaking they

7  will bite and hang on to that suspect until they're told to do

8  something different.  So the advantage is possibly the suspect

9  doesn't get bitten with a bark and hold dog.  The disadvantage

10  is that that same suspect could be standing there with a firearm

11  pointed at the handler as he approaches and the dog not engage

12  him.

13    Q.    Okay.  In this particular case Canine Torres was a bite

14  and hold trained dog, is that correct?

15    A.    Yes, sir.

16    Q.    Does an officer with a bite and hold K-9 like Torres

17  was in this case, does the officer depend on that K-9 to

18  determine who to bite?

19    A.    No, sir.

20    Q.    Okay.  Tell me how is it that the officer is able to

21  direct the K-9 who to bite?

22    A.    That starts in basic training and that is a constant

23  goal or focus of training throughout the dog's career.  You

24  begin by teaching the dog who to bite by visual stimulation and

25  equipment that also allows the dog to learn how to bite.  We

1    teach the dog to then -- a lot us teach the dog to release
2    before we actually teach to bite.  We teach them to release.  So
3    it's pretty in depth.  I can continue explaining it, but I think
4    that kind of gives you an idea.
5        Q.    Have you ever heard of something called a choke off?
6        A.    Yes, sir.
7        Q.    Is that a method used in training to increase a K-9's
8    bite hold?
9        A.    It could be.
10       Q.    Is a choke off used in the training of a K-9?
11       A.    With some agencies and some dogs it is, yes, sir.
12       Q.    Describe the motion of a choke off?
13       A.    Well, there's varying types of choke offs.  The method
14   that I teach is approach the dog from behind, you bring both
15   hands up underneath the collar.  You actually are detaining and
16   controlling the dog with both hands.  You're not actually
17   choking the dog off.  You're raising the dog up and holding the
18   dog until the dog releases generally associated with a verbal
19   command.
20       Q.    And what is the verbal command that's provided at the
21   time of a choke off?
22       A.    It depends on the command, sir.  What language it's
23   going to be used in...
24            THE COURT REPORTER:  I need him to be a little
25        louder because he's kind of trailing off at the end.

16

1    BY MR. CAMERON:

2        Q.    Okay.  I'm sorry, could you speak a little louder

3    please.  The court reporter is having some difficulty hearing

4    you?

5        A.    Certainly.  Sorry.

6        Q.    That's fine.  Let's see, so just I understand it might

7    be different languages used, but we're speaking English here so

8    I just want to know what is the English equivalent of the

9    command that is provided at the time of choke off?

10       A.    I would teach the dog to say out that's his word of

11   verbal stimulus.

12       Q.    Are there some K-9's you're saying are not trained

13   using the choke off?

14       A.    Absolutely.

15       Q.    And what would be used instead of a choke off to

16   increase a K-9's bite?

17       A.    Let me kind of explain or go back just a hair.  I don't

18   think people use the choke off to teach the dog to bite harder.

19   I think that they use the choke off to have -- remove the dog

20   from the bite.  Now, I may have misspoken a few minutes ago.

21   People may or handlers or trainers may use backwards pressure

22   from a lead or something to pull the dog away from what it's

23   actually being trained to bite to create the dog to bite that

24   equipment harder.  But to train the choke off to have the dog

25   release that's just to get the dog to release the bite.

17

1    Q.    Have you ever been aware of a choke off being used in

2    the training of a dog to make the dog want the object that it's

3    biting more?

4    A.    Not a choke off, no.

5    Q.    Is the use of a choke off an acceptable means of

6    removing a K-9 from a bite in the field?  When I talk about in

7    the field I'm talking about it's biting a suspect.

8    A.    Again I think you have to be very cautious with a

9    quote, a choke off, in the respect that you're suggesting that

10   they're yanking backwards on that and that very seldom is that

11   done if ever because it creates an injury a little more serious

12   as -- has the potential for doing that for the bite.

13   Q.    Make sure I understand what you're saying is that you

14   would be cautious in using a choke off technique to remove a K-9

15   from a bite of a suspect?

16   A.    Yes.

17   Q.    And is that because a choke off could exacerbate the

18   bite?

19   A.    It could.

20   Q.    And is it true that the only reason you might use a

21   choke off in the field removing a bite, a K-9 bite from a

22   suspect, is because the verbal command is not working?

23   A.    No, sir, not at all.

24   Q.    Okay.  Under -- why would an officer use a choke off to

25   remove a K-9 from a bite?

1    A.    To control the dog once he's come off the bite.

2    Q.    Okay.  Let's say -- let's say officer is -- let me

3    rephrase.  Would it be an appropriate use of the choke off

4    technique if the officer was unable to remove a K-9 from a bite

5    by verbal command?

6    A.    The dog is not releasing a bite from a verbal command

7    the handler would have to put his hands on the dog, that is

8    correct.

9    Q.    If a K-9 does not release a bite by verbal command does

10   that tell you that the K-9 is not being properly trained?

11   A.    Not -- that's a situational based assertion there

12   because some dogs, yes, some dogs, no, depending upon the actual

13   situation.  It may not apply.

14   Q.    Typically when you have a K-9 who has a bite of a

15   suspect and the officer sees that it's appropriate to have the

16   K-9 release that bite, ordinarily the officer would use a verbal

17   command, correct?

18   A.    I can't say that is correct all the time, no, sir.

19   Q.    Okay.  Well tell me outside of using the verbal command

20   what other method would an officer use to release the bite?

21   A.    That's a different question.  The verbal command is

22   first and then if the verbal command doesn't work or he doesn't

23   give a verbal command he must go hands on to the dog.  But

24   choking him off or just controlling the dog on the bite is not

25   quite the same thing.

19

1    Q.    Yes, sir.

2    A.    That's actually two different.

3    Q.    So when an officer uses a verbal command to release the

4    dog from the bite of the suspect, where would the officer be at?

5    Is he next to the dog when he gives the verbal command or is he

6    suppose to be a distance away behind cover?

7    A.    That again is a situational basis, sir, because

8    typically speaking I train officers that they don't call the dog

9    off of a bite until they are safe and secure.  In other words,

10    they have lethal cover on the suspect they may move up and they

11    probably will move up, put their hands on the dog before they

12    give a verbal command to out the dog.  That way there's no

13    opportunity for the dog to reengage that suspect or somebody

14    else.  That's just not always the case.  Dog releasing of the

15    bite from a distance maybe the appropriate thing, but again it's

16    still situational based.

17    Q.    Yes, sir.  Now, when we talk about releasing from a

18    distance is that done because if the handler approaches the dog

19    and gets next to the dog while the dog is in a bite, that it --

20    the dog may increase it's bite hold in an effort to protect the

21    handler?

22    A.    I wouldn't say to protect the handler, no, sir.

23    Q.    You never heard of that if a handler approaches a K-9

24    while it is biting a suspect that that K-9 will increase it's

25    bite hold on the suspect?

20

1    A.    I've heard it.  I've seen it all the time.  But it's

2    not necessarily based on protecting the handler.  It's generally

3    based on the fact that the dog knows he's fixing to be removed

4    from the bite and the dog wants to stay on the bite.

5    Q.    Would you agree that the use of the choke hold would be

6    a technique used as a last resort to remove the K-9 from a bite?

7    A.    No, sir, not at all.

8    Q.    Is it fairly well known among K-9 handlers that if the

9    handler approaches, gets near the K-9 while he's biting the

10   suspect that the K-9 will increase it's bite hold?

11   A.    That's not a every bite every dog situation, no, sir.

12   A dog that's well trained goes to bite he actually does bite,

13   the dog should be demonstrating the same bite capability at the

14   onset of the bite as it is -- as the handler approaches to put

15   his hands on the dog and remove the dog.  That should not

16   change.  If it does change then you have to look at why is it

17   changing.

18   Q.    If a K-9 attacks the handler after the K-9 is released

19   from a bite what does that say about that particular K-9?

20   A.    Doesn't tell me a whole lot of anything, sir.  My

21   experience that a lot of my dogs have bit suspects and when I

22   removed them from the bite they turn around and bit me and

23   that's not -- there's a difference in the reason that they're

24   biting.  That's the best that I can answer the best I can tell

25   you.

21

1    Q.    You don't have any explanation as to why a K-9 would do

2    that to the handler?

3    A.    Again there's different reasons for that.  My

4    particular dog that I worked I had eight dogs during my career,

5    this particular one dog was the only dog that I had that did

6    that.  I worked him on the street for 12 years and he would

7    energy [phonetic] once he bit a suspect.  When I removed him

8    whether it was verbal or physical he would turn around and nip

9    me so it's still a bite.  But it's way different than what he's,

10    you know, biting on the suspect.  So the dogs are different and

11    there's different types of bites.

12    Q.    Would you agree that K-9s used in police work need to

13    undergo regular training?

14    A.    Absolutely.

15    Q.    And is that because if the K-9 is not reinforced in the

16    training that it might revert back to his less domestic

17    nature?

18    A.    I don't really know how to answer that, sir, to be

19    serious.

20    Q.    K-9 underneath all of the shiny fir and all that is

21    basically a wild animal, right?

22    A.    I disagree.

23    Q.    If it's not trained regularly and go through the

24    motions regularly there is a good change that that K-9 will not

25    act in the manner or behave in the manner that's expected of a

1    police officer, right?

2        A.    Mr. Nelson, dogs are trained and mandated to maintain

3    training through the courts.  So to say that a dog just doesn't

4    get trained weekly or monthly is going to revert to some less

5    than trained behavior it is not always the case.  There's quite

6    a few times where I might introduce my dog because I had so many

7    dogs in training my dog may not see that for six months and then

8    when he comes back to that training he drops back into that and

9    just performs exceptionally well.  So I can't really agree with

10   that.  I will say that if their training is proper and the dog

11   has been properly trained and the handler has been properly

12   trained that that's not really an issue.  It's really just a

13   maintenance thing just to continually reinforce that positive

14   behaviors.  But no, it's not normally that they forget and

15   become wild dogs.

16       Q.    How -- when we say there should be regular training,

17   how often should the training take place?

18       A.    Well, the industry standard is 16 hours a month.

19       Q.    And where is this industry standard located?

20       A.    In the OSAC.  Documents, SWG Dog documents.  You can

21   look on my website.  This is how we articulate clearly posted

22   there that we recommend a minimum of 16 hours training per month

23   per dog.

24       Q.    What type of training is this suppose to be.  Is this

25   all for apprehension or for detection, what training is it?

1    A.    No, sir.   That 16 hours a month covers all phases of

2    that dogs training.

3    Q.    So the 16 hours should include -- just give me a run

4    down because I don't know what all areas you consider to be all

5    phases?

6    A.    Sure.   Detection, narcotics, explosives, any other type

7    of -- dog works guns or anything like that detection.   Then

8    patrol, obedience, building searches, area searches, tracking,

9    high risk vehicle searches, high risk traffic block training,

10   patrol training with officers, encompasses everything.

11   Q.    So we have detection, patrol, and searches, is that the

12   three main areas?

13   A.    I'm sorry.   Say they again, sir.

14   Q.    All right.   I was just trying to get a handle on what

15   you -- when you say all phases of training should be done 16

16   hours, I was trying to pick up and distill what you said you

17   have -- is there just like three areas?   Talking about, one,

18   detection; two, patrol; and three, searches?

19   A.    Yes.   That also includes all the handler training.   We

20   may do classroom training specifically on the --

21             THE COURT REPORTER:   Specifically on -- I'm

22        sorry.   He's trailing off.

23             THE WITNESS:   Okay.   I'm sorry.   Is that better?

24             THE COURT REPORTER:   Yeah, that's better.

25             THE WITNESS:   That 16 hours covers all aspect

1      including handlers and dogs, classroom and field work.

2  BY MR. CAMERON:

3      Q.    Yes, sir.  And the subject areas that are generally

4  covered, detection, patrol, and searches, is that right?

5      A.    Pretty much, yes, sir.

6      Q.    All right.  And under the heading of patrol is that

7  where apprehension would be covered?

8      A.    Yes, sir.

9      Q.    Are you aware of any training that's provided to none

10  K-9 handlers, just regular patrol officers who are not handling

11  K-9s, what to do if they come across what they know to be an

12  accidental bite by a K-9?

13      A.    No, sir.  I don't know of any agency that normally

14  trains that aspect.  I will say that we train that at the SWAT

15  dog level.  Because the dog is working in such close proximity

16  with SWAT operators that we may not want to expose ourselves to

17  the closest person to the dog may actually put their hands on

18  the dog and give the dog an out command.  So it does happen, but

19  I do not know of any agency that regularly trains their

20  patrolmen to do that.

21      Q.    In this particular situation with Chad Boyett City of

22  Bossier City, were you aware Canine Torres had an electronic

23  collar on at the time?

24      A.    I know that in his deposition Chad talked about

25  generally speaking when he works that the dog is wearing a

1   collar and he's wearing a transmitter, but I don't know for sure
2   that he had the collar on at that time of this incident.  I
3   don't know that.
4       Q.   If it was -- did you see in the deposition where he
5   stated it was his habit, routine, or practice to have the
6   electronic collar?
7       A.   Yes, sir.  Yes, sir.
8       Q.   So how is the electronic collar used in a situation
9   like what we have in this case?
10      A.   I don't think the electronic has a place in this
11  particular situation, sir.
12      Q.   How is the electronic collar used?
13      A.   There's been a lot of different training modalities
14  with it.  Typically speaking it's an extension of the leash so
15  that we have greater distance between the dog and the handler
16  typically speaking.
17      Q.   Does the electronic collar assist in recalling the
18  K-9?
19      A.   If the dog and that agency has trained the dog to
20  recall with the collar that potentially could be viable, but
21  most of the agencies don't use it to recall a dog.  They use it
22  to stop a dog.
23      Q.   Okay.  Explain what you mean?  Is it to stop the dog
24  from pursuing or stop the dog from doing whatever it's doing?
25      A.   Both of those could apply.

1    Q.    And in your experience what is the typical range of an

2    electronic collar?

3    A.    It depends on the manufacturer, sir.  There's too many

4    variables.

5    Q.    As far as using a verbal recall command can that be

6    done during the time that a K-9 is pursuing a suspect in order

7    to stop the pursuit?

8    A.    Absolutely.

9    Q.    When a K-9 officer gives a warning that -- let me

10    rephrase.  In a situation where you have a K-9 handler who has

11    released the K-9 to apprehend a suspect in the open, not in a

12    building, but outside, and the K-9 handler provides a warning,

13    is that warning simply to the person being pursued so they have

14    an opportunity to surrender or does it have a greater purpose in

15    warning potential bystanders?

16    A.    As you ask the question I don't know why an officer

17    would deploy the dog to apprehend somebody and then do the

18    warning.

19    Q.    So you're saying at least in your experience a dog

20    handler never provides a warning to a fleeing suspect that he's

21    about to release a K-9 on him?

22    A.    No, sir, I did not say that at all.

23    Q.    Okay.  Well I misinterpreted your answer then.

24    A.    You asked the question the handler deployed the dog and

25    then give a verbal warning.  I don't know that anybody would do

1    that.

2         Q.   Oh, I see what you're saying.  You give the warning

3    first and then deploy the dog?

4         A.   If the warning is applicable that is correct.

5         Q.   Now going back to -- well I'm hoping my original

6    question is is the warning that a K-9 handler might give before

7    deploying the K-9 is the purpose of that simply to warn the

8    fleeing suspect or is that a greater purpose in also advising

9    anybody in the immediate vicinity that the K-9 handler is about

10   to release a K-9?

11        A.   So the answer why we give warnings is to give suspects

12   an opportunity to surrender.

13        Q.   And that's -- as far as you know that's the only

14   purpose of a warning?

15        A.   That's the only court mandated reason for the

16   warning.

17        Q.   Okay.  So you're basing that not on industry standards,

18   but on some court ruling?

19        A.   And industry standards and a lot of department policies

20   and guidelines.  But that does not mean that somebody in an area

21   could hear the -- that has a right to be there could hear the

22   warning and come see what's going on.

23        Q.   And again the industry standard concerning the warning

24   is that that same organization you mentioned earlier OSCA?

25        A.   No, it has nothing to do with those guys.

1    Q.   All right.  So what industry standard are you

2  referencing with -- regarding the warning?

3    A.   Normal operation of patrol dogs.

4    Q.   I understand that, but I was thinking when you said

5  industry standards it might be a set of rules or standards

6  issued by some group, organization like International Chief of

7  Police, somebody like that.  I was just wondering --

8    A.   I'm not -- the warnings are mandated by the courts.

9  The court also gives us opportunities not to provide warnings.

10  If we're in imminent peril you do not have to give a warning.

11    Q.   And imminent peril means what now exactly?

12    A.   Okay.  We'll use this particular case.  There is no

13  reason, justifiable reason because the threat to Officer Boyett

14  and other officers was there and all ready established.  There

15  was no court mandate that he had to put himself into a

16  dangerous, more dangerous situation than he already had by

17  giving a warning.

18    Q.   So we were talking about imminent peril we're talking

19  about this is a known threat to the life of the officer or

20  serious bodily harm to the officer or others, is that what we're

21  talking about?

22    A.   Yes, sir.  And just for a reference there's some --I

23  actually quote some of the cases in my report, but the most

24  recent one was several months ago Collins vs. City of Tucson and

25  that is specifically addressed on the back because it's a threat

1    that existed, the officer did not have to give a warning.

2        Q.   Now, you have reviewed some of the pictures taken of

3    the little five year old girl who got bit by the police K-9?

4        A.   Yes, sir.

5        Q.   And is it accurate to say that the K-9 actually bit

6    Jewel?  That's the little girl's name.

7        A.   I can't say that that's accurate.  That he bit or tried

8    to bite, but I'm being honest with you I can't guarantee that

9    those are teeth marks and not done with the toes.

10           THE COURT REPORTER:   That those are teeth marks

11       and what?

12           THE WITNESS:   I can't guarantee that that was

13       done by teeth or toes.

14   BY MR. CAMERON:

15       Q.   Or what toes?  The claws you mean?

16       A.   Right.  The claws of the dog, yes, sir.

17       Q.   What is the standard of accepted practice regarding

18   release of a K-9 when innocent bystanders are present?

19       A.   Did you say release of a K-9?

20       Q.   Yes.

21       A.   I don't know of any agency that would intentionally

22   release their dog to apprehend a person with a bunch of

23   pedestrians around.  I don't know that that's...

24       Q.   Now, when we say that there are pedestrians or

25   bystanders present, would these be individuals that the officer

30

1    should see or they -- and I'm just trying to figure out how far
2    away these bystanders could be and still be within the standards
3    to release the K-9 to apprehend?
4        A.    First off you have to go by the agency's policies and
5    their training modalities.  Second thing is the officer is going
6    to have to make decisions based on his training and policies.
7    And the third thing that you would look for is that he's looking
8    at the totality of, for example, if you've got bystanders to the
9    left and the suspect running to the right and there's nobody
10   there, there's no problem deploying that dog.
11       Q.    So you're -- let me rephrase.  So the practice would be
12   if there are pedestrian bystanders in the relevant path taken by
13   the suspect then you do not release, but if there aren't any in
14   that path way then it's reasonable to release the K-9?
15       A.    Objectively reasonable, yes, sir, depending upon the
16   situation.
17            THE COURT REPORTER:  I'm sorry.  Say that again
18        please.
19            THE WITNESS:  Objectively reasonable depending
20        upon the situation.
21   BY MR. CAMERON:
22       Q.    Right.  Okay.  So I'm just looking at this idea about
23   the suspect has a pathway he's going and a K-9 is going to
24   follow that same pathway.  How big of a pathway is the officer
25   going to visualize to say well -- say we have a suspect running

1  in one direction in one pathway and there's a pedestrian 20 feet

2  off of that pathway, is that a pedestrian that we're going to

3  protect or is that someone it's still going to be reasonable to

4  release the K-9?  I'm just trying to figure out how wide this

5  pathway can be?

6      A.    It's situationally based and it has to be based on what

7  that officer sees at that time of that incident.  The bottom

8  line is if he doesn't see anybody he is good to deploy.

9      Q.    Well let me ask you this, this particular incident

10 happened in an apartment complex and there were many buildings

11 inside this apartment complex.  I mean wouldn't you agree with

12 me that even if an officer looks down a particular pathway he's

13 not going to be able to see around the corner of any of these

14 buildings, right?

15     A.    That's correct.

16     Q.    Shouldn't he make some kind of presumption, we have an

17 apartment complex or a lot of people who live in apartment

18 complexes.  There could be people around the corner, innocent

19 people.  I mean is that something that the officer should take

20 into account?

21     A.    I'm sure that he would take it into account, but once

22 the dog has made it's -- has addressed or recognized or

23 identified his target those people generally don't even come

24 into place.  The dog doesn't have his focus on them.

25     Q.    Now, is there any training like that you provide to

1    agencies to avoid a K-9 biting an innocent bystander?

2        A.    Sir, that's really kind of standard training.  We teach

3    the dogs to identify the threat.  We allow them to, you know, to

4    apprehend or address the threat.  While this start -- this type

5    of training begins early in the dog's career by teaching them

6    what we want, to bite what we don't want to them to bite.

7        Q.    Is there any training that you perform where

8    individuals might play a role of an innocent bystander?

9        A.    I don't intentionally set that up to play a role, but I

10   do intentionally put people around my target.

11       Q.    Do you know if the City of Bossier City performed that

12   kind of training?

13       A.    I'm not sure, sir.

14       Q.    Do you agree that it's a reasonable practice that

15   should bystanders be within 20 yards of the K-9 handler, the K-9

16   handler should not deploy that K-9?

17       A.    No, sir.  I guess the general agreement to that

18   statement there's too many variables --

19            THE COURT REPORTER:  Sir, I need you to speak

20       louder please.

21            THE WITNESS:  I apologize.  I can't agree to

22       that.  There's too many variables in that statement

23       and I know from experience that I personally have

24       deployed my dog to apprehend suspects in very close

25       proximity of other people.  Once my dog has positively

1        targeted that person I'm very comfortable with that

2        dog being released to go bite that one person.

3   BY MR. CAMERON:

4        Q.    Are you aware that Officer Boyett attempts to justify

5   his failure to use a verbal command from a distance because he

6   was afraid the Canine Torres would release Jewel, but reattach

7   to her father, you aware of that?

8        A.    Oh, absolutely.  I think it was a prudent decision.

9        Q.    Should a handler assume that his well trained K-9 is

10  going to follow his commands?

11       A.    He did follow the command.  He apprehended and chased

12  the target, contacted Williams, and knocked Williams down.

13       Q.    Well, shouldn't Boyett have enough faith in his K-9

14  that if he gave a command to release from a distance that the --

15  Torres would have released Jewel and return to him?

16       A.    So if you're asking me specifically about this

17  particular deal I'm going to say absolutely not, no way because

18  Mr. Solomon immediately put his hands on the dog and was

19  attempting to pull the dog off of his daughter.  So what he did

20  in Boyett's report said that he was hitting him and grabbing him

21  and choking him and yanking him back, which that in and of

22  itself could explain the injuries to the little girl.  But by

23  not giving the dog a verbal out command he took the ability of

24  that dog to disengage from the girl's shirt.  If you'll look at

25  his deposition Officer Boyett when he put his hand on the dog

1    says -- clearly says the dog was biting the shirt, which is not
2    the little girl, but biting the shirt, so why would he call the
3    dog off and give the dog the opportunity to engage somebody
4    else.

5        Q.    When a K-9 is commanded to release a bite what is it
6    suppose to do?

7        A.    Release the bite.

8        Q.    And then after releasing the bite where is the K-9 to
9    go or where is it suppose to position itself?

10        A.    Again that's kind of a vague question because the
11    bottom line when we're talking about this particular case the
12    dog is being attacked.  What would you expect the dog to do to
13    just to run away from that fight or go back to the handler or to
14    engage the threat that he perceived happening to him?

15        Q.    Ordinarily typically when a K-9 is commanded to release
16    it's bite when it's biting -- or apphrending a suspect, what is
17    it suppose to do, where is it suppose to go?

18        A.    If there are no other extenuating circumstances it's
19    just the suspect and just the dog and the handler has a verbal
20    release or it's not in their policy to put their hands on the
21    dog before they tell the dog to release, then the dog should
22    release the bite and either down right there by the suspect, sit
23    by the suspect, or come back to the handler depending upon their
24    training modality.

25        Q.    Would you agree that the use of a choke off to release

35

1    a K-9 from a bite and apprehension shows a control problem with

2    the dog?

3        A.    Absolutely not.

4        Q.    So that's something all K-9 handlers do regularly they

5    do the choke off with the dog?

6        A.    Sir, the training methods have changed.  Use to -- the

7    guideline was call the dog off the bite and back to you.  And

8    what we found was that there's so many negative sides to that

9    that most agencies are going to leave the dog on the bite until

10   we go and put our hands on the dog safely.  That way we can

11   insure that the dog doesn't reengage the suspect, doesn't

12   reengage an officer.  It doesn't reengage somebody else.  We

13   don't give an opportunity for the dog to make that decision on

14   his own.

15       Q.    Was it your understanding of the facts that Officer

16   Boyett followed behind Torres who was running to make contact

17   with Williams?

18       A.    I'm sorry.  Can you say that again please?

19       Q.    Sure.  Well, I'll tell you what, let me look at your

20   expert report.  I believe that might help us both here a little

21   bit.  Okay.  On page five you have roman numeral four incident

22   summary, you see that?

23       A.    Yes, sir.

24       Q.    All right.  No. 7 you write Officer Boyett was directly

25   behind the suspect as Torres chased him through the area through

1    this area.  So that was a fact that you found from -- after

2    examining the depositions and these types of things, right?  You

3    follow me?

4         A.    Oh, yes, sir.  I answered that.  I said that was

5    correct.

6         Q.    Sorry.  I didn't hear it.  Okay.  Then next page, page

7    six, item 10, you write, quote, Officer Boyett observed Canine

8    Torres pursuing Williams and making physical contact with him in

9    the lower leg as he crossed a sidewalk on the west side of Easy

10   Street.  And this was a fact that you found from looking at all

11   the items -- I think 85 different item that you looked at

12   including depositions and reports, is that correct?

13        A.    Yes, sir.

14        Q.    So you were able to determine that Boyett saw Torres

15   make contact with Williams, correct?

16        A.    Yes, sir.

17        Q.    And at that point in time when he made -- Torres made

18   contact with Williams, Jewel and her father and Jewel's little

19   sister A'Brianna were, what, 10 to 20 feet away from there at

20   that time?

21        A.    No, sir.  I don't have that information.  I can't agree

22   with that or disagree.  I don't know.

23        Q.    Well, let me ask you this, if in fact Jewel and her

24   father and A'Brianna were 10 to 20 feet away from Williams when

25   Torres was making contact with Williams that Boyett should have

1    seen A'Brianna, Jewel, and her father?

2        A.    Well, looking at the video I can't agree that they were

3    10 to 20 feet away, but the question is if they were should he?

4    If they were he should have, but I don't think that's -- I don't

5    think that you can come to that conclusion because we don't know

6    exactly how close the suspect was to Jewel when Torres bit

7    him.

8        Q.    Let me go to on to another subject.  Did you -- you

9    reviewed Boyett's video and his audio?

10       A.    I have, yes, sir.

11       Q.    And did you hear him say when he ran up to Canine

12   Torres to get him off of Jewel that he, quote, jerked him,

13   grabbed him and of course he let go immediately, end quote.  Do

14   you recall that part?

15       A.    Yes, sir.  I read that, yes, sir.

16       Q.    And would you agree that what -- from that and what --

17   how Officer Boyett described how he obtained Torres release from

18   Jewel that Officer Boyett was using a choke off technique?

19       A.    I can't say he used a choke off technique.  I can say

20   that he had his hands on the dog and gave the dog a verbal

21   release and the dog released.

22       Q.    Okay.  Now, if he was not using a choke off technique

23   what technique was he using?

24       A.    Hands on the dog.  He was using a verbal command once

25   he put his hands on the dog, told the dog to release, and the

1   dog released.

2        Q.   So there is training that you're aware of that if a K-9

3   handler simply puts his hands on the dog that the dog is going

4   to release?

5        A.   It depends on the dog, but I've seen it a thousand

6   times, yes, sir.

7        Q.   Now this -- I'm sorry.  Go ahead.

8        A.   Now, when I say I've seen it a thousand times it was

9   one of the things why I insisted that all my handlers put their

10  hands on a dog before they gave the verbal release demand.  That

11  way we had immediate, direct control of the dog release on the

12  verbal command.  Now, as they got later in their careers they're

13  smart enough to say I'm fixing to have to let go.  So as soon as

14  the handler touches them they're releasing.

15       Q.   Well, the fact that Boyett describes the manner in

16  which he obtained Torres release as, quote, jerked him doesn't

17  that tell you that what we're talking about is a choke off not

18  simply putting the hands on the dog?

19       A.   No.  It don't tell me that at all, sir,  because what

20  he does say is that the dog only had her by the shirt.  So he's

21  not actually biting the girl anymore, is he?

22       Q.   Well what method are you aware of where a K-9 officer

23  can jerk the dog to get the dog to release other than a choke

24  off?

25       A.   Because that's what I said further is that I don't know

1    anybody who jerks their dog off bites.  Put their hands on the

2    dog and controls, takes the dog off the bite is not the same

3    thing as what you're implying by jerking the dog off the bite.

4        Q.   I'm not implying anything.  I'm just using Officer

5    Boyett's description.  He says he jerked him -- talking about

6    the dog.  You don't know anybody that does that though, right?

7        A.   Not anybody that's got any knowledge and experience,

8    no, sir.  Again the difference is biting a person and biting an

9    article.

10       Q.   Now, going to your report looking at the roman numeral

11   two which tells us what materials you looked at and reviewed, I

12   have 85 different items here.  And I guess my question to you

13   right now is have you reviewed anything else that is not

14   listed?

15       A.   Not that I recall, no, sir.

16       Q.   I want to ask you about if you reviewed the depositions

17   transcripts of Vidalia Murray?

18       A.   I don't see it listed, sir.  So I don't know if I

19   reviewed it after this report was written or not.  I don't know

20   that.

21       Q.   And same question on -- for the depositions of Ms.

22   Kimball and a Jessica Williams, did you review those

23   depositions?

24       A.   Again if I don't have it listed if I reviewed it it

25   would have been done after this report was submitted.

40

1    Q.    Did -- in your report, your expert report, you do not

2    provide any opinion regarding whether the fleeing suspect could

3    have been forcibly stopped before he reached the apartment

4    complex?

5    A.    I wasn't ask to give an opinion based on a pursuit

6    policy.

7    Q.    I understand.  Have you ever visited the apartment

8    complex site?

9    A.    No, sir.

10    Q.    Have you reviewed any photographs or satellite images

11    or anything such as that of the site?

12    A.    No, sir.

13    Q.    Have you reviewed any topographical maps?

14    A.    No, sir.

15    Q.    Now, I don't know if you saw this or not.  You saw the

16    video from the Officer Provost's vehicle that was behind Officer

17    Boyett and it showed the release of Canine Torres out of the

18    vehicle?

19    A.    Yes, sir.

20    Q.    And then there was a point in time when Boyett directs

21    Canine Torres I guess toward the suspect, you recall seeing

22    that?

23    A.    Yes, sir.

24    Q.    Now, the actual command for the K-9 to apprehend

25    there's the verbal component and is there also a none verbal

1    component such as pointing, that kind of thing?

2        A.    He pointed in the direction, but I don't know that

3    pointing is just something that they trained to show the dog who

4    they want it to bite.  I don't know that.

5        Q.    Are you able to testify whether from the point at the

6    very spot where Officer Boyett released Canine Torres to

7    apprehend Williams that Boyett could actually see where Williams

8    was?

9        A.    Yes, sir.

10       Q.    And how are you able to do that?

11       A.    His deposition.

12       Q.    Okay.  So you're relying on Boyett's testimony?

13       A.    Of course.

14       Q.    In your career as a consultant or expert witness have

15   you -- how many times have you testified in court as an expert?

16       A.    Since I've started my business or before?

17       Q.    I say started your business as a consultant with K-9s.

18       A.    Through my business I have not testified in court.

19       Q.    Okay.  Are you saying before you started your business

20   you had?

21       A.    Absolutely.  Multiple times.

22       Q.    And what areas were you accepted as an expert?

23       A.    State, district, and federal court.

24       Q.    Oh, okay.  Bad question on my part.  What field of

25   expertise were you accepted at an expert in?

1      A.    K-9.

2      Q.    Just K-9, general K-9.  These cases where you testified

3  in federal, state court, were these criminal cases?

4      A.    Yes, sir.  All of them were criminal cases.

5      Q.    You never had to testify in court regarding civil

6  rights violations or a Constitutional violation?

7      A.    Correct.

8      Q.    And have you written expert reports such as what you've

9  done here regarding civil cases where a K-9 was involved?

10      A.    Yes.

11      Q.    How many of those have you written?

12      A.    Six, five or six.  I'd have to go look through my

13  records.

14      Q.    And have you in those cases that you provided written

15  expert reports have you been deposed like what we're doing

16  here?

17      A.    Yes.

18      Q.    And how many times have you been deposed?

19      A.    This is my second deposition.

20      Q.    Of the five or six expert reports that you have

21  provided, how many of those or what percentage of those reports

22  were provided for a plaintiff?

23      A.    One report for a plaintiff and that was a detection

24  case.

25            THE COURT REPORTER:  You said one where?

1           THE WITNESS:  One report plaintiff and that was a
2       detection case and everything else has been for the
3       defendant.
4    BY MR. CAMERON:
5        Q.    Explain what you mean by a detection case?
6        A.    A gentleman was working his dog for this agency and he
7    got hurt and they failed to take care of some of their
8    responsibilities.  And so I have -- was hired to provide
9    information regarding his dog, not the actual injury or anything
10   like that, just what was going on and information about the
11   dog.
12       Q.    So this particular plaintiff that you gave an expert
13   report for he was a K-9 handler?
14       A.    That's correct.
15       Q.    And was he a member of the MPCA?
16       A.    No, sir.
17       Q.    The expert reports you provided to defendants were any
18   of those defendants members of the MPCA?
19       A.    Yes, sir.
20       Q.    Are we talking about all of them or some of them or
21   what percentage?
22       A.    All reports.
23       Q.    Have you ever been asked to review a case where
24   individual plaintiff was suing a law enforcement agency to
25   review it on behalf of the plaintiff?

1    A.    I just answered that, yes, sir.

2    Q.    Oh, I'm sorry.  I didn't hear you.

3    A.    I have a case with that, yes, sir.

4    Q.    I'm sorry?

5    A.    I said I have a case with that, plaintiff is a law

6    enforcement officer is suing his agency, yes.

7    Q.    Yes, sir.  Okay.  I understand.  What I'm talking about

8    -- I guess I didn't make myself clear.  Have you ever been asked

9    to review a case for a plaintiff who was injured talking about

10   maybe a suspect or innocent bystander was injured by a police

11   K-9 being asked by that injured party?

12   A.    So let me just make sure I understand.

13   Q.    Sure.

14   A.    What you're asking is a plaintiff who was injured by a

15   police K-9 have I ever assisted them or wrote a report for

16   them.

17   Q.    Well not that.  We can get to that in just a second.

18   I'm asking have you ever been asked by such a person to review

19   their case?

20   A.    No, sir.

21   Q.    Would you ever do that?

22   A.    I would review it, yes, sir.

23   Q.    And would you if you saw that there was a violation

24   would you write a report for them?

25   A.    If that officer was in the right and he was wrong, yes,

1    sir, I would.

2        Q.    Now, you're the president of MPCA, right?

3        A.    Correct.

4        Q.    If there was a -- let's say you had one of these

5    injured plaintiffs that came to you who has been injured by

6    police K-9 and the defendant is a member of the MPCA, would you

7    as the president write an expert report if you found a violation

8    for -- in such a case?

9        A.    Absolutely not.  I don't get involved with those cases

10   through MPCA.  The only legal advice or representation of an

11   expert witness that I would provide on behalf of MPCA is in the

12   event the certification, integrity of the certification is being

13   questioned.  If there is any question regarding a department

14   case whatever the case maybe, if it does not involve the

15   integrity of my certification MPCA does not get involved.  If it

16   does involve the integrity of my certification then I will find

17   somebody to represent MPCA with that in that situation.

18       Q.    All right.  Let me make sure we're on the same page.

19   So if a plaintiff whose been injured by a K-9, police K-9 comes

20   to you requesting you to review the case and provide an expert

21   report and the offending K-9 belongs to an agency that is a

22   member of MPCA, are you telling me that you would under take

23   that case or that you would not?

24       A.    Would not.

25       Q.    And is that because you may have a conflict of

46

1   interest?

2       A.    Absolutely.

3       Q.    Chad Boyett he is as far as you know a member of the

4   MPCA?

5       A.    That's correct.

6       Q.    And he has been certified by the association?

7       A.    Certified as what?

8       Q.    Been certified as a I guess a K-9 handler.  I don't

9   know, I'm not exactly sure what your certification consist of.

10      A.    Well, I don't certify just the handlers.  I certify K-9

11  teams.  And yes, in 2016 and 2017 he went through detection and

12  patrol certifications for MPCA.  He received a patrol two

13  certification in '16 and '17 through MPCA, which means he had

14  the recall and he had the verbal release from a distance which

15  means it's the industry's best practice to reach that level.

16      Q.    Are you aware -- let me rephrase this.  I'm sorry.  Are

17  individual members of the MPCA or can cities or political

18  subdivisions also be members?

19      A.    We are a law enforcement certification and training

20  body.  Let me rephrase that.  Training body and certification.

21  Certification is a byproduct of what we do.  The court mandate

22  that we have certification to prove the dogs credibility to an

23  outside organization.  That's why we have certification.  We

24  have individual agencies with one handler.  We have agencies

25  with 50 handlers.  We have agencies with hundreds of handlers.

1    Q.   Is it accurate to say that you as the president of MPCA

2    would not provide an expert opinion that a member of your

3    organization violated any individual's Constitutional Rights?

4    A.   I'm not going to get involved with that at all, no,

5    sir.  I will not.

6    Q.   So you would not provide an opinion for any MPCA member

7    other than upholding the actions of that MPCA member?

8    A.   What I have to do is make sure that if I discuss

9    anything with anybody that's an MPCA member is to determine

10   whether or not MPCA certification is being questioned.  Mr.

11   Cameron?

12   Q.   Yes.

13   A.   I hate to ask, but may I take a short break I need to

14   --

15   Q.   Oh, absolutely, absolutely.  You want us to call you

16   back in about 15 minutes.  We're getting pretty close to being

17   done.  This will give me a chance to kind of gather my thoughts

18   and conclude the deposition.  So we'll call you back in 15

19   minutes.

20   A.   Yes, sir.

21   Q.   All right.  Thank you.

22             (Whereupon, a break was had.)

23        MR. CAMERON:  I just have a little bit more to do

24      not a whole lot left.

25        MR. CLARK:  Are we back on the record?

1          MR. CAMERON:  Well, we can be.  What's going on?

2          THE WITNESS:  I'm just not real comfortable.  I'd

3     like to -- your last question I'd like to make sure

4     I'm completely clear on how my stance on things with

5     -- I want to make sure you understand that I base my

6     thoughts and opinions on the actions.  Let me explain.

7     If somebody came to me and gave me a case and I

8     thought the case was wrong, that that handler did

9     something wrong I would give that opinion regardless

10    of whether it's my member, an MPCA member or not.  I

11    based my opinions on, you know, the overall industry

12    standard and I have had cases where my members have

13    done the wrong thing and I provided, you know,

14    consulting and opinions on those situations.  So I

15    just want to make sure we're clear.  I've kind of got

16    two different aspects of this.  Protecting the

17    integrity of the association vs. protecting a member

18    rights.  If they're right, they're right.  If they're

19    wrong, they're wrong.  That's just the way it is.

20         Does that make sense?

21    BY MR. CAMERON:

22         Q.   That's your statement, not mine.  I'm not going to

23    comment.  Okay.  So we appreciate -- I appreciate your

24    statement.  Appreciate you giving it to us.  Although I have to

25    do a motion to strike because this is a spontaneous statement.

1    It wasn't any kind of question associated with it.  But let me
2    just ask you some other questions here.  As the president of
3    MPCA is that a paid position?
4        A.   No, sir.
5        Q.   So your income is from -- basically from the training
6    that you do?  I'm sorry?
7             THE COURT REPORTER:  I need you to state that
8        again because it broke up.
9             THE WITNESS:  I'm retired.  I have retirement for
10       the rest of my life and I have a personal business.
11   BY MR. CAMERON:
12       Q.   Yes, sir.  I'm just saying.  Is the training -- okay.
13   Besides your retirement benefits you get from the City of
14   Pasadena, the training would that be your chief source of income
15   at the time?
16       A.   I'm not going to say it's my chief source.  I don't
17   know.  To be honest with you I don't know how much income we
18   make.  I know I've been very, very busy.  But working on
19   contracts and training, yes, is -- makes income, yes, sir.
20       Q.   How many training sessions have you performed say so
21   far this year in 2019?
22       A.   Sir, I'd have to go back and count.  I don't know.
23   It's quite a few.
24       Q.   Can you give me an average per month of training
25   sessions that you conduct?

1     A.    Since April I've gone two to three weeks a month.  Not
2   all of that is training.  I do -- for the Department of Homeland
3   Security office I evaluate dogs.  I judge dogs.  I put dog
4   trials on.  And then I do -- those are -- DHS is paid.  The rest
5   of them are not paid positions.
6         THE COURT REPORTER:  I'm sorry, which is the paid
7       position?
8         THE WITNESS:  My training, Department of Homeland
9       Security and the service contract that we have.  But
10      when I go do K-9 trials that is not paid.  That's just
11      voluntary.  Sometimes they're associated with the
12      training where I do get paid for the training, but the
13      trials are not paid.
14  BY MR. CAMERON:
15    Q.    Going back to your report on page five, part four, the
16  incident summary fact number five.  You write that Officer
17  Boyett saw that he, the passenger was armed, carrying a hand
18  gun.  Did you yourself review that video?
19    A.    Yes, sir.
20    Q.    And did you see the man carrying a hand gun?
21    A.    I saw a man carrying an object in his hand, yes, sir.
22    Q.    You can't identify it as a hand gun?
23    A.    I have to assume -- as a police man I have to assume
24  that it was a weapon.
25    Q.    But in the video you were not able to positively

1    identify it as a hand gun?

2        A.    I don't know.  I did not positively see that it was a

3    hand gun, but I did positively see that there's something there

4    and so that created the threat.

5        Q.    Looking at page six where you have your opinion number

6    one you state in part in my professional opinion the utilization

7    of Canine Torres as a less than lethal force option to arrest

8    Williams was reasonable, lawful, and consistent with modern

9    police practices, industry standards in accordance with state

10   and federal law, Bossier City Police Department's general orders

11   use of force policy and K-9 policy.  Question I got for you

12   right now is identify for me the industry standards that you

13   reference in your opinion?

14       A.    When suspects evade law enforcement the use of a police

15   K-9 as a less lethal force option is an industry standard.

16       Q.    Yeah, I guess what I'm looking for is some rules,

17   regulations, standards that are in writing and published by an

18   organization.  I'm looking at -- where are these industry

19   standards?

20       A.    Industry standards are not published.  They're

21   basically guidelines created by the court and legislation that

22   we have to operate under.  So there's no, quote, written

23   industry standard.  Industry standard in terms of industry

24   standard because that's what's happening in the industry is they

25   follow the legislation from the court.  And if you'll refer to

1   my report, I'm not real sure which page number it is, but I

2   actually give you the Louisiana state legislative code of

3   criminal procedure for them to arrest with a warrant, without a

4   warrant, city policy and general orders and policies use of

5   force, arresting officer without a warrant, method of arrest

6   without a warrant, use of force policy and procedures.  So I put

7   all of that from the State of Louisiana Code of Criminal

8   Procedure as well as Bossier City's general policies and

9   guidelines for use of force, K-9, and arrest.

10      Q.   Where you cite the Louisiana legislative acts or code

11  of criminal procedure articles.  That's pages 8 through 10.

12  We're talking about Article 218 and then the Bossier City

13  policies -- oh, and Article 220 as well.  Is that accurate?

14      A.   Yes, sir.

15           THE COURT REPORTER:  I'm sorry, say that again.

16           THE WITNESS:  Graham vs. Connor.

17  BY MR. CAMERON:

18      Q.   You also cite to Byrd vs. City of Bossier and Montanez

19  vs. City of Orlando.  These are also cases in law that you

20  reference as being industry standards?

21      A.   Yes, sir.  I'm not sure -- where did you get those

22  cases from?

23      Q.   They're right there in your opinion number one on page

24  six.  They're right there at the bottom.

25      A.   Page six, okay.  I just want to make sure that I --

1  okay.

2      Q.    And you also as far as the Graham v. Connor factors,

3  you also are citing Smith v. City of Hemet of the 9th circuit as

4  --

5      A.    Yes, sir.

6      Q.    Okay.   That's also a part of the industry standards

7  you're referencing, is that correct?

8      A.    Crenshaw vs. Lister, Escobar v. Montee.

9      Q.    So these are additional aspects of the industry

10  standards that you're referencing?

11      A.    Correct.

12      Q.    Now, you write on page 10, quote, and this is just in

13  part and you can site whatever part of this report you want to

14  in your answer.   But in part you state, quote, no answer is

15  required -- let me rephrase it.   No officer is required to place

16  himself in a lethal situation while announcing his presence or

17  immediate location to a suspect that is known to be armed.   What

18  evidence is there that Williams was known to be armed?

19      A.    When Boyett gave his deposition he clearly said that he

20  saw the gun in the passenger's hand as he exited the vehicle and

21  with that assumption has to be made for the safety of the

22  officer and anybody that that suspect -- the driver could have

23  -- Williams could have come in contact with, you have to assume

24  and treat him as if he's armed until such a time is proven that

25  he's not and in this case he was.

1    Q.   Well, isn't it correct that Boyett never saw a gun in

2    Williams' possession prior to Torres biting Jewel?

3    A.   That's correct.

4    Q.   And on page 11 is it accurate to say looking at the top

5    paragraph there that where you write, quote, it is the handlers'

6    responsibility to ensure that the K-9 has made the proper target

7    identification?

8         MR. CLARK:   What page?

9         MR. CAMERON:   Eleven.

10   BY MR. CAMERON:

11   Q.   And this is like the last sentence of the end of the

12   top paragraph.

13   A.   That's correct.

14   Q.   And going to the next paragraph you write in part

15   Canine Torres was able to make a clear visual contact with

16   Williams.  Let me just back up.  I'll read the whole sentence.

17   Last sentence of the first full paragraph on page 11 states,

18   quote, Officer Boyett is pointing in the direction and moving

19   in a direction behind William and K-9 was able to make a clear

20   visual contact with Williams.  Your conclusion that Canine

21   Torres was able to make a clear visual contact with Williams, is

22   that based upon Boyett pointing in the direction and moving in

23   the direction behind Williams?

24   A.   Absolutely.  Partially.  It's also based on my

25   experience knowing the bodily language and communication between

1    dog and handlers and dog's experience, more experienced with

2    dogs in this particular time of situation.

3        Q.    Was there anything else that led you to believe that,

4    quote, Canine Torres was able to make a clear visual contact

5    with Williams?

6        A.    Yes, sir.  As he pursued a path everybody when he

7    crossed the street and didn't -- and contacted Williams.  So

8    there's no doubt in my mind that the dog had clear target

9    identification and did exactly what he was told to do.

10       Q.    Going to the next paragraph it's accurate that after

11   reviewing the 80 some odd pieces of evidence in the case

12   including depositions that, quote, Officer Boyett saw Canine

13   Torres run directly into Williams and knock him down, is that

14   correct?

15       A.    That's correct.

16       Q.    Going to two more paragraphs down you write, quote, as

17   one of the factors that could have played a role in this

18   situation with Torres biting Jewel, quote, confusion created by

19   a number of people in that exact area or the suspect odor in the

20   immediate vicinity of Jewel resulted in an accidental bite.

21   Tell me what you're referencing here about the suspect odor?

22       A.    Okay.  Suspect in a vehicle he was agitated.  I'm sure

23   he was jumping, a bunch of adrenalin, so his odor inside the car

24   as he exits the vehicle his odor is still following him.  He's

25   running down crosses the street and that's when Torres hits him,

1  contacts him.  He goes down.  So immediately there's a
2  transition from Torres and Williams to Jewel.  So the suspect
3  not only did he run through there, but his odor is also in that
4  same exact vicinity.
5      Q.    Did Canine Torres track Williams using his odor?
6      A.    No, sir.  He made a visual identification and he
7  followed him.
8      Q.    Did Torres obtain Williams scent before he was
9  released?
10     A.    I can't answer that.  Basically he immediately was
11 going on visual target identification and what's off record
12 during that pursuit, I can't answer to that.  Nobody can.
13     Q.    All right.  Going to page fourteen under opinion three,
14 the third paragraph under the opinion.  You state that, quote,
15 there were no obvious pedestrians outside in the area, end
16 quote.  What do you base your conclusion on for that?
17     A.    Well, first, on Officer Boyett's deposition.  Second,
18 based on all the videos that I watched I didn't observe anybody
19 in -- through out the whole pursuit around the apartment complex
20 and then once they entered into the parking lot I didn't
21 visually observe anybody in any of the cameras of the
22 vehicles.
23     Q.    Do you know how long it took for the pursuit to pass
24 the apartment complex and then circle back to it?
25     A.    No, sir.  I'd have to evaluate that time.

57

1    Q.    Well, wasn't there enough time for other tenants to

2    come outside to see what the sirens and flashing lights were all

3    about?

4    A.    Which part of the apartment?

5    Q.    The entire apartment complex.  I mean wasn't there

6    enough time for people to come out of their apartments out into

7    the open from the time the officer first passed until they

8    circled back?

9    A.    Well, I can't give you a good answer on that because

10   anybody could have just walked out of any part of the apartment

11   and gone to the grocery store.  But that's not necessarily

12   because they heard the sirens I mean.

13   Q.    All right.  I mean that happens though, people

14   sometimes seem to be attracted to sirens and flashing lights.

15   They want to see what's going on.  You've experienced that,

16   haven't you?

17   A.    Absolutely.

18   Q.    And the situation with tenants in their apartment there

19   at this complex, was not a static situation, is it?

20   A.    Very fluid.

21   Q.    And on page 15 you provide some opinions that the

22   injuries that little Jewel suffered were minimal and

23   superficial, is that -- was that your opinion about the

24   injuries?

25   A.    That verbiage is actually from the physician's report

1    deposition.  Looking at the photographs of the injury that's my
2    supposition also, yes, sir.
3         Q.    You're not suggesting that Jewel may not have suffered
4    a great deal from this, are you?
5         A.    From the dog bite?
6         Q.    Right.
7         A.    Sir, I can't answer that.
8              MR. CAMERON:  Well, I'll tender if you have any
9         questions, Layne.
10             MR. CLARK:  I don't have any questions.  We are
11        -- obviously we're going to read and sign since this
12        was a telephone deposition.  Court reporter, you can
13        send it through me.
14             THE COURT:  Yes, sir.
15             MR. CAMERON:  I got two concluding questions to
16        ask.
17   BY MR. CAMERON:
18        Q.    Did you understand the questions that you answered?
19        A.    Most of all of them except for that one I needed the
20   statement on I have to -- I was not very clear on the question
21   prior to the break.
22        Q.    Did you have an opportunity, a fair opportunity to
23   understand and to answer the questions?
24        A.    Yes, sir.
25                   (Whereupon, the proceeding was concluded.)

1    STATE OF LOUISIANA)

2    PARISH OF CADDO)

3           This certification is valid only for a transcript

4    accompanied by my original signature and original required seal

5    on this page.

6           I, Yoranda N. Said, Certified Court Reporter in and for
     the State of Louisiana, as the officer before whom this
7    testimony was taken, do hereby certify that Terry Anderson, to
     whom the oath was administered, after having been duly sworn, by
8    me, upon authority of R.S. 37:2554, did testify as hereinbefore
     set forth in the foregoing 59 pages; that this testimony was
9    reported by me in the stenotype reporting method, was prepared
     and transcribed by me or under my personal direction and
10   supervision, and is a true and correct transcript to the best of
     my ability and understanding; that the transcript has been
11   prepared in compliance with transcript format guidelines
     required by statute or by rules of the board, that I have acted
12   in compliance with the prohibition on contractual relationships,
     as defined by Louisiana Code of Civil Procedure Article 1434 and
13   in rules and advisory opinions of the board; that I am not
     related to counsel or to the parties herein, nor am I otherwise
14   interested in the outcome of this matter.

15

16          SUBSCRIBED AND SWORN TO on this the 17th day of
     October, 2019.

17

18

19

20   _____
     YORANDA N. SAID, CCR NO. 23029, RPR

21

22

23                    OFFICIAL SEAL
                      YORANDA N. SAID
                    Certified Court Reporter
24            in and for the State of Louisianna
                  Certificate Number 23029
25              Certificate expires 12-31-19

                                                                    60

Federal Rule of Civil Procedure, Rule 26

Disclosure of expert Testimony

**Case:**    SOLOMON COLEY and ARSHANKE HALL individually and on behalf of their minor children JEWEL COLEY and A'BRIANNA COLEY , Plaintiffs  vs  CITY OF BOSSIER CITY, OFFICER CHAD BOYETT AND SGT. FAULKNER, DEFENDANTS

Case No. C- 17-1553

**Name:**    Terry Anderson

**Company:**    Keli's K9's LLC

Training, Service Canines and Consulting

1566 County Road 4510 Hillister, Texas 77624

I, Terry Anderson, have been retained as an expert witness for the City of Bossier City, Louisiana, in this action. I have been asked to consider the facts in this case and form opinions regarding:

*Negligence, Excessive Use of Force and Failure to Train, in response to a duty to serve and protect the general public from attacks by a police dog during and after the apprehension, responsibility to properly purchase, train, promulgate appropriate adequate Policy and Procedures, handle and control an acceptably trained certified police dog, Failure to respect and protect the Plaintiff's Civil Rights and the Defendant's use of force.*

EXHIBIT
122

I.     **Expert's Background and Experience**

- I am the Trainer/Handler for Keli's K9's LLC. We train single purpose and dual purpose canines for Law Enforcement Agencies. I also train dogs for private citizens in Basic, Intermediate and Advanced Obedience.
- We work our own service dogs in the private sector searching for narcotics and explosives.
- We provide Training for LE agencies regarding all areas of police service dogs and tactics.
- I began my career in 1988 at Pasadena Police Department (PPD) where I worked until I retired as a Sgt. in 2013. I became a certified instructor through the State of Texas Commission on Law Enforcement Standards in 1989.
- I became a canine handler in 1991 and attended numerous canine training schools. I became a certified canine trainer in 1994 and head trainer for PPD that same year. I remained the head trainer for PPD canine Program until just prior to my retirement in 2013. I was responsible for canine procurement, testing and evaluations, budgets, weekly unit training, selection of handlers, handler training programs, monthly departmental reports, medical consultations, Policy and Procedures, mission specific training and operational deployments, and personnel evaluations as well as proficiency assessments.
- I was elected President of National Police Canine Association (NPCA) in 2004 and I still retain that elected position. I spent three years on the Standards Committee (SC) for NPCA. The SC was responsible for developing certification standards for NPCA. I oversee a 1400-member organization with an annual budget exceeding $200,000.00, where we provide training and certifications to LE entities. I annually attend a Legal Update Class that we provide to our members. I teach all disciplines related to canine training to our members.
- I also was a member of PPD SWAT team from 1994-2013. I remained on SWAT following my promotion and was moved to PPD Special Operations Division Sgt and responsible for forty operators in Canine, SWAT and EOD. This responsibility entailed overseeing unit training of all three units, budgets, procurement of equipment, personnel selections and operational deployments. I am employed as an instructor for SKIDDS and travel all over the United States teaching SWAT operators and canine teams how to interact during tactical deployments.
- During my career I have testified in City, State and Federal Courts and have been retained previously as an expert witness on the following cases:

    De La Rosa v. City of Tucson, Case No. C20164674
    George William Rios v. City of Tucson, No. CV-17-00003-JAS-PSOT
    Raymond Collins v. Officer Barry Pedersen, No. 4-17 -cv- 00157-RCC
    Daniel Tegart v. Officer Jeff Rusmley, No. CV-17-00472
    Raymond Roberts v. City of Albuquerque, Case No. 1:18-cv-00253-JAP-SCY
    ROBERT C. MOORE v. NATIONAL RAILROAD PASSENGER CORPORATION (AMTRAK)
    Civil Action No: 2018 CA 006324B

- I have been on three Federal Boards which are responsible for developing industry best practices. I was on the Executive Board for SWGDOG and NEDCAB. Currently I am one of 25 members for OSAC.

II.    **Below is the data and information I considered in forming my opinions:**

1. 000001-47 Investigation File (Cad Call Information & reports)
2. 000001-310 CBC Responses to RFPD
3. 000400-702 Training Records- Boyett
4. 000703-1070 Training Records- Faulkner
5. 002942-3089 Personnel Files- Boyett
6. 003090-3521 Personnel Files- Faulkner
7. 004558-4571 IA-Faulkner 03-IA-91
8. 004572-4614 IA-Faulkner 14-20
9. 005090-5091 IA- Boyett- Report 3-18-13
10. 005092-5093 IA- Boyett- Report 5-29-14
11. 005094-5097 IA- Nelson,Boyett-2015
12. 005101-5107 CAD Calls Boyett
13. 005108-5119 CAD Calls Faulkner
14. 005131 Disciplinary Action- Boyett
15. 005132-5138 Disciplinary Action- Faulkner
16. 005140 Disciplinary Action- Freeman
17. 005151-5189 TORRES- General Info from Disk
18. 005190-5216 Torres Incident Reports
19. 005217-5243 Torres Bite - Andrew Bayles
20. 005244-5247 Torres Bite – Womack
21. 005248-5265 Torres Bite- Dunkentell
22. 005266-5269 Torres bite- Fred Carter
23. 005270-5271 Torres bite-Cooley
24. 005272-5310 Torres Medical
25. 005311-5408 Boyett-Torres Training
26. 005409-5431 Officer's Training w/ Torres
27. 005432-5588 Torres Training
28. 005589-5688 Training Report Torres
29. BOSSIER PARISH INCIDENT (Criminal History)
30. CADDO PARISH (Criminal History)
31. ARSHAKNE HALL deposition
32. OFFICER BOYETT deposition
33. OFFICER CISCO deposition
34. OFFICER FAULKNER deposition
35. OFFICER FREEMAN deposition
36. OFFICER GAYDOS deposition
37. OFFICER ORTIZ deposition
38. OFFICER PROVOST deposition
39. SOLOMON COLEY deposition

40. Scanned Documents (1) training report
41. Scanned Documents training report
42. PHOTOS
43. [1] COMPLAINT
44. [6] Answer
45. [19] First Amended Complaint
46. 4 1 2017 FREEMAN CHASE CAR TO CAR
47. 4 1 2017 FREEMAN CHASE INFORMATION CHANNEL
48. 4 1 2017 FREEMAN
49. 15-01 – BCPD Use of Force Policy
50. CLINGER MED RECS
51. COLEY PLS EXP REPORT (Plaintiff's Expert report)
52. COLEY TOTS TO TEENS
53. COLEY UH RECS
54. CONT FAM SRVCS
55. JENNINGS MED RECS
56. BCPD K-9 POLICY
57. Disk 1 of 6, C00400 A thru (Disk of MVS and BWC)
58. 5-22 DISC. RESP-1 (Answer to Plaintiff's Interrogatories)
59. 5-22 DISC. RESP-2 (Agreement between BCPD and Leroy Azlin for training, payment records, receipts)
60. 5-22 DISC. RESP-3 (Payment receipts, Course Outline)
61. 5-22 DISC. RESP-4 (Training records Eric Sproles)
62. 5-22 DISC. RESP-5 (Training records Eric Sproles)
63. 5-22 DISC. RESP-6 (Training records Eric Sproles)
64. 5-22 DISC. RESP-7 (Training records Eric Sproles)
65. 5-22 DISC. RESP-8 (Training records Eric Sproles)
66. 5-22 DISC. RESP-9 (Training records Eric Sproles)
67. COLEY (1) (Cad Calls and Incident reports)
68. COLEY (2) (Cad Calls and Incident reports)
69. COLEY (3) (Cad Calls and Incident reports)
70. COLEY (4) (Cad Calls and Incident reports)
71. COLEY (5) (Answer to Plaintiff's second set of interrogatories)
72. COLEY (6) (Canine Daily Report: On Duty Dogs, 2016)
73. COLEY (7) Undetermined blank page)
74. COLEY (8) (Canine Daily Report: On Duty Dogs, 2017)
75. COLEY (9) (Canine Monthly report, DMVR Policy, BWC Policy, Pursuit Policy, Boyett Schedule, CAD Call and reports)
76. 5-13-19 Erica Proby - Statement of Non-Appearance
77. 5-13-19 Lawanda Perkins deposition
78. 104353_5-21-19 Randall Glen White, Jr., M.D. deposition
79. Capt. Aguirre's deposition
80. Leroy Azlin deposition Transcript Pt. 1
81. Leroy Azlin deposition Transcript Pt. 2
82. 5-22 DISC. RESP-1 (Answer to Plaintiffs Interrogatories)
83. CH ANS. TO 4th ROGS & RFPD (Answer to Interrogatories and Response)
84. PLS answers to Roes and RFPD
85. PROBY TRANSCRIPT

III.  **Here are the facts presented to me and upon which my opinions are based.**

Primary Participants:

- **Trevier Perez Williams** B/M 03-18-91, 2871 Joust Drive Shreveport, La. the defendant who fled from Bossier City Police Officers and was later charged with multiple felony crimes (NOTE: Not a named person in this suit)
- **Solomon Coley** B/M 03-02-85, 541 E. Stoner Street #143, Shreveport, La. Father of Jewel Coley
- **Jewel Coley** B/F 06-21-11 1319 Acorn Street Shreveport, La. The Child who was bitten by Canine Torres
- **A'Brianna Coley** B/F 05-24-2013 1319 Acorn Street Shreveport, La. Sister to Jewel who was present when Jewel was bitten
- **Arshakne Quadrell Hall** B/F 1319  Acorn Street Shreveport, La. Mother of Jewel and A'Brianna
- **Officer Chad Boyett, City of Bossier City Police Officer, canine handler**
- **Sgt. Faulkner, City of Bossier City Police Officer**


IV.  **Incident Summary:**

1. On 04-01-2017, at approx. 2121, Officer Provost of the Bossier City Police department observed a white Honda Civic (LA Temp # 16800457) driving with no head lights. As he attempted to stop the vehicle it refused to stop and a vehicle pursuit ensued.
2. During the pursuit Officer Provost was the lead unit pursuing the vehicle until Canine Officer Boyett was able to take over the lead unit in the pursuit.
3. The pursuit continued through Bossier City and came to an end in a parking lot at 541 E. Stoner, Shreveport, La.
4. As the white Honda entered the parking lot at 541 E. Stoner, the two occupants of the vehicle jumped out of the vehicle, as it continued to roll forward in gear, and fled from the pursuing officers on foot.
5. As the passenger exited the white Honda, Officer Boyett saw that he was armed, carrying a handgun.
6.  Canine Officer Boyett exited his police unit and gave canine Torres his command to apprehend/bite the driver, who was later identified as Trevier Perez Williams.
7. Williams fled west bound on the sidewalk between several apartment buildings towards Easy street. Officer Boyett was directly behind the suspect as Torres chased him through this area.
8. As Williams ran through the apartment complex and crossed Easy Street, he ran right into the exact area where Solomon, Jewel and A'Brianna were walking southbound on Easy Street.
9. Solomon and his daughters were walking home from a nearby location after having attended a birthday party.

10. Officer Boyett observed canine Torres pursuing Williams and make physical contact with him in the lower leg as he crossed a sidewalk, on the west side of Easy street.

11. Officer Boyett stumbled as he jumped down a retaining wall and momentarily lost sight of canine Torres and the suspect.

12. Officer Boyett heard a female voice saying "he's biting the baby". Once he regained sight of Canine Torres, he realized that Canine Torres was biting a subject other than Williams.

13. Officer Boyett, without any hesitation, hastily ran towards Canine Torres.

14. Canine Torres knocked Williams down but apparently did not bite him. Instead he transitioned to Jewel, the little girl who happened to be standing right by Williams when Torres hit him.

15. Solomon, Jewel's father, grabbed canine Torres and attempted to get him to release his daughter. Officer Boyett immediately ran to canine Torres to stop him from biting Jewel.

16. Once Officer Boyett had direct, physical control of Torres, he gave him his release command. Canine Torres released his bite and Officer Boyett pulled him away from their immediate area and called for an ambulance, for medical treatment.

17. The fire department arrived and treated Jewel's injuries and then transported her to the hospital.

V. **Professional Opinion:**

The following are my professional and expert opinions, which I will offer in this case, and the basis and reason for those opinions. My professional and expert opinions are based on the information I reviewed as well as my training, experience, expertise, education and familiarization with professional publications. It is my opinion that:

<u>Opinion #1</u>

*In my professional opinion the utilization of Canine Torres as a less than lethal force option to arrest Williams was reasonable, lawful and consistent with modern police practices, industry standards and in accordance with State and Federal Law, Bossier City Police Department's (BCPD's) General orders, Use of Force Policy and Canine Policy. Officer Boyett had NO intention of his canine partner Torres biting Jewel. Obviously, Canine Torres acted on his own with no direction from the defendant causing this unintentional bite; therefore, **the defendant is NOT responsible for violating the plaintiff's civil rights.** (refer to: Byrd v. City of Bossier, No. 14-30809, 2015 WL 5259961. At \*1 (5th Cir. Sept 10, 2015 and Montanez v. City of Orlando, 678 F. App'x 905-911 (11th Cir. 2017)*

Police Service Dogs have an important role in Law Enforcement. Their role is multi-faceted and encompasses responsibilities from public relations, education, detection of hidden odors, a static presence of deterrence and use of force options.

State and Federal Laws, individual departmental policies and procedures and various departmental guidelines govern how police service dogs are utilized on the streets and in the

Industry. Industry standards are observed by agencies that utilize canine teams in Law Enforcement.

Canines are commonly deployed to detect hidden human odor as well as other illegal substances or dangerous items such as explosives.

Their intelligence, willingness to learn and proven ability to accept and obey commands provides officers another tool to successfully complete their tasks. Their physical capabilities such as agility, speed, temperament and inherent character traits improve officers' ability to locate hidden criminals, and increase the safety of officers, the person they are searching for and citizens. Canine teams are commonly utilized in departments "Force Continuum" as less than lethal options.

Officer Boyett was employed by the City of Bossier City as a Police Officer at the time of this incident. Officer Boyett was on duty responding to calls for service via departmental policies that require them to enforce City, State and Federal laws and protect the citizens of Bossier City. While on active duty status this felonious vehicle pursuit occurred and Officer Boyett responded to the area to assist in this case.

Although this incident began as a simple, non-moving traffic offense it soon turned into an aggravated felony vehicle pursuit which is serious in nature and a threat to the safety of officers and citizens. Speed was a minimal factor during this felonious pursuit; however, Williams continued to disregard the safety of himself, his passenger, the officers pursuing him and the general public as he intentionally violated traffic laws such as stop signs, red lights and traffic flow directions thus creating the threat and level of serious crime.

At 2125 Officer Boyett and Canine Torres took over the number one or lead spot in the vehicle pursuit. This position allows the canine unit to be unimpeded in visualizing the suspect vehicle. It also allows the canine unit to quickly, visually identify a person who exits the suspect vehicle. During the pursuit Canine Torres can be heard on Officer Boyett's MVS whining and excited. This behavior is an indicator that Canine Torres is anticipating being utilized to apprehend someone inside that vehicle.

As the pursuit continues south in the 1300blk of Easy Street there is no obvious pedestrian traffic along the roadway in plain view. As the white Honda continues to evade and eventually enters the parking lot at 153 Stoner both the driver side door and the passenger side door open, confirming to the officers involved, that both subjects were preparing to exit the vehicle and continue fleeing on foot. *(Boyett Deposition, p. 86 9-25, p. 87 1-6)*

According to Officer Boyett's deposition he again visually cleared this area for any bystanders knowing he was likely going to deploy Canine Torres. As the vehicle slowed but kept moving, he observed the un-identified passenger exit the vehicle with a firearm in his hand and flee north east through the parking lot and into the apartment complex. *(Boyett MVS and Deposition page 85, 16-23)*

Simultaneously, he observed Williams exit the driver side of the vehicle and flee on foot. At this point in time, in a matter of seconds, Officer Boyett must analyze the situation and make an immediate decision. These decisions are made based on his current observations, knowledge, training and experience.

Officer Boyett knew the passenger was armed with a firearm so he must assume that the driver was armed with a firearm also. During the pursuit near the apartment complex he did not observe any obvious pedestrian traffic near the street or in the area and as the suspect vehicle entered the parking lot at 153 Stoner he did not see anyone in the area.

All that information combined along with these factors are involved in making his decision: the severity of this crime, the immediate threat posed to officers and others, the fact that both suspects were actively fleeing officers. This satisfies all the components of *Graham v. Conner, (490 U.S. 386, 394 1989) and Smith v. City of Hemet, (394 F.3d 689, 702 (9th Cir. 2005))* The facts and circumstances, which were legally relevant to the "objective reasonableness" determination, are only those that were known to the officer at the time force was used.

The imminent threat to officers and others existed because of the serious nature of the crime and knowing the suspects were armed with firearms. The facts and circumstances that were known to Officer Boyett and the potential for Williams to be armed with a weapon provided the utilization of Canine Torres without a verbal canine warning was a justified and reasonable Use of Force.

**The deployment of canine Torres was justified, lawful and in accordance with State and Federal Laws, Bossier City PD Canine Policy as well as the Bossier City PD Use of Force Policy, The Bossier City General Order and Industry Standard.** *(Crenshaw v. Lister 556, F.3d, 1282 5th Cir. 2009 and Escobar v. Montee 895, F.3d, 387, 394 5th Cir. 2018. Other References below)*

*Louisiana State Legislature: Code of Criminal Procedure*

*Art. 218.  Method of arrest without warrant*

*A peace officer, when making an arrest without a warrant, shall inform the person to be arrested of his intention to arrest him, of his authority, and of the cause of the arrest.  A private person, when making an arrest, shall inform the person to be arrested of his intention to arrest him and of the cause of the arrest.*

*The officer or private person making the arrest need not so inform the person to be arrested if the person is then engaged in the commission of an offense, or is pursued immediately after its commission or after an escape, or flees or forcibly resists before the officer or person making the arrest has an opportunity to so inform him, or when the giving of the information would imperil the arrest.*

*Art. 220. Submission to arrest; use of force*

*A person shall submit peaceably to a lawful arrest. The person making a lawful arrest may use reasonable force to effect the arrest and detention, and also to overcome any resistance or threatened resistance of the person being arrested or detained.*

*Bossier City Policies and General Orders*

*Canine Policy:*

A. *Patrol*

5. *K9 teams shall respond to and may deploy at the following,*

c) *events in progress or that have just occurred*

e) *Felony crimes in progress or that have just occurred*

C. *Use of Force Policy:*

1. *Use of specially trained police k-9s for law enforcement responsibilities constitute a real or implied use of force. In this, as in other cases, officers may only use that degree of force that appears reasonably necessary to apprehend or secure a suspect as governed by the Department's Use of Force Policy*

*Arrest Policy:*

V. *Arrest by Officer Without Warrant*

A. *A peace officer may, without a warrant, arrest a person when,*

1. *The person to be arrested has committed an offense in his presence; and if the arrest is for a misdemeanor, it must be immediately or on close pursuit*

2. *The person to be arrested has committed a felony, although not in the presence of the officer.*

IX. *Method of Arrest without a warrant*

B. *The officer making the arrest need not inform the person to be arrested if the person is then engaged in the commission of an offense, or is pursued immediately after its commission or after an escape, or flees or forcibly resists before the officer making the arrest has the opportunity to so inform him, or when the giving of the information would imperil the arrest*

*Use of Force Policy:*

*IV. Procedures*

A. *Use of Force, force of any kind shall only be used in the following circumstances,*

    1. *In self defense or in defense of innocent persons but only to the degree which is immediate and reasonable*

    2. *To effect the lawful arrest to the extent that the force is reasonable and necessary to overcome any resistance or threatened resistance of the person being arrested.*

    3. *To prevent the flight or escape from an arrest or officer may use the same force to prevent the flight or escape of a lawfully arrested person and is reasonable for the arrest*

Officer Boyett had no choice but to effect this arrest in the fastest and safest manner possible; Nevertheless, deploying Canine Torres without a verbal warning to stop Williams from fleeing was prudent, justified and acceptable under U.S. case law and industry standards. Regardless of departmental policies, no officer is required to place himself in a lethal situation by announcing his presence or immediate location to a suspect that is known to be armed. Officer Boyett stated in his deposition that he saw the passenger suspect exit the vehicle carrying a firearm and knew that he had no choice but to believe that Williams was armed also. In fact, Williams was armed.

Officer Boyett stated during the final moments of this pursuit he had not observed any bystanders outside in this area. *(reference: Officer Boyett Deposition page 123 line 4-7)* Officer Boyett advised when Canine Torres was released to apprehend Williams, he was between 65-70' away from them. Canines learn from association and repetition. Through my training/experience in this situation I strongly believe that Canine Torres exited his unit and immediately identified Williams as he fled. My experiences have been that my seasoned canine partners are watching the events unfold as the pursuit develops. Knowing that their target is inside the vehicle in front of them my canine partners are watching and waiting for the suspect

to exit that vehicle and flee on foot. Typically, an experienced canine that has been in this situation previously makes the positive identification of the fleeing suspect on his own; however, it is the handler's responsibility to ensure that the canine has made the proper target identification.

As Officer Boyett exited his unit and opened the back door for Canine Torres, he ensured that Canine Torres had positively identified Williams as his target. By listening to his verbal commands on his MVS Officer Boyett never corrected Canine Torres, he only gave him his apprehension command. These commands mean that Canine Torres correctly identified who he was commanded to pursue. This action is visually caught on Officer Provost's MVS. The recording clearly shows when Canine Torres exited the unit, he ran right beside Officer Boyett until they cleared the last private vehicle in the parking lot next to where Williams was last seen running. Officer Boyett is pointing in the direction and moving in the direction behind Williams and Canine Torres was able to make a clear visual contact with Williams.

Starting from behind Williams and the speed at which Canine Torres can reach in his pursuit created a distance between Canine Torres and Officer Boyett. As the foot chase continued outside of the apartment complex Williams crossed a public roadway and ran directly into the immediate vicinity of the Plaintiff Jewel, her father and sister. Officer Boyett saw Canine Torres run directly into Williams and knock him down. At the same time, Officer Boyett jumped off a retaining wall and he stumbled causing his view to be momentarily blocked by a parked vehicle.

In reviewing the MVS provided to me Sgt. Faulkner's MVS clearly shows Williams running across the street being chased by Torres, the physical contact between them and Williams getting knocked to the ground. Williams immediately got up and continued running in the opposite direction from Canine Torres.

Due to the immediate proximity of Jewel to the exact location where Canine Torres contacted Williams, for whatever reason, Canine Torres was not able to bite Williams and hold on to that bite: Torres transitioned and bit Jewel. There is no conclusive answer to this unfortunate incident and an exact supposition is impossible.  There are many factors that could have played a role in this incident, an awkward positional contact, reduced visual content due to darkness, confusion created by the number of people in that exact area or the suspect odor in the immediate vicinity of Jewel resulted in an accidental bite.

In reviewing the medical records provided to me, prior to this accidental bite and following the bite, there is no health reason why Canine Torres could not physically perform his duties as a police canine. BCPD goes above and beyond to ensure the health care of their canines as proven by the number of medical records and preventative care they receive.

Officer Boyett's deployment of Canine Torres was to capture, as safely as possible, an armed fleeing felon not to bite Jewel. Any thought that Officer Boyett intentionally directed or allowed Canine Torres to bite Jewel is absurd. Canine Torres had already identified, chased and contacted Williams as he was directed by Officer Boyett. Canine Torres's action after that initial contact with Williams can only be considered an accidental bite.

When Officer Boyett re-established visual contact with Canine Torres and realized he was biting someone other than Williams his complete attention went from pursuing him to removing Torres from the bite. Officer Boyett observed Solomon, Jewel's father physically grabbing Torres by the collar, lifting him of the ground and hitting him with an open hand across the top of his head. *(Boyett Deposition p. 99 11-16)*

Officer Boyett immediately ran to get physical control of Canine Torres. He grabbed Torres and gave him his out command. Officer Boyett stated when he grabbed Canine Torres the canine was not actually biting Jewel but had her by her shirt. *(Reference: Boyett Deposition page 122, line 15-22)* Officer Boyett advised Canine Torres immediately released the bite when he gave his release command and believed he was only biting Jewel for approximately three seconds. Through his training and experience Officer Boyett had the presence of mind to understand that if he had verbally called Torres off the bite from a distance, he most likely would have engaged Solomon defensively because he was attacking him. Officer Boyett's prudent and immediate response reduced the already unfortunate incident by not making it worse.

Officer Boyett secured canine Torres with his leash and after ensuring that medical services were contacted, he returned Canine Torres to his unit and secured him there. Officer Boyett also ensured that he advised Sgt. Freeman on the scene that Torres had bitten a little girl.

<u>Opinion #2</u>

*In my opinion the Bossier City Police Department has **NOT** failed to adequately train Officer Boyett and Canine Torres.*

In reviewing Officer Boyett's personal training records he was hired by the Bossier City Police Department (BCPD) in 09-2008 and I find his history of training to be extensive. He is well trained in most every aspect of Law Enforcement. He has a plethora of different training records found. This training includes internal and external training. Officer Boyett has had no disciplinary actions and two complaints in his career. Both complaints resulted in him being exonerated. This is an outstanding validation of his character and demeanor which attests to his decision-making capabilities. By all accounts and documents produce for my evaluation Officer Boyett is a conscientious and exceptional officer.

Officer Boyett was assigned to BCPD canine unit on 11-29-15 and has received volumes of training specific to police canines. Canine Torres was put into service with Officer Freeman in 2013 after they successfully completed a 120 Basic Canine Handlers Course from "Four A Canine", taught by Leroy Azlin. After reviewing all the training records from both Officer Freeman and Officer Boyett, it is abundantly clear Canine Torres and both handlers have been exposed and trained under a leading trainer in the Law Enforcement Canine Industry. The voluminous records indicate that Canine Torres is very capable of being a police service dog and highly trained. He has successfully completed courses of training with Officer Freeman and Officer Boyett.

In Leroy Azlin's deposition he states that he is an independent trainer/evaluator hired by the City of Bossier City Police Department to observe the canine units training and make any recommendations he believes are necessary for this unit. Further review of his deposition he advises that one of the areas he is always aware of is the bite ratio of each canine team. Mr. Azlin advises that the bite ratio is "I know their bite ratio is almost nil". When asked how he knows this he states, "Because they arrest a lot more people than they use the force of the dog on". He states they advised him of their arrests with their canine partners and he knows about every dog bite. *(refer Azlin depo, page 19 thru 24)*

In reviewing all the training records and utilization records of Canine Torres when he was assigned to Officer Freeman and then Officer Boyett, Canine Torres has only had five instances where he was forced to bite suspects. In correlation to the number of arrest that Canine Torres has accumulated since he went into service with the BCPD Canine unit that number is pointedly lower according to Mr. Azlin.

Mr. Azlin has a long-established career as a canine handler, trainer, supervisor and is a published author regarding canine detection training. It is abundantly clear that Bossier City Police Department has ensured their canines and handlers are trained to a very high industry standard by a competent and qualified trainer. Considerable effort and expense have been put into BCPD canine unit with regards to training and certifications.

Canine Torres was purchased from a well-known, established vendor who accepts dogs based on its natural instincts and drives, their character and temperament and other pertinent traits. The vendor or his designee's then trains the canine to an accepted level of industry standards based on the buyer's predetermined requirements. Not every canine has this ability. It is obvious that to achieve these standards Canine Torres must be very levelheaded and demonstrate an enormous amount of acceptance to be controlled by the handler.

According to BCPD Canine Policy each canine team must successfully pass a certification with a recognized National Organization that has certifications that meet or exceed industry standards. Officer Freeman and Officer Boyett have both received Patrol 2 certification with Canine Torres from the National Police Canine Association. (NPCA) Officer Freeman and Canine Torres in 2013, 2014,2015. Officer Boyett and Canine Torres received Patrol 2 certification from NPCA in 2016 and 2017.

A level 2 Patrol certification from NPCA meets an INDUSTRY BEST PRACTICE which is the highest level of certification offered for patrol canines through the NPCA. The level of control needed to achieve this certification displays the enormous amount of control Officer Boyett possess regarding Canine Torres and Canine Torres's ability to clearly understand and act on commands by Officer Boyett.

The BCPD maintains departmental Policies and Procedure Manuals for their canine unit which established guidelines for training, certifications, deployments and all facets of record keeping for their canine teams.  I have examined BCPD Canine Policy as well as their Use of Force Policy, Arrest policy and Pursuit policy. Although it appears that it has been several years since any

updates have occur in BCPD regarding their policies, BCPD maintains an above average written canine policy.

*Opinion #3*

> *In my opinion Officer Boyett did **NOT** utilize Excessive Force nor was he negligent or grossly negligent in his actions regarding the deployment of Canine Torres to apprehend /arrest Williams. Officer Boyett had a duty to act in resolving this incident as it was known to him at the time. Officer Boyett had no intention for Canine Torres to bite the plaintiff. Obviously, Canine Torres acted on his own with no direction from Officer Boyett causing this unintentional bite. (refer to: Byrd v. City of Bossier, No. 14-30809, 2015 WL 5259961. At \*1 (5th Cir. Sept 10, 2015 and Montanez v. City of Orlando, 678 F. App'x 905-911 (11th Cir. 2017) The BCPD and its canine unit follow current law enforcement standards for policies, training customs, practices and procedures and state/federal Constitutional and statutory laws.*

Being the first police unit involved in this pursuit allowed Officer Boyett the advantage of an unobstructed view of the suspect vehicle, the areas surrounding the path the pursuit took and a clear visual of both suspects as they fled from the vehicle.

To properly evaluate this matter, we must consider several factors: Through his training and experience Officer Boyett knew that the suspect vehicle had committed felonious crimes of evading in a motor vehicle and had needlessly jeopardized the lives of officers involved in the pursuit and innocent citizens that it passed or came in contact with.

As the pursuit drove around the area of 153 Stoner, the apartment complex, there were no obvious pedestrians outside in the area. Officer Boyett's and Officer Provost's MVS provides a clear view off what they observed during the pursuit. There are no bystanders visible on their MVS as the pursuit entered the parking lot at 153 Stoner. As the pursuit entered the apartment parking lot, knowing that the suspects intended to flee from the vehicle on foot, Officer Boyett had a duty to act and arrest one or both suspects if possible. As the suspects exited the moving vehicle, clearly seeing that the vehicle was still in forward motion and that the passenger was armed with a handgun Officer Boyett knew they were now faced with an imminent lethal threat and potentially a deadly foot pursuit. This elevated the threat to a higher risk for the officers involved and any unknown persons the suspects could encounter.

In Graham v. Connor, an excessive force claim is analyzed under the "objective reasonableness" standard. Objective reasonableness is determined considering the facts and circumstances confronting the officer, without regard to their underlying intent or motivation. The "reasonableness" of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight.

Police officers are taught that the potential for violence exists until the suspect has been secured with handcuffs or otherwise rendered safe. Officers are trained on a continuing basis to

evaluate each situation as it presents itself as any event could escalate into a deadly force utilization.

Officers are provided with training as well as General Orders and Operating Procedures to guide them through each situation they encounter. Their training includes Policies on departmental Use of Force situations. These force continuums clearly define each level of force how/when it can be utilized in any given situation. *In my opinion, Officer Boyett's use of force in this case was objectively reasonable and within department guidelines; Therefore, his action to deploy Canine Torres to stop the fleeing felon and prevent him from committing violence on any innocent bystander he could contact as he attempted to escape is justified and in accordance with applicable laws and industry standards.*

Once Canine Torres contacted Williams knocking him to the ground, Torres had conducted himself as he has been trained; however, due to circumstances that are not factually verifiable Canine Torres, on his own without any command or direction from Officer Boyett transitioned from Williams and bit Jewel.

Officer Boyett had NO intention of Canine Torres biting Jewel; therefore, there is NO definable claim to Excessive Use of Force. Under these circumstances, in my professional opinion, Officer Boyett was neither negligent nor grossly negligent when he deployed Canine Torres to arrest Williams. It is clearly an unfortunate, accidental bite.

When Officer Boyett realized this incident had occurred he immediately took the safest action possible to stop the bite and eliminate the opportunity for another bite. Officer Boyett's reaction to physically controlling Canine Torres before giving his verbal out command is another display of his ability to think properly according to his training and experience in a high stress situation. Knowing the possibility of another bite existed if he did not establish hands on control of Canine Torres, Officer Boyett removed that from potentially occurring.

Through my training, experience and knowledge regarding canine bites, there are two certain facts:  1. The tissue damage Jewel sustained is VERY minimal for canine Torres to have been left on the bite for an extended time, 2. A bite for an extended period of time would result in significantly more tissue destruction

I have found that tissue damage is directly related to a plethora of factors.  For example: How confident a dog bites, the age and size of the dog, the condition of his teeth, his health, the duration of the bite, the location of the bite on the body and the number of times a dog has bitten a person.  Numerous environmental factors add to or detract from the actual bite.

Canine Torres being an experienced and confident Police Service Dog that has effected the arrest on multiple suspects during his five-year career I would expect his bite to be solid and capable of significant tissue destruction when he does bite; however, in reviewing the photographs and medical records provided to me the physical injuries that Jewel sustained were minimal, superficial as stated by the attending physician. *(Refer depo of Dr. White page 20 line 7-15)* The injuries appeared to be more superficial with two small punctures and scratches. There was no sutures and minimal bleeding. In my opinion these minor injuries could relate to

the fact that Canine Torres in no manner intended on biting her. *(COLEY UH RECS, Disk 1-6 C00400 A thru F)*

Per the BCPD Canine Manual, it clearly states that "ALL" canine Use of Force events the Canine Trainer and Canine Supervisor shall be notified immediately, followed by the appropriate report and use of force report. Sgt. Gaydos was notified and responded to the scene as well as the hospital where he met several times with Solomon Cooley. Officer Boyett submitted his supplemental report and use of force report according to departmental policy. It was reviewed by the chain of command and found not to be in any violation of BCPD policies and procedures.

*In my opinion, after reviewing the facts, I find that Officer Boyett's utilization of Canine Torres as a less lethal force option to arrest Williams was reasonable, lawful, proper and in accordance with industry standards, State and Federal Laws, BCPD's Use of Force Policy and BCPD Canine Policy. Even though an accidental bite did occur there is neither direct or indirect action on his part that would indicate in any manner any form of Negligence or Gross Negligence.*

The compensation I will receive for my study and testimony in this manner is:

SCHEDULE OF FEES-Terry Anderson-2019

a. All Case Preparation: $200.00/hour
b. Any Deposition: $300.00/hour
c. Court Room Charges: 4 hours standby waiting to testify is $500.00, 8 hours standby waiting to testify is $800.00 (hours past 8 for standby testimony will be billed at case preparation rate)
d. No charges accrue once called to testify. Charges do accrue for pre-testimony and post testimony if not released from court.
e. Consultation Fee: $250.00/hour
f. Travel Time: $75.00/hour Plus $0.56/mile
g. Retainer (for Expert work only): $3,000.00 (Non-refundable)
h. Non-disclosed Case Analyst Work: $200.00/hour

VI.    **I have testified as an expert witness at trial or deposition in the preceding 5 years.**

**(refer to attached CV for further details)**

**I have provided these opinions based on the information that I have reviewed, and I reserve the right to change, amend or supplement my opinion based on additional information.**

—————————————————

**Terry Anderson – Keli's K9's**

Terry Anderson, Sgt., Pasadena Police Department (Ret.)
Canine Consultant/Trainer
Keli's K9's LLC
1566 County Road 4510
Hillister, Texas 77624
contact@kelisk9s.com
713-562-7371

## Summary

Twenty-five year law enforcement career includes seven years as a supervisor over patrol, canine unit, swat and eod units. Canine handler and swat operator for twenty years and trainer for the canine unit for twenty –two years. Five years assigned to narcotic unit with canine partner. Variety of operational responsibilities related to patrol, canine, swat and eod. Have testified multiple times in county, district and federal court cases related to canine utilizations and narcotic investigations. Prior experience as an Expert witness in canine related investigations. President of National Police Canine Association (NPCA). Previous Board Member of two Canine related Federal Boards involving Best Practices for Canine Training/Operations (SWGDOG) and Minimum Standard Explosive Canine Training and Certifications (NEDCAB). Current Member of Organization of Scientific Area Committee (OSAC) for forensic canine best practices. Affiliate of NTOA responsible for review of tactical deployments involving canine awards. Certified twice through the State of Texas as an Advanced Life Support Paramedic.

## Experience

- 2013-Present    Canine Trainer/handler and owner of Keli's K9's
                  Consultant/Trainer City of Brenham canine unit
                  President of NPCA
                  Expert witness for Canine Related Investigations
                  Member of OSAC
  Owner/trainer of business that procures, trains and provides canine services (narcotic/explosive canine searches) for LE agencies and investigations as well as train dogs for private citizens. Provide consultation and analysis of canine related cases. One of sixteen members of OSAC responsible for developing best practices for canine industry.

- 1988-2013      Sgt. Pasadena Police Department (Ret.)

  Began career in March of 1988, obtained Basic, Intermediate, Advanced and Master certifications through the State of Texas as a Police Officer. Certified through the State of Texas as aTCLEOSE Instructor. Taught Basic Life Support techniques for PPD academy as



EXHIBIT
122b

well as courses in all forms of canine discipline, tactics, tactical operations and small team tactics.

Spent a total of fifteen years on night shift patrol as a canine handler, swat operator, and later as a Sgt with my canine partner on swat. Promoted to Sgt and moved to Special Operations over canine, swat and eod. As the Sgt over these combined units I was responsible for sixty tactical operators daily assignments, training, procurements and all field operations. Training included developing course curriculums and PowerPoint presentations for all units.

Five years experience as a narcotic investigator with my canine. Extensive surveillance and search warrant experience.

Prepared and managed budgets for the canine unit, swat and for eod. Also participated in multiple grant writing/submissions that resulted in several million dollars being awarded to our agency as well as our regional, multi agency, eod team.

Teach swat operators and canine teams across the country on integrating canine teams into tactical operations successfully. (SKIDDS)

Also, I am a Vice Chairman for National Tactical Officers Association (NTOA) Awards Committee.

- 1986-1988    Paramedic for City of Baytown
  Adjunct Instructor/Preceptor for San Jacinto Jr College EMT Program

Hired as paramedic and original member of a New City Service for the Health Department of the City of Baytown. Became a shift supervisor responsible for two ambulances, vehicle maintenance, ER relations, four personnel and equipment inspection.

**Education**

- 1982            Graduated HighSchool
- 1983-1984    Two Year Athletic Scholarship to Alvin Community College
- 1984-1986    Enrolled San Jacinto Jr College (SJJC) EMT Program
- 1986-1988    SJJC Diver Medic Program and Commercial Underwater Welding Program

Post high school graduation, I entered the work force in construction and painting, then decided to return to school. Received athletic scholarship and utilized one of two years and decided to pursue a first responders career with the intent to become a firefighter-paramedic. While obtaining Basic Certifications for EMT, I became a local volunteer firefighter. As I advanced in EMT certifications my career goals changed as I developed a deeper interest in the commercial diving field and was able to combine both fields by becoming a Certified Commercial Diver and paramedic-diver medic.

**Certification**    Texas Commission on Law Enforcement

- Basic, Intermediate, Advanced and Master LE Certifications
- Successfully completed Basic Supervisory Course at Sam Houston State University
- Basic through Advanced Swat operator
- Numerous tactical certifications with weapons, less lethal, breaching, armored vehicle operations and explosive entry
- Previously Certified as a Paramedic by the State of Texas
- Certified Basic Open Water Sport Dived
- Certified Commercial Diver in deep dives, chamber operations and mixed gases
- Co-owner of Keli's K9's licensed through the State of Texas #C03041801
- President and Life Time Member of NPCA

**Interest/Skills**

- Currently handle our own detection canine teams that conduct private searches for narcotics and explosives.
- Train dogs for LE in Detection and Patrol that includes all aspects of control and aggression bite work. As well as basic through advance obedience for private citizen owned canines.
- Hunting, fishing, horseback riding, hiking, riding motorcycles and RVing.
- Attend the Non-Denominational (Christian) Church, Elim, that I grew up attending.
- Thirteen years experience as President of NPCA managing a 501 © 3, non-profit organization, with a two hundred thousand dollar a year budget, an executive board of nine board members and overseeing all daily operations as well as problem solving organization issues across this country. NPCA is responsible for training/certifications of our members.

References available on request

**Terry Anderson, CV**